UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DALE LLOYD COTTRELL, | ) | 1:04-cv—05943-SMS-HC |
| | ) | |
| Petitioner, | ) | ORDER DIRECTING THAT P. D. |
| | ) | BRAZELTON, ACTING WARDEN OF |
| | ) | PLEASANT VALLEY STATE PRISON, BE |
| v. | ) | SUBSTITUTED AS RESPONDENT |
| | ) | PURSUANT TO FED. R. CIV. P. 25(d) |
| ROBERT H. TRIMBLE, et al., | ) | |
| | ) | ORDER DISMISSING PETITIONER'S |
| Respondents. | ) | STATE LAW CLAIM CONCERNING |
| | ) | APPOINTMENT OF COUNSEL |
| | ) | |

ORDER DENYING THE FIRST AMENDED
PETITION FOR WRIT OF HABEAS
CORPUS (Doc. 58)
AND DIRECTING ENTRY OF JUDGMENT
FOR RESPONDENT

ORDER DENYING PETITIONER'S
REQUESTS FOR EVIDENTIARY HEARING
AND DNA TESTING

ORDER DECLINING TO ISSUE A
CERTIFICATE OF APPEALABILITY

Petitioner is a state prisoner proceeding pro se and in forma pauperis with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to the parties' consent and the subsequent order of the Court filed on February 25, 2005, the matter has been referred to the Magistrate Judge for all

proceedings, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73(b), and Local Rule 301. Pending before the Court is the first amended petition (FAP) for writ of habeas corpus, filed on September 26, 2007 (doc. 58).

I.   Jurisdiction and Substitution of Respondent

Because the petition was filed after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the AEDPA applies in this proceeding.  Lindh v. Murphy, 521 U.S. 320, 327 (1997), cert. denied, 522 U.S. 1008 (1997); Furman v. Wood, 190 F.3d 1002, 1004 (9th Cir. 1999).

A district court may entertain a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court on the ground that the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. §§ 2254(a), 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000); Wilson v. Corcoran, 562 U.S. –, –, 131 S.Ct. 13, 16 (2010) (per curiam).

Plaintiff claims that in the course of the proceedings resulting in his conviction, he suffered violations of his Fifth, Sixth, and Fourteenth Amendment rights.  Thus, violations of the Constitution are alleged.

Further, the conviction challenged arises out of the Madera County Superior Court (MCSC), which is located within the jurisdiction of this Court.  28 U.S.C. §§ 2254(a), 2241(a), (d).

On February 4, 2005, Respondent's counsel filed a notice of appearance for Respondent James A. Yates, Warden of PVSP. Petitioner had thus named as a respondent a person who had custody of the Petitioner within the meaning of 28 U.S.C. § 2242

2

and Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts (Habeas Rules).  See, Stanley v. California Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994).

Reference to the Adult Facilities Locator on the official website of the California Department of Corrections and Rehabilitation (CDCR) reflects that currently, P. D. Brazelton is the Acting Warden of PVSP.  Fed. R. Civ. P. 25(d) provides that a court may at any time order substitution of a public officer who is a party in an official capacity whose predecessor dies, resigns, or otherwise ceases to hold office.  The Court therefore concludes that P. D. Brazelton, Acting Warden of the Pleasant Valley State Prison, is an appropriate respondent in this action, and that pursuant to Fed. R. Civ. P. 25(d), he should be substituted in place of James A. Yates.

In summary, the Court concludes that it has jurisdiction over this action and over Respondent Brazelton.

II.  Procedural Summary

Petitioner is incarcerated at Pleasant Valley State Prison (PVSP), located in Coalinga, California, pursuant to a judgment of the Superior Court of California, County of Madera, of conviction following a jury trial of second degree murder (Cal. Pen. Code § 187(a)) with personal use of a firearm (Cal. Pen. Code §§ 1203.06(a)(1), 12022.5(a)).  (Clerk's Transcript (CT), LD[1] 17, 30.)

An initial preliminary hearing was held on February 18, 1998, at which Petitioner was represented by David Smothers.

---

[1] "LD" refers to documents lodged by Respondent.

(Unpaginated Supplement to habeas corpus petition [HC2, Cal. Supreme Ct. no. S115848] received Jan. 27, 2004, mot. to set aside information pursuant to Cal. Pen. Code § 995 at 2.)  A motion to set aside the information made by Mr. Smothers was granted.  (Id., decl. of David Smothers, Esq., dated April 30, 1999.)  A second preliminary hearing was held on September 11, 1998, and Petitioner was held to answer.  (LD 19.)

The trial commenced on January 19, 1999, and concluded on January 22, 1999.  (RT (LD 20-21) 6, CT 30.)  On June 18, 1999, the trial court denied a motion for a new trial in which Petitioner challenged the adequacy of his trial counsel's investigation and performance at trial.  The ineffective assistance claim was based on counsel's alleged failure to 1) investigate and present forensic evidence, and 2) contact, investigate, and present as a witness Michael Avila, who could have testified to potentially impeaching statements made by a jailhouse informant, Rudy Sanchez, who had testified to Petitioner's extra-judicial admissions at Petitioner's trial.

On June 18, 1999, the court sentenced Petitioner to fifteen (15) years to life for second degree murder plus four (4) years for the personal use of a gun.  (CT 206-208.)  The four-year enhancement was stricken on June 25, 1999.  (CT 210.)

Petitioner appealed to the California Court of Appeal, Fifth Appellate District (DCA) (no. F033539) on the grounds argued in the motion for a new trial, namely, that he had been denied his right under the Sixth and Fourteenth Amendments to the effective assistance of counsel.  (Appellant's Opening Brief (AOB), LD 1, 12-18.)  During the pendency of the direct appeal in February

4

2001, Petitioner filed in the DCA a petition for writ of habeas corpus (no. F037604, HC1-DCA pet., LD 4 as supplemented on October 7, 2010) in which he raised the issues presented in the appeal concerning the ineffective assistance of trial counsel. Further, in the collateral proceeding, Petitioner presented statements from third parties that the informant, Rudy Sanchez, had recanted his testimony and had stated that he had been cooperating with the authorities in exchange for not being prosecuted for having used drugs during his incarceration in jail. (LD 5.) The DCA affirmed the conviction and denied the habeas petition in an opinion (DCA OP) on October 19, 2001. (Pet., Exs. Vol. II (doc. 3) Exh. ["Page"] I.)

Review by the California Supreme Court was summarily denied on January 3, 2002. (No. S102217, Pet., Ex. II (doc. 3).)

Petitioner commenced a second round of habeas review by filing on January 16, 2003, in the Madera County Superior Court (MCSC) a second habeas corpus petition (case no. CV 19645, HC2-MCSC, LD 8) in which he raised the issues he had raised in the first habeas petition filed in the DCA as well as ineffective assistance of trial and appellate counsel for failure to investigate and argue a violation of Petitioner's Fifth, Sixth, and Fourteenth Amendment rights with respect to pretrial statements of Petitioner (admitted without objection at trial) alleged to have been involuntary and obtained without the appropriate Miranda protocol. (LD 8.) In support of the Madera petition, Petitioner submitted jail and hospital records. (Id.) The MCSC found insufficient justification for renewal of the issue of ineffective assistance of trial counsel on habeas

corpus, citing to In re Harris, 5 Cal. 4th 813, 825, 829 (1993).
The MCSC further stated that with respect to appellate counsel,
Petitioner had failed to show entitlement to relief by a
preponderance of the evidence.  (Pet., Exs. Vol. II (doc. 3), Ex.
III; Att. to FAP (doc. 59), 121-22.)

    Petitioner continued his second round of state habeas by
filing a habeas petition in the DCA (no. F042700) on March 23,
2003, raising the ineffective assistance of appellate counsel for
not having raised claims of trial counsel's ineffectiveness,
including the claims relating to Petitioner's pretrial
statements, as well as a due process violation by the prosecution
by failing to provide evidence regarding the informant pursuant
to Brady v. Maryland, 373 U.S. 83 (1963).  (HC2-DCA, LD 10.)  The
petition was denied on April 3, 2003, without a statement of
reasoning or authority.  (Doc. 59, 124.)

    Petitioner completed his second round of state habeas by
filing a petition for writ of habeas corpus in the California
Supreme Court on May 14, 2003, in which he raised the ineffective
assistance of appellate counsel, the Brady issue, and admission
of statements that were involuntary in violation of due process
and obtained without Miranda protections.  (Case no. S115848,
HC2-CASC, LD 11.)

    The record filed in this Court, including the California
Supreme Court's docket as well as Respondent's supplementation
and correction of the record filed in 2010, reflects that
Petitioner filed numerous documents in the action, including an
application to supplement the petition "Received" on August 7,
2003 (LD 12, 1; LD 14); a supplement to the petition to verify a

previous supplement "Received" on January 12, 2004 (lodged as LD 31 by Respondent on October 7, 2010; LD 14); a memorandum to "CLARIFY MINOR CLERICAL 'NUMERICAL' MISLAYS IN SUPPLEMENT HABEAS CORPUS," "Received" on January 27, 2004 (lodged as LD 33 by Respondent on October 7, 2010; LD 14); supplemental exhibits to the petition "Received" on January 27, 2004 (lodged by Respondent as LD 32 on October 7, 2010; LD 14); a supplement to amend the petition and memorandum in support "Received" on February 2, 2004 (LD 13, LD 14); and Petitioner's application to supplement and to amend the petition "Received" on February 2, 2004 (lodged by Respondent as LD 34 on October 7, 2010; LD 14).

In his supplemental filings, Petitioner raised the following issues: 1) allegedly ineffective assistance of trial counsel by failing to investigate and present exculpatory forensic evidence in the form of an opinion of Stephen O'Clair, Senior Criminalist of the California department of Justice (DOJ), that the presence of the casing left in the chamber of the gun indicated a self-inflicted gunshot wound (LD 12, 13); 2) allegedly ineffective assistance of trial counsel in failing to present results of gunshot residue tests run on the victim as interpreted by Steven Dowell, a research criminalist, who found that the victim might have discharged a firearm or had her hands otherwise in an environment of gunshot residue, which Petitioner argued tended to show a self-inflicted wound (LD 12, 13); 3) allegedly ineffective assistance of trial counsel based on the failure to hire an expert to examine all the evidence, as Joseph Orantes, an expert hired for the motion for a new trial, had done and had concluded that the victim died of a self-inflicted contact wound (LD 12,

7

13); 4) allegedly ineffective assistance of trial counsel based on the failure to investigate and call Michael Avila as a witness to impeach Sanchez, the jailhouse informant (LD 12, 13); 5) a violation of Petitioner's Fifth and Fourteenth Amendment rights by the prosecution's failure to disclosed material favorable evidence, including a report concerning Sanchez's possession of cocaine in jail that provided a basis for a finding of bias, motive, and interest of Sanchez in testifying against Petitioner (LD 12, 13); 6) violation of Petitioner's rights to a fair trial and due process based on use of involuntary statements and statements made without <u>Miranda</u> warnings (LD 12, 13); 7) cumulative error based on violations of Petitioner's rights to due process, equal protection, fair trial, and effective assistance of trial counsel in violation of the Fifth, Sixth, and Fourteenth Amendments (LD 12, 13, 33); 8) allegedly ineffective assistance of trial counsel in failing to move to exclude Petitioner's pretrial statements (LD 12, 33); 9) allegedly ineffective assistance of appellate counsel in failing to raise issues concerning trial counsel's ineffective assistance, <u>Brady</u> error, and admission of Petitioner's post-trial statements (LD 12, 33); 10) cumulative error (LD 12, 33); and 11) insufficiency of the evidence to support the conviction (LD 13, 40).

Petitioner submitted in the supplemental filings the declaration of Stephen J. O'Clair and his summary report; Steven Dowell's report; the declaration and analysis of forensic analyst Joseph M. Orantes; the declaration of David Smothers; the declarations of Cheri Bodle and Steven Rosenlind; documents allegedly written by, or written upon by, the informant, Rudy

Sanchez; reports from the Madera County Jail; and medical records from the hospital.  (LD 12, 32.)  Other exhibits were found in the original habeas petition filed in the action before the California Supreme Court.  (LD 12.)

The Supreme Court denied the petition on June 16, 2004, without a statement of reasoning or authority.  (Doc. 59 [S115848], 126; LD 14 (our docket doc. 17), 2.)

Petitioner filed the original petition in this Court on July 7, 2004, and Respondent filed a motion to dismiss on February 4, 2005, arguing that Petitioner had failed to exhaust his claims that his Fifth, Sixth, and Fourteenth Amendment rights had been violated by use of his involuntary statements.  On March 29, 2005, the Court ruled that the record before the Court did not show that the California Supreme Court had failed to consider supplemental materials submitted to it in which the issue was raised; thus, the claims had been exhausted.

Respondent filed an answer on June 14, 2005.  The matter was stayed from December 2, 2005, through October 16, 2007, to permit Petitioner to undertake further state court proceedings.

Petitioner commenced a third round of state habeas proceedings by filing a petition for writ of habeas corpus in the MCSC on November 3, 2005.  (HC3-MCSC, doc. 36, 6 through doc. 36-1, 59.)  On November 8, 2005, the MCSC ordered the Attorney General of the State of California to file a return to the petition, in which the court stated that Petitioner claimed 1) the prosecution withheld exculpatory evidence; 2) his attorney was ineffective for failing to request discovery and for failing to investigate the jailhouse informant; and 3) the cumulative

1  effect of several errors deprived Petitioner of due process and

2  resulted in a miscarriage of justice. (LD 23.)  Respondent filed

3  an answer (LD 24), and Petitioner filed a traverse and two

4  amended traverses (LD 25-27).

5     By order dated October 27, 2006, and docketed on November

6  20, 2006, the MCSC denied the petition and made specific

7  findings. (LD 28.)  It found that Petitioner had not alleged

8  sufficient facts to justify piecemeal presentation of successive

9  and/or delayed claims, and thus the petition was denied. (LD 28,

10 2.)  As to Brady error predicated on the prosecution's failure to

11 disclose that 1) the informant worked for the prosecution, was

12 wearing a wire, and was recording his conversations, and 2) a

13 state crime lab report indicating there were no spermatozoa on a

14 prepared slide from the murder victim's vaginal swab, the court

15 found that Petitioner had not presented a verified, specific

16 evidentiary basis for relief regarding the informant, and the

17 evidence was insufficient to establish that the prosecution

18 failed to disclose the lab report; even if not disclosed, the

19 report would not have had any effect on the credibility of

20 Petitioner's statements or other physical evidence that showed

21 that Petitioner had sex with the victim shortly before she was

22 killed; additional equivocal evidence that Petitioner might not

23 have had sex with the victim was not material. (LD 28, 2.)

24 Trial counsel's failure to discover recordings of Sanchez's

25 conversations had not been shown to be prejudicial, and

26 Petitioner's claim concerning counsel's failure to obtain

27 information that the informant was in possession of drugs in jail

28 in 1997 was untimely and had previously been rejected. (Id.)  The

10

claim of cumulative error was rejected because the court had found no legal error and concluded that Petitioner's factual allegations lacked credibility.  (Id. at 3.)

On November 16, 2006, Petitioner continued with his third round of state habeas by filing a petition for writ of habeas corpus in the DCA (HC3-DCA) in which he raised the claims he had raised in the MCSC.  (LD 29.)  The DCA denied the petition and stated, "Petitioner is filing piecemeal petitions and the issue of Brady v. Marilyn (sic) (1963) 373 U.S. 83, is without merit.  (In re Clark (1993) 5 Cal.4th 750, 767-68.)" (LD 29.)

Petitioner filed a petition for review in the California Supreme Court on April 23, 2007.  (LD 30.)  On June 13, 2007, the Supreme Court denied the petition without a statement of reasoning or citation of authority.  (LD 30.)

In September 2007, Petitioner filed in this proceeding the first amended petition (FAP) (doc. 58) with attachments (doc. 59) that is presently pending before the Court.  In October 2007, the stay of this action was vacated, and a response to the petition was ordered to be filed.  Respondent filed an answer to the FAP on June 5, 2008, in which it was admitted that most of Petitioner's grounds or claims were exhausted, none of the grounds was entirely procedurally barred or barred by non-retroactivity, and the petition was not barred by the statute of limitations.  (Doc. 75, 4.)  Petitioner filed a traverse on August 18, 2009.  (Doc. 98.)

In response to directions from the Court, Respondent filed on October 7, 2010, corrections to the answer and a supplemental notice of lodging with respect to the petition filed in the

11

California Supreme Court during the second round of state habeas proceedings.

III.   <u>Standard of Decision and Scope of Review</u>

Title 28 U.S.C. § 2254 provides in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Clearly established federal law refers to the holdings, as distinguished from the dicta, of the decisions of the Supreme Court as of the time of the relevant state court decision. <u>Cullen v. Pinholster</u>, - U.S. -, 131 S.Ct. 1388, 1399 (2011); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71 (2003); <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000).  It is thus the governing legal principle or principles set forth by the Supreme Court at the pertinent time.  <u>Lockyer v. Andrade</u>, 538 U.S. 71-72.

A state court's decision contravenes clearly established Supreme Court precedent if it reaches a legal conclusion opposite to, or substantially different from, the Supreme Court's or concludes differently on a materially indistinguishable set of facts.  <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000).  The state court need not have cited Supreme Court precedent or have been aware of it, "so long as neither the reasoning nor the

1  result of the state-court decision contradicts [it]."  <u>Early v.</u>
2  <u>Packer</u>, 537 U.S. 3, 8 (2002).  A state court unreasonably applies
3  clearly established federal law if it either 1) correctly
4  identifies the governing rule but then applies it to a new set of
5  facts in a way that is objectively unreasonable, or 2) extends or
6  fails to extend a clearly established legal principle to a new
7  context in a way that is objectively unreasonable.  <u>Hernandez v.</u>
8  <u>Small</u>, 282 F.3d 1132, 1142 (9th Cir. 2002); <u>see</u>, <u>Williams</u>, 529
9  U.S. at 407.  An application of clearly established federal law
10  is unreasonable only if it is objectively unreasonable; an
11  incorrect or inaccurate application is not necessarily
12  unreasonable.  <u>Williams</u>, 529 U.S. at 410.

13       A state court's determination that a claim lacks merit
14  precludes federal habeas relief as long as it is possible that
15  fairminded jurists could disagree on the correctness of the state
16  court's decision.  <u>Harrington v. Richter</u>, 562 U.S. -, 131 S.Ct.
17  770, 786 (2011).  Even a strong case for relief does not render a
18  state court's conclusions unreasonable.  <u>Id.</u>  In order to obtain
19  federal habeas relief, a state prisoner must show that the state
20  court's ruling on a claim was "so lacking in justification that
21  there was an error well understood and comprehended in existing
22  law beyond any possibility for fairminded disagreement."  <u>Id.</u> at
23  786-87.  The standards set by § 2254(d) are "highly deferential
24  standard[s] for evaluating state-court rulings" which require
25  that state court decisions be given the benefit of the doubt, and
26  the Petitioner bear the burden of proof.  <u>Cullen v. Pinholster</u>,
27  131 S. Ct. at 1398.

28       In assessing under section 2254(d)(1) whether the state

court's legal conclusion was contrary to or an unreasonable

application of federal law, "review... is limited to the record

that was before the state court that adjudicated the

claim on the merits." Cullen v. Pinholster, 131 S. Ct. at 1398.

Evidence introduced in federal court has no bearing on review

pursuant to § 2254(d)(1). Id. at 1400. Further, 28 U.S.C.

§ 2254(e)(1) provides that in a habeas proceeding brought by a

person in custody pursuant to a judgment of a state court, a

determination of a factual issue made by a state court shall be

presumed to be correct; the petitioner has the burden of

producing clear and convincing evidence to rebut the presumption

of correctness.

> IV. Admission at Trial of Petitioner's Pretrial Statements
> in Violation of Petitioner's Fifth, Sixth, and
> Fourteenth Amendment Rights

> A. Introduction

Petitioner was convicted of having murdered Cathy Bonham,

who died on the night of November 24, 1997, in Petitioner's

presence and in his car of a gunshot wound inflicted at close

range with a gun registered to Petitioner. (RT (LD 20-21) 8-9,

20-22.) There were no other eye-witnesses. Petitioner did not

testify at trial, but law enforcement officers testified

concerning extra-judicial statements made by Petitioner to them

after Bonham's death.

Petitioner argues that introduction of these statements at

trial violated his rights under the Fifth, Sixth, and Fourteenth

Amendments of the Constitution. He argues that some of the

statements were involuntary or coerced because of his mental and

medical condition, ingestion of medications and intoxicants, and

1   law enforcement officers' alleged use of coercive tactics.   He

2   contends that some of the statements were taken in violation of

3   the requirements of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

4                    B.   <u>Decision on the Merits to Be Reviewed</u>

5        In deciding the appropriate deference to be given to a state

6   court decision, it must be determined whether the claim was

7   adjudicated on the merits within the meaning of 28 U.S.C.

8   § 2254(d), which limits habeas relief with respect to "any claim

9   that was adjudicated on the merits in State court

10  proceedings...."   A state has adjudicated a claim on the merits

11  within the meaning of § 2254(d) when it decides the petitioner's

12  right to relief on the basis of the substance of the

13  constitutional claim raised, rather than denying the claim

14  because of a procedural or other rule precluding state court

15  review of the merits.   <u>Lambert v. Blodgett</u>, 393 F.3d 943, 969

16  (9th Cir. 2004).

17       A state court's denial of habeas relief without a statement

18  of reasons is presumed to have been adjudicated on the merits in

19  the absence of any indication or state law procedural principles

20  to the contrary.   <u>Harrington v. Richter</u>, 131 S.Ct. at 784-85.

21  The presumption may be overcome when there is reason to think

22  some other explanation for the state court's decision is more

23  likely.   <u>Id.</u> at 785.   Where a petitioner has failed to show that

24  the California Supreme Court's decision did not involve a

25  determination of the merits of his claim, a summary denial of

26  relief will thus be considered to be an adjudication on the

27  merits.   <u>Id.</u>

28       Here, Petitioner's substantive claims concerning the

admission of his pretrial statements were raised before the
California Supreme Court.  In denying the motion to dismiss these
claims that was previously filed by Respondent in this action,
this Court determined that Petitioner had presented the claims to
the California Supreme Court in his second round of habeas corpus
proceedings (HC2-CASC) in supplements to the petition that were
stamped "Received."  (Doc. 22, 5-7.)  In the ruling on
Respondent's motion to dismiss, this Court stated that whether
the California Supreme Court actually ruled on Petitioner's
claims was unclear.  (Doc. 22, 6.)

The California Supreme Court denied the petition for writ of
habeas corpus on June 16, 2004, without a statement of reasoning
or authority.  The decision of the California Supreme Court was
not limited to procedural points and purported to be a decision
on the petition as a whole.  The Court concludes that it has not
been shown that the California Supreme Court's decision did not
involve a determination of the merits of Petitioner's claims.
Pursuant to Harrington v. Richter, 131 S.Ct. at 784-85, it is
concluded that the summary denial of Petitioner's petition (HC2-
CASC) constituted an adjudication on the merits within the
meaning of 28 U.S.C. § 2254(d)(1).

The California Supreme Court's denial of the petition for
writ of habeas corpus on June 16, 2004, without a statement of
reasoning or authority, was the last decision concerning
Petitioner's pretrial statements.  Where a state court has
reached a decision on the merits but provides no reasoning for
the decision, the Court will review the record to determine
whether the state court decision was objectively unreasonable.

<u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1402.   The petitioner still has the burden to show that there was no reasonable basis for the state court to deny relief.   <u>Harrington v. Richter</u>, 131 S.Ct. at 784.   The correct analysis has been described by the Supreme Court as follows:

> [A] habeas court must determine what arguments or theories... could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

<u>Cullen v. Pinholster</u>, 131 S.Ct. at 1402 (citing <u>Harrington v. Richter</u>, 131 S.Ct. at 786).

Accordingly, this Court will review the record to ascertain whether or not the California Supreme Court's decision denying habeas relief on the claims was objectively unreasonable.

  C. <u>Facts</u>

Petitioner relies on facts contained in the reporter's transcript, the transcript of the preliminary hearing, the supplemental clerk's transcript, and hospital records.   (FAP 20-22, 40-42, 65-69.)   Petitioner likewise relied on these sources in the pertinent proceeding (no. S115848) before the California Supreme Court.[2]

The trial transcript reflects the testimony of Madera County Sheriff's Office Community Service Officer Diana Rankin, who on November 25, 1997, at approximately 3:18 a.m., received a 9-1-1 telephone call from Petitioner, who asked that officers be

---

[2] Respondent states that Petitioner did not provide a copy of the transcript of the first preliminary hearing to the California Supreme Court.   (Doc. 75 p. 33, n. 17.)   The Court notes that Petitioner did cite to several pages of the transcript in a recounting of the pertinent facts set forth in the petition (HC2 [LD 11], pp. 16-19 (citing to pp. 20-23) as well as in an unpaginated, supplemental document received by the California Supreme Court on January 27, 2004 (correction to the answer lodged in this Court on October 7, 2010).

dispatched to his home.  (RT 18-19.)

### 1. <u>Petitioner's Statement to Deputy Campbell at Petitioner's Home (First Statement)</u>

Madera County Deputy Sheriff Tolbert Campbell, Jr., testified at trial that upon being dispatched on November 25, 1997, for a possible suicide victim in a car, he arrived at Petitioner's residence at approximately 4:09 a.m.  He found a dead female dressed in a long sweater that extended below the waist with nothing underneath; she was in the passenger seat of Petitioner's car, which was located at the back of Petitioner's residence.  (RT 20-22.)  A black plastic pistol was observed beside the decedent's left hip.  (RT 35.)

Deputy Campbell smelled alcohol on Petitioner and observed slowness or sluggishness in his actions and talking, but the officer did not consider Petitioner to be under the influence at that point.  Petitioner was lucid and was able clearly to articulate and to explain himself; he could talk coherently, pronounce words correctly, and follow a train of thought, although at times he seemed anxious, and the volume of his voice went up and down.  He did seem to meditate or think about the answers to questions before answering.  (RT 23-24, 32.)

Later in the conversation, Petitioner admitted that he was using prescription medication, and he had consumed a six-pack of beer in his car.  (RT 24, 26, 32.)  Petitioner said that the medication was Elavil, which he had taken for nine years; Petitioner remarked that he was very tolerant of its effects. (RT 39-40.)  The deputy did not see Petitioner directly put medication in his mouth, but he did see Petitioner take an

18

unknown number of pills out of a bottle of medication handed to
him by the deputy.  Petitioner had taken a nap before he took the
medication, but Campbell denied that Petitioner passed out.  When
Petitioner awoke, Campbell noted in a report prepared within
twenty-four hours of the incident that Petitioner was anxious and
shaking uncontrollably.  He also noted that the odor of alcohol
was strong, Petitioner seemed sluggish, and he was confused about
the timing of events.  (RT 32, 38.)

When the deputy asked Petitioner to explain the
circumstances of Bonham's death and to start early in the evening
with respect to the incident, Petitioner said that on the twenty-
fourth between 8:30 and 9:00 p.m., he had consumed a pitcher of
beer at the Raymond General Store.  His daughter informed him by
telephone at about 10:30 pm. that she had spoken by telephone
with Cathy Bonham, who wanted Petitioner to call her.  (RT 24-
25.)  Petitioner called Bonham, declined her offer to come visit
Petitioner, and told her that he wanted to be alone.

On his drive home, Petitioner stopped at a gate two miles
south of his home, parked, and sat for about twenty minutes while
drinking beer and writing a suicide letter to Connie, his
estranged wife.  (RT 24-26.)  Bonham pulled up in her car, came
up to his window, and began talking, but Petitioner told her to
leave him alone, and he started up his car and drove about a
quarter of a mile into a gated area.  Bonham followed him, parked
behind his car, exited her car, opened the passenger door of
Petitioner's car, and sat down in the passenger side of
Petitioner's car.  Petitioner ignored her, continued writing and
drinking, and eventually picked up a gun that was lying in his

1  lap.  (RT 25-26.)

2    Petitioner told Campbell that he pushed the magazine release
3  button, let the magazine drop out about a quarter of an inch,
4  pulled the slide to the rear, released the slide back forward,
5  pushed the magazine back up into the back of the pistol, put the
6  gun to his head, and stated, "I want to die.  I really want to
7  die."  (RT 36.)  He then pulled the trigger; nothing happened
8  because the weapon was empty at that point, and since nothing had
9  been put in the chamber, it just clicked.  (RT 27.)  He repeated
10  the process and again put the gun to his head, when Bonham
11  reached over, took the weapon from him, pulled the slide back on
12  the weapon and chambered a round, let it go forward, placed the
13  gun to the left side of her head with her left hand, stated, "I
14  want to die, too," and pulled the trigger; the gun discharged,
15  and Bonham slumped into the seat.  (RT 27-28, 36.)

16    When Campbell asked Petitioner to explain the story again,
17  Petitioner said that Bonham put the gun directly to her head;
18  Petitioner omitted from his statement the fact that she had
19  pulled the slide to the rear and chambered the round.  (RT 37.)
20  He also said that he got the gun from the center console of his
21  car instead of from his lap.  (RT 37.)

22    Petitioner told Campbell that fear caused him to drive out
23  of the property to the gate and then to return to the decedent's
24  car to try to drive it out of the property, but he could not
25  drive both vehicles, so he drove his car home.  He paced for a
26  while, called his estranged wife, tried to cover the body with a
27  sheet from his bed but decided that it did not look right, and
28  threw out the sheet.  (RT 29.)

1    Campbell was somewhat confused by Petitioner's account
2  because most people are not left-handed, and most women do not
3  commit suicide by shooting a weapon.  (RT 33-34.)

4    The deputy initially took Petitioner to the Madera County
5  Sheriff's Department, where Campbell observed that Petitioner was
6  unsteady on his feet, and his speech was slurred; it was
7  necessary to assist Petitioner out of the vehicle.  At that
8  point, Campbell believed that Petitioner needed medical
9  attention, so he took Petitioner to the Madera Community
10  Hospital.  (RT 39.)

11    Petitioner alleged in the petition before the California
12  Supreme Court that when officers began to arrive on November 25,
13  he was still in shock and unaware of the passage of time.  He was
14  immediately detained in custody and guarded by officers, deprived
15  of his freedom of action in every significant way, and not
16  allowed to use his phone to call family or anyone for medical or
17  legal help.  (LD 11, 4.)  He had begged on the 9-1-1 call not to
18  talk about the incident any more.  (LD 11, 4.)  Further, Deputy
19  Campbell had Petitioner repeat his statements many times and had
20  him back up to different parts of his statements, which confused
21  Petitioner.  Petitioner alleged that his "nap" at his home was
22  actually an instance of his having passed out from an overdose of
23  Elavil.  (LD 11, typed p. 18; LD 12, 10.)  He alleged that it was
24  obvious that he needed medical attention and had been suicidal
25  earlier in the night, but they allowed him to take more
26  medication.  (LD 11, typed p. 19.)  Petitioner alleged he was
27  detained on the floor in his house in one spot while being
28  guarded by officers.  (Id. at typed pp. 19, 21.)  Officers used

leading questions, fed him suggestions, backed up the narrative, and badgered him.  (Id. at typed p. 21.)

### 2. Statement to Detective Michael Molsbergen at Petitioner's House (Second Statement)

Detective Michael Molsbergen of the Madera County Sheriff's Office testified at trial that he arrived at Petitioner's house on November 25, 1997, at about 6:15 a.m.  Deputy Campbell was still at the scene, which had been secured by additional officers.  In the daylight Molsbergen observed Petitioner's car and the decedent; he confirmed Deputy Campbell's observations and further discovered a set of the decedent's car keys looped around the decedent's right thumb and a pair of shoes on the right floorboard near her feet.  (RT 41-44, 63.)

Molsbergen went to the house to talk to Petitioner, who was asleep.  Molsbergen woke him up, but it was not easy because Petitioner was kind of groggy.  Right after Petitioner awoke, he was not well oriented, his mannerisms were sluggish, and his sense of time was not very good.  He took two to four minutes to get his bearings; then between 6:30 and 7:00 a.m., the detective initiated an interview and spoke with Petitioner in his living room.  (RT 48-49, 101-02.)  The detective could not recall if he smelled alcohol on Petitioner.  (RT 101.)

Early in the conversation, Petitioner told Molsbergen and Detective Bump, who was also present, that the decedent had tutored Petitioner's daughter, Jasmine.  Petitioner said that while he was at the Raymond General Store drinking beer, he had discussed with Bonham the possibility of her coming up to Petitioner's place.  (RT 50.)

When asked what happened, Petitioner said he had parked at the gate of property owned by Don English while feeling very depressed.  He was writing a suicide note when Bonham arrived and got in the car.  (RT 49-51.)  Petitioner said he picked up his pistol, which he kept in the car, released the magazine of the gun, lowered it slightly from the locked position, pulled the slide back, released it, put the firearm to his own head, and pulled the trigger; the gun did not fire.  Petitioner again pulled the slide, cocked the weapon, and put the gun to his head. Subsequently Bonham took the weapon from his hand and told him that he was not the one who should kill himself; rather, it was she.  Petitioner told Bonham not to, but Bonham put the gun to her head, pulled the trigger, and the gun went off.  (RT 51-52.)

In a panic, Petitioner drove to his house, arrived somewhere between 12:00 and 1:00 a.m., and called 9-1-1.  (RT 52.) Molsbergen testified that the original 9-1-1 call came in about 3:20 a.m.  Petitioner also said that he called his wife.  (RT 52-53.)

Molsbergen saw that the bed in Petitioner's bedroom was devoid of sheets, blankets, or coverings of any kind, and there were no sheets in the dryer.  When asked what happened to the bedding, Petitioner said he had burned it in a rock-lined barbecue pit by his house because although he had intended that the bedding cover the victim in case Jasmine came outside, it did not work very well, so he burned it.  Molsbergen found some pieces of satin in the fire pit.  (RT 53-54.)

            3.   Statement to Detective Molsbergen at
                 the Hospital (Third Statement)

Molsbergen testified at trial that on November 26, 1997, at 1:15 a.m. at the hospital, he had a second conversation with Petitioner after Molsbergen informed Petitioner of his <u>Miranda</u> rights, and Petitioner stated that he understood his rights and agreed to speak with the detective.  A tape and transcript of the interview were admitted at trial.  (RT 63, 79; Clerk's Supp. Transcript (CST) [Tr. Exh. 36, LD 18], 1-15.)  The detective testified that he received a call at about 12:45 a.m. from the deputy at the hospital, who reported that Petitioner said he wanted to make a statement.  (RT 103.)

Petitioner gave a somewhat narrative statement that he had not expected Bonham to come up that night but did expect her to come up the next day.  He stated that he put the gun to his head, pulled the trigger, and it did not go off; then Bonham took the gun, did the same, pulled the slide, let it go, and then put the gun to her head; however, Petitioner told the detective that this time he and she could see that a round had gone into the chamber, so Bonham fired the gun out of the window.  Then Bonham lowered the magazine of the gun again, cycled the slide, put it to her head, stated, "See there's no round in the chamber now," and the gun fired.  Petitioner said that when the gun discharged, he was reaching for the gun and said to let him check it or that she did not check it first for a round.  Petitioner did not say that the decedent had made any other comments in the conversation.  (RT 64-68; Clerk's Supp. Transcript (CST) [Tr. Exh. 36, LD 18], 2,7.)

Records from the Madera Community Hospital were before the California Supreme Court.  (Pet., case no. S115848, LD 11.)  They reflect that at 17:03 on November 25, 1997, Petitioner was

admitted for an Elavil overdose; he was discharged on November 27, 1997, at 10:45. However, nurses' notes reflect a lavage procedure earlier at 11:04 on November 25, followed by removal of the tube at 11:10; Petitioner was lethargic and mumbled when answering questions. Thus, it may be inferred that Petitioner was actually being treated at the hospital long before 17:03. By 12:52, Petitioner responded to his name but did not make conversation. Results of one ECG performed on November 25 are not legible but suggest some abnormality (notation of "Otherwise normal ECG" is visible), but another ECG with a date of service of November 25 reflects a check mark next to "Normal ECG." (LD 8.)

On November 26, 1997, by 07:00, it was noted that Petitioner was awake, alert, and talkative; he expressed his innocence and his hope that the investigation would show his innocence. He continued to complain of seeing green spots. He was alert and awake at 10:30, and he was resting with only intermittent visions of green spots by 13:25. It was noted that the detective was there to speak with him at 13:40. At 16:05 and 17:45, Petitioner complained of green spots, sharp pain to the chest, and palpitations; he cried intermittently and spoke about his family. At 21:15, Petitioner was received from the emergency room with complaints of chest pain and seeing green spots since the morning; at 22:00, Petitioner was awakened for medication, and he complained of seeing green spots and of concern about the consequences of an overdose; he wanted to talk to a doctor. At 23:50, Petitioner slept with no apparent discomfort. The final diagnosis was drug overdose and chest pain.

The medical records reflect that Petitioner was prescribed Xanax, also called Alprazolam, from November 25 through 27 for anxiety.  Notations concerning the drug appear next to the dates of November 25 and November 26, but the precise dates and times at which the drug was administered to him are not clearly and legibly set forth.[3]

Petitioner also submitted what appear to be printed materials from unspecified sources concerning the general effects of Elavil (Amitriptyline) and Xanax (Alprazolam).

Petitioner alleged in his petition before the California Supreme Court that statements were recorded at the hospital after his emergency treatment and before he had fully recovered; he had been administered unknowingly and involuntarily a tranquilizer, and he did not have the mental capacity to waive his <u>Miranda</u> rights due to alcohol and an overdose of drugs that resulted in mental incapacity; Petitioner was not allowed to detoxify before undergoing interrogation by multiple officers.  (LD ll, typed pp. 3, 15.)

 Moldbergen admitted that he had said to Petitioner that his statement was pretty much the same story he had told before.  (RT 119.)

### 4.   <u>Statement to Detectives Molsbergen and Bump</u>
   <u>at the Sheriff's Office (Fourth Statement)</u>

Detective Molsbergen testified concerning a fourth statement, which was recorded, and a transcript of the recording was introduced in evidence at trial.  When Petitioner was

_____

[3] Dates are not clearly legible, and the times medications were given are not consistently noted.

released from the hospital around noon on November 27, 1997,
Molsbergen picked up Petitioner, brought him to the sheriff's
office, and interviewed him for a third time there with Detective
Chuck Bump from 12:20 p.m. until 1:03 p.m.  (RT 80-81, 110; CST
[Tr. Exh. 37, LD 18] 16-52.)  Molsbergen testified that
Petitioner had asked to speak again and initiated the
conversation.  The detective read Miranda rights to Petitioner,
who agreed to talk and waived his rights.  (RT 103, 80-81; CST
16.)

Petitioner said that at the general store where he was
drinking beer, he called Bonham, who said she had called Jasmine
to see about bringing Jasmine's math book home and was uncertain
if she was coming up.  (CST 16-17.)  Petitioner was depressed
about his wife, went to the English gate at about 9:30 or 10:00,
and parked; he knew that Bonham would see him sitting there if
she did come by, and they could drink beer together.  He drank
beer and wrote a note to his wife.  After about a half hour or
forty-five minutes, Bonham arrived.  As was their custom when
they would meet, they drove to a place where no one could see the
two married persons drinking beer.  Bonham wore a long sweater,
and Petitioner did not know if she had anything under it;
sometimes Bonham would come and meet him in a nightgown if it was
late.  (Id. at 17-18, 26.)

Petitioner said he did not know if he would have sex with
her that night; he had sex with her two or a very few times
before, but most of the time they would just fool around so she
would not get pregnant.  (Id. at 25, 44.)  Cathy Bonham's
husband, Jim, and Petitioner had argued, and Petitioner had not

1  had sex with Cathy after that conversation, in which Petitioner

2  had promised he would never be around her again; Petitioner

3  estimated it had been a week and a half since he last had sex

4  with her. (Id. at 44.)

5      Petitioner got out his gun and said he felt like committing

6  suicide but would or could not do it because of Jasmine.  He

7  popped the clip, pulled it down a little bit, cocked it, and

8  "(Inaudible)" to his head, saying that was just what he felt like

9  doing to himself.  (Id. at 19.)  Bonham reminded Petitioner that

10  he had to think of Jasmine, and she took the gun from him.  He

11  told her to wait a minute, but she said she knew what she was

12  doing with a gun.  Then she cocked it with a thumb and a finger

13  and shot it out the window; she gave the gun back to Petitioner

14  at his request.

15      Petitioner sat there with the clip, cocking it back and

16  forth, and then he slid the clips close to the top so that it was

17  not clipped; then he put it to his head again and said it was

18  what he would do if he did not have his daughter.  Bonham then

19  said, "Let me show you what that looks like," and she took it and

20  put it against her head.  She said, "Doesn't this look terrible?"

21  She pulled the trigger, and at once she had a blank look on her

22  face, her arm fell down, a little bit of blood started trickling

23  out of the hole where she was shot, and she fell to the side.

24  (CST 18-19.)

25      Petitioner told Molsbergen and Bump that he could not

26  remember how many times each person cocked the gun, but Bonham

27  had shot the gun out the window.  (Id. at 30.)

28      Petitioner felt panic, confirmed that Bonham was dead, drove

home, called his wife to come get Jasmine, spoke with his father
and sister, and told them someone had died.  Petitioner said that
despite having had several beers, he still knew what he was
doing.  (Id. at 19.)  He started driving Bonham to the hospital
and then returned to his house, drank more beer, and thought that
he did not want his estranged wife, whom he wanted to have back,
to know that he had had a relationship with Bonham, who was his
wife's "old best friend."  (Id. at 20.)  Bonham had been in his
bed watching TV with Petitioner a few days before, and Petitioner
thought authorities might search the house and find "hair spray
and whatever" and know that Bonham had been there.  (Id. at 20.)
Petitioner burned the sheets and everything on his bed with
gasoline in a barbeque so his wife would not find out that Bonham
had been in Petitioner's bed.  (Id. at 21.)

    Petitioner said that the gun had been lying crosswise on the
seat and the console.  Upon the arrival of his wife, Connie, and
her companion, a person named "Spanky," Spanky went back to the
car to confirm that Bonham was dead, and she admitted to
Petitioner that she touched the gun but wiped if off.  (Id. at
21.)  Petitioner gave the note he had written to his wife.
Petitioner instructed Connie and Spanky to report the shooting as
soon as they got home, and then he reported it himself.  (Id. at
22.)

    Petitioner did not recall that at his home he had said that
he had wrapped the decedent in the bed linens; he had taken
Elavil before those questions were asked, and he was under the
influence and falling asleep.  (Id. at 34.)  Petitioner said that
he took an overdose of Elavil thirty-five to forty minutes before

Molsbergen had talked with him, and that he had told the other officer that he took a handful in order to sleep. (Id. at 19, 40-41.)  Petitioner had a pitcher of beer with his meal, returned and drank another pitcher over a long period of time, and then bought some beer.  He had not taken medication that day. (Id. at 35-36.)  Petitioner had taken Elavil for eight years for dizzy spells with irregular heartbeat; when he took Elavil, it would not change him or do anything to him except eliminate the spells. (Id. at 45-46.)

During the encounter, Molsbergen walked out a few times to get water and a tape; he did not recall if he was in the interview when Officer Bump accused Petitioner of having said he had shot out the window himself.  (RT 107-08.)

Molsbergen testified at trial that at some point he told Petitioner about the decedent's car having been at Petitioner's home that night; Molsbergen thought it was possibly credible information when he questioned Petitioner, but he ultimately determined that it was not credible information.  (RT 84.) Further, the absence of the bedding from Petitioner's bed originally had led officers to believe that the shooting could have occurred somewhere other than the vehicle.  (Id. at 86.)  It was questioned whether or not the decedent had been shot in the car, and Molsbergen presented that to Petitioner, who insisted that the shooing occurred in the vehicle.  Ultimately, Molsbergen had no evidence to show that the shooting did not occur in the car.  (Id. at 107.)  He recalled saying to Petitioner that in the previous statement, Petitioner had said he fired the gun out the window once; however, Molsbergen had not heard that from

Petitioner, was not sure where he obtained the information, did
not intend to say something known to be untrue when he said it,
had no evidence to support it, but had recalled it as having been
said in one of the interviews.  (Id. at 108-11.)

At trial Molsbergen testified that he recalled that Officer
Bump had asked Petitioner to go to the sheriff's department for a
nitrate specimen, a test for determining if a person has fired a
handgun.  (Id. at 112.)  That test was not done on Petitioner.
(Id.)

Petitioner alleged in his petition before the California
Supreme Court that he was given Xanax and was under its influence
when a recorded statement was taken, and when he was released
from the hospital and a second recorded statement was taken.  (LD
11, typed p. 16.)  He alleged that a prison physician had
reviewed his records and was shocked that statements of
Petitioner were used in court because at an unspecified time,
Petitioner was near possible heart failure.  (LD 11, typed pp. 2-
3.)

Petitioner alleged that after his stomach was lavaged and he
experienced sinus tachycardia, he had blurred vision and saw
green spots for three days; he opined that at the house he had
confusion and hallucinations.  (LD 11, typed p. 21.)  When the
statement was taken at the sheriff's office after Petitioner's
release from the hospital, Petitioner did not have the mental
capacity to waive his rights because he was under the influence
of Xanax; he was fed numerous details that did not occur and told
to believe them.  (Id. at typed pp. 21-22.)

Petitioner alleges in the FAP that before the tape recorder

31

was turned on, Molsbergen made knowingly false statements that
the fatal shot could not have occurred in the car, forensics had
proven there was not enough blood in the car, and the victim's
car had been seen parked behind Petitioner's car at his house the
night of the shooting.  (FAP 68.)

### 5.   Statement to Detective Molsbergen during the Walk-Through (Fifth Statement)

On December 2, 1997, Molsbergen interviewed Petitioner a
fourth time during a walk-through at the scene of the shooting;
the interview resulted from Petitioner's statement to District
Attorney's investigator Fabian Benabente that Petitioner would
like to go out and show the officers the scene.  (RT 103, 109.)
Molsbergen was within earshot of all that was said; he recalled
telling Petitioner that the last time Petitioner had said that he
fired the gun out the window once; however, the detective had not
heard that from Petitioner but recalled it as having been said.
(Id. at 108-09.)  Another officer told Petitioner that the body
could not have been dead in the car because of a lack of blood in
the car.  (Id. at 118.)

Detective Molsbergen had thought it possible that the
shooting could have occurred somewhere other than in Petitioner's
vehicle because of the burned bedding found in the barbeque
outside Petitioner's house.  (RT 85-86.)  Molsbergen testified at
trial that when interviewing a suspect, he tried to nail down the
story.  One tactic was trying to tell a suspect that something
could not have been one way to see if they changed their story;
however, he did not use that tactic in the present case or
intentionally deceive Petitioner.  He had information that the

32

1   decedent's car had been at Petitioner's house earlier, but he had
2   no physical evidence to support it; he confronted Petitioner with
3   that statement, and Petitioner insisted the car was never at his
4   house to his knowledge.  The detective questioned whether or not
5   the decedent was shot in the vehicle.  (Id. at 105-06.)
6   Molsbergen was not sure where he got the information that
7   Petitioner had admitted to firing the gun out the window, but
8   there was no evidence to support that.  (Id. at 111.)

9          D.   Analysis

10         The voluntariness of a confession is a legal question not
11  entitled to a presumption of correctness, but a state court's
12  findings of fact underlying the issue are entitled to a
13  presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1).[4]
14  Rupe v. Wood, 93 F.3d 1434, 1444 (9th Cir. 1997).  Here, the
15  state court made no express findings.

16         In determining whether a statement or confession was
17  involuntary and obtained in violation of the principles of due
18  process of law protected by the Fifth and Fourteenth Amendments,
19  a court examines whether a defendant's will was overborne by the
20  circumstances surrounding the giving of the statement or
21  confession.  Dickerson v. United States, 530 U.S. 428, 434
22  (2000).  A court considers the totality of all the surrounding
23  circumstances, including the characteristics of the accused and
24  the details of the interrogation.  Id.  Thus, circumstances such

25

26         [4] Title 28 U.S.C. § 2254(e)(1) provides that in a proceeding instituted
27  by a person imprisoned pursuant to a state court judgment, a determination of
    a factual issue made by a state court shall be presumed to be correct, and the
28  petitioner shall have the burden of rebutting the presumption of correctness
    by clear and convincing evidence.

33

as the nature and length of the questioning, the location of the questioning, the presence or absence of advice as to rights, the use of tactics such as fear or trickery, and the maturity, physical condition, mental health, and other circumstances of the accused are considered. <u>Withrow v. Williams</u>, 507 U.S. 680, 693-94 (1993). However, it is clearly established that coercive police activity is a necessary predicate to a finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986).

1)   <u>The First Statement</u>

Here, there were no circumstances of coercion during the first conversation with Deputy Campbell. Campbell asked Petitioner to repeat his story, but there is no evidence of prolonged interrogation or badgering. The deputy had arrived at about 4:00 a.m., had reviewed the physical evidence before talking to Petitioner, and then after the questions, Petitioner had taken a nap and was still asleep when Detective Molsbergen arrived at about 6:15 p.m. In view of the time frame and the vague, general nature of Petitioner's assertions of improper questioning, it is reasonable to conclude that Petitioner's allegations of prolonged, badgering interrogation were exaggerated or untrue. <u>Compare</u>, <u>Colorado v. Connelly</u>, 479 U.S. 157, 164 n. 1 (collecting cases reflecting more prolonged, repeated sessions of questioning accompanied by overt coercion or deprivation of necessities such as sleep, water, or food).

With respect to the location of the questioning in Petitioner's living room, Petitioner himself had called the

authorities to his home, and the nature of the questioning was consistent with an initial and basic attempt to determine what had happened, to ascertain the location of the death, and to locate any evidence.  Although Petitioner alleged that he was directed to remain in one place, Molsbergen testified that when he arrived at the home, he saw Petitioner on a couch or ottoman in the living room.  The officers were obviously engaged in securing the scene.  Under these circumstances, some restriction from roaming about the premises was not sufficient to reflect coercion of a type that would overbear one's will.  Considering all the evidence, it is reasonable to conclude that Petitioner was not as restricted as he later claimed.

Although Petitioner had consumed, and smelled of, alcohol and was slow in talking and acting, Deputy Campbell observed that Petitioner did not appear to be under the influence because he was lucid, coherent, and capable of articulation.  Considering his recent presence at the death of a friend, Petitioner's anxiety, thoughtfulness, and confusion as to the precise time were not inconsistent with a capacity to answer questions.  Petitioner related the pertinent events in reasonable detail and in chronological order.  Although Petitioner alleged very generally that his repeated requests to make telephone calls were rejected, any refusal to permit him to continue to make calls to his family while he was conversing with the officers was not necessarily coercive, but rather was consistent with a desire to secure the scene and prevent interference with the investigation.

With respect to Petitioner's taking medication, it is not unreasonable to conclude that because Deputy Campbell did not

35

observe the number of pills that Petitioner took, the deputy was uncertain of the amount of medication consumed and the possible extent of the effect of the medication.  Further, in light of Petitioner's comment to the responding officer that he had taken his medication for many years and was very tolerant of its effects, his taking his medication did not reasonably signal an overdose or any undue, underlying distress or mental limitation. Petitioner's sleeping around dawn was likewise reasonably interpreted as reflecting tiredness; it further reflects that he was at liberty to behave as he desired absent interference with the attempt to secure the scene and gather information. Petitioner's assertion that he passed out, as distinct from falling asleep, lacks support in the evidence and is inconsistent with his later awakening, remaining conscious, and giving another coherent statement at his home before subsequently exhibiting signs of being under the influence of medication.

Further, the Court notes that merely being under the influence of a medication does not constitute being coerced.  Cf. United States v. Kelley, 952 F.2d 562, 565-66 (9th Cir. 1992), disapproved on other grounds in United States v. Kim, 105 F.3d 1579, 1581 (9th Cir. 1997) (being on the verge of heroin withdrawal was held insufficient to demonstrate involuntariness where the defendant exhibited the ability to think rationally and where there were no circumstances of coercion); United States v. Lewis, 833 F.2d 1380, 1384-86 (9th Cir. 1987) (statements taken at a hospital several hours after the defendant was administered a general anesthetic were held to be voluntary where the defendant purported to feel all right, was responsive, and

1   demonstrated unimpaired recollection); <u>United States v. Martin</u>,

2   781 F.2d 671, 672-74 (9th Cir. 1993) (statements made to police

3   at a hospital were voluntary despite a defendant's being in pain

4   and under the influence of Demerol, a pain-killing medication,

5   where he was conscious, relatively coherent during the

6   questioning, and sat up and spoke freely).

7       After considering the circumstances surrounding Petitioner's

8   statement, the Court concludes that Petitioner has not

9   demonstrated that his first statement was coerced or involuntary.

10              2.   <u>The Second Statement</u>

11      With respect to Detective Molsbergen's questioning of

12  Petitioner at his home to obtain Petitioner's second statement,

13  Molsbergen observed that when Petitioner awoke, he got his

14  bearings after a few minutes.  Molsbergen did not see him ingest

15  the medication.  Deputy Campbell testified that it was after

16  Petitioner took a nap that he awoke, anxious and shaking, and

17  proceeded to take some medication from a bottle.  Thus, the facts

18  reasonably support a conclusion that Petitioner was not yet

19  suffering from a drug overdose at the time Molsbergen interviewed

20  him at the house.

21      Further, Petitioner's assertion that he had taken medication

22  and was suffering from an overdose when he spoke with the

23  detectives at his home was made in his fourth statement taken at

24  the sheriff's office.  (LD 18, 19, 25-26.)  A reasonable fact

25  finder could conclude that by that time, Petitioner had been

26  arrested and desired to undercut the validity or reliability of

27  his previous statements

28      Petitioner was able to relate to Molsbergen the previous

1  night's history from before 9:00 p.m. when he was at the store in
2  Raymond until he arrived home and made telephone calls.  It was
3  not until Petitioner was arriving at the sheriff's office that
4  Campbell observed him exhibiting an unsteady step and slurred
5  speech.  Considering all the circumstances at the house, it is
6  reasonably concluded there was no prolonged questioning,
7  deprivation of the necessities of life, or other conduct that
8  could be considered coercive.  Petitioner has not shown that his
9  statement was coerced or involuntary.

10              3.   The Third Statement

11       The first statement given at the hospital occurred at 1:15
12  a.m. on November 26, about fourteen hours after Petitioner's
13  lavage at 11:04 on November 25, and a few hours before nurses'
14  notes reflect that he was talkative, declaring his innocence, and
15  expressing hope that investigation would demonstrate his
16  innocence. (LD 18, 1; LD 11.)  Although Petitioner alleges that
17  he was deprived of sleep, the records show that after the lavage,
18  Petitioner was lethargic; thereafter, there are no notes for the
19  afternoon and evening of November 25.  In the FAP, Petitioner
20  himself stated that he slept after his emergency treatment, awoke
21  for questioning by officers guarding him, and then slept again
22  until 1:00 a.m. on November 26, when he was questioned.  (FAP
23  69.)  Although Petitioner categorized the sleep as "medically
24  induced," the meaning of this assertion is unclear.
25  Nevertheless, it appears even from his own allegations that he
26  was not deprived of sleep in the approximately thirteen hours
27  that passed between the lavage and the interrogation.

28       Petitioner asserts that he lacked capacity because he had

                                38

been given a tranquilizer.  Petitioner provides no details

concerning his condition that would warrant a conclusion that

having been administered Xanax rendered him incapable of giving a

statement.  Further, there is no expert testimony concerning the

timing and dosage of any tranquilizers or the effect on

Petitioner's state of mind at the time.  The copies of printed

material concerning the medications lack a foundation and, in any

event, do not demonstrate the effect of the medications on

Petitioner at the pertinent time.

In addition, the transcript of the recorded statement

reflects that Petitioner acknowledged that his rights had been

read to him, and he understood that he was being questioned; he

then proceeded to answer questions without reservation.  (LD 18,

1.)  There is no indication that Petitioner was unwilling to give

a statement; indeed, to the contrary, when Petitioner gave his

fourth statement at the sheriff's office after release from the

hospital, Petitioner had inquired about when it was that

Petitioner allegedly had said that Petitioner himself had shot

the gun out the window.  In response, Detective Molsbergen said:

> No, as a matter of fact, it's on the other side
> of that tape that you and I talked at the hospital
> after you called and said you wanted to talk to us.

(LD 18, 15.)  Petitioner replied:

> Okay, I did not fire that gun out the window.

(Id.)  Petitioner did not take the opportunity to contradict

Molsbergen's characterization of the earlier recorded statement

as having been pursuant to Petitioner's invitation or suggestion.

The Court concludes that the evidence reasonably supports a

conclusion that Molsbergen was summoned to the hospital at

1  Petitioner's behest.

2      Considering the responsive, detailed answers given by

3  Petitioner during the questioning, Petitioner's documented

4  condition a few hours after the questioning, his willingness to

5  talk about the death and his expressions of innocence to persons

6  in the vicinity, his demonstrated understanding of the

7  interrogation process, and his acknowledgment that he had been

8  read his rights, it is reasonably concluded that Petitioner

9  understood his rights and willingly gave them up when he

10  proceeded to answer questions.

11      A valid waiver of Miranda rights generally results in a

12  finding of voluntariness of a confession following the waiver.

13  DeWeaver v. Runnels, 556 F.3d 995, 1003 (9th Cir. 2009),

14  cert. denied, 130 S.Ct. 183 (2009) (quoting Missouri v. Seibert,

15  542 U.S. 600, 608-09 (2004) and Berkemer v. McCarty, 468 U.S.

16  420, 433 n.20 (1984)).  Petitioner's recorded acknowledgment of

17  having been read his rights and being willing to give a statement

18  militate against a finding of coercion.

19      With respect to the nature of the questioning and of any

20  representations made to Petitioner during the questioning, the

21  questioning included inquiries regarding what happened as well as

22  requests for details concerning his meeting with Bonham and the

23  shooting and for explanations of his burning of the bedding and

24  his delay in contacting authorities.  Petitioner was asked about

25  the inconsistency of his previous statement that the death

26  occurred about 10:00 p.m., when the 9-1-1 call came after 3:00

27  a.m., which resulted in his admission that he was mixed up as to

28  time.  (LD 18, 3-4.)  He was apparently confronted with

photographs of burned items, and he denied having burned any pants. (Id. at 12.)  Molsbergen stated that the victim's car was seen parked behind Petitioner's car at Petitioner's house, but Molsbergen later stated that he had no evidentiary basis for that assertion.  Petitioner denied having parked Bonham's car there or knowing that it was there, although he indicated that it was possible that she had been there when he was not there.  (Id. at 5-6, 9, 13.)  The transcript does not indicate that any other misrepresentations of fact were made by the detective with respect to this statement.

Generally, confronting a person with the evidence against the person is not in itself coercive.  United States v. Orso, 266 F.3d 1030, 1039 (9th Cir. 2001) (overruled on another point in Missouri v. Seibert, 540 U.S. 600 (2004)).  Further, although a misrepresentation of fact made by an officer during questioning is a relevant circumstance, it is generally not sufficient in itself to render a statement involuntary; rather, the focus is on whether considering all the circumstances, the confession is the product of an essentially free and unconstrained choice by its maker.  Frazier v. Cupp, 394 U.S. 731, 737-39 (1969) (misrepresentation that another party had confessed); Pollard v. Galaza, 290 F.3d 1030, 1033-34 (9th Cir. 2002).

Here, the misrepresentation concerning the presence of the victim's car at Petitioner's house was not critical to the pertinent transaction; Petitioner himself stated that it was possible that the car was there, but it would have been before he had arrived and without his knowledge.  It thus does not logically tend to show coercion either on its own or in light of

41

1  all the other circumstances.

2      In summary, Petitioner's assertions concerning his lack of

3  capacity during the questioning at the hospital are vague and

4  conclusional.  There is no expert opinion testimony concerning

5  Petitioner's actual state of mind at the pertinent time.  General

6  information regarding the effects of Xanax or Elavil lacks the

7  specificity necessary to pinpoint the precise effect of drugs or

8  alcohol on Petitioner at any specific time.  It does appear that

9  Petitioner continued to have green visions during his

10 hospitalization, but no other records reflect symptoms that could

11 possibly interfere with giving a statement.  A review of the

12 transcript shows that the questioning was not prolonged.

13 Petitioner's answers were responsive and detailed; his only

14 uncertainty or confusion was with the precise times of the

15 events, which was understandable concerning Petitioner's anxiety

16 and his ingestion of alcohol on the evening of the death.

17     The Court concludes that the totality of the circumstances

18 attending Petitioner's first statement at the hospital do not

19 demonstrate coercive conduct or that Petitioner's will was

20 overborne.  Compare, Mincey v. Arizona, 437 U.S. 385, 398-99

21 (1978) (confession held to be involuntary where the defendant had

22 been seriously wounded just a few hours earlier and ultimately

23 required a month's hospitalization, had been described by his

24 doctor on arrival at the hospital as "depressed almost to the

25 point of coma," had received some treatment but was still in the

26 intensive care unit, complained of "unbearable" leg pain, was

27 evidently confused and unable to think clearly about either the

28 events in question or the circumstances of his interrogation,

42

1  gave facially incoherent answers, repeatedly declined to answer

2  questions without a lawyer, and was questioned while he was lying

3  on his back on a hospital bed, encumbered by tubes, needles, and

4  breathing apparatus); Henry v. Kiernan, 197 F.3d 1021, 1026-30

5  (9th Cir. 1999) (confession held to have been actively coerced

6  and involuntary where the interrogation was continued for an hour

7  after the defendant stated that he wanted counsel, police knew

8  that the Miranda protocol had been violated and deliberately

9  continued with the interrogation, the interrogator misrepresented

10  the consequences of the statement by informing the defendant that

11  any statement could not be used against him for any purpose, the

12  statements were admitted as substantive evidence of guilt and not

13  only as impeachment, and the defendant was rambling,

14  unresponsive, confused, frightened, sobbing, and incoherent while

15  making the statement).

16                    4.  The Fourth Statement

17       With respect to the statement taken upon Petitioner's

18  release from the hospital, Petitioner was told that his statement

19  was being recorded and would be transcribed, and he expressly

20  acknowledged that he had been read his constitutional rights, his

21  family had retained an attorney to represent him, and with that

22  in mind, he wished to make a statement.  (LD 18, 1-2.)  This

23  evidence strongly indicates that Petitioner's participation was

24  voluntary.

25       The session lasted for forty minutes.  (Id. at 1, 37.)

26  Petitioner began by making a long, uninterrupted narrative

27  statement (id. 1-7); he was then questioned concerning some

28  details of his statement and his communications with the victim

1   and with another woman.  He was then confronted with his four

2   different versions of the cocking and shooting of the gun, and

3   Detective Bump stated that at the hospital, Petitioner had said

4   to a deputy the other day that <u>Petitioner</u> had shot the gun out of

5   the window.  Petitioner denied having said that.  (<u>Id.</u> at 14-15.)

6   Petitioner stated that he did not remember how many times each

7   person cocked the gun, but he remembered that it was Bonham who

8   had shot the gun out the window.  (<u>Id.</u> at 15.)

9        Petitioner argues that his statement was involuntary because

10  of misrepresentations of fact made by the officers.  However,

11  Detective Molsbergen testified that he did not intentionally

12  deceive Petitioner; he had information that the decedent's car

13  had been at Petitioner's house but no physical information to

14  support it, and Petitioner denied that the car had been there.

15  (RT [LD 20] 106.)  At one point it was questioned whether or not

16  the decedent had been shot in the vehicle, and Molsbergen

17  presented that to Petitioner, who insisted the shooting occurred

18  in the vehicle.  (<u>Id.</u> at 107.)  The detective also had recalled

19  that Petitioner had said that he shot the gun out the window, but

20  Molsbergen admitted that he did not personally hear that and was

21  not sure where he got that.  (<u>Id.</u> at 109-11.)

22       The record does not require or substantially support a

23  finding of intentional misrepresentation, but in any event, the

24  matters misrepresented were not sufficient to constitute coercion

25  or to cause Petitioner's will to be overborne.  Petitioner was

26  not misled as to matters essential to understanding the

27  significance of his rights or the consequences of giving a

28  statement.  <u>Cf.</u>, <u>Moran v. Burbine</u>, 475 U.S. 412, 423-24 (1986).

1    The Court concludes that the totality of the circumstances

2  attending Petitioner's fourth statement do not demonstrate

3  coercive conduct or that Petitioner's will was overborne.

4  Considering all the circumstances, it is concluded that the

5  evidence reasonably supports a conclusion that Petitioner's

6  fourth statement was voluntary.

7                    5.  Fifth Statement

8      Petitioner's fifth statement was essentially consistent with

9  his fourth statement.  Petitioner argues that it was involuntary

10  because of misrepresentations of fact made by the officers.

11    In view of all the circumstances, the Court concludes that

12  Petitioner's fifth statement made at the walk-through on December

13  2 was likewise voluntary.  The evidence supports a reasonable

14  conclusion that Petitioner initiated the contact, was given his

15  rights, and waived his rights.  There are no indicia or

16  circumstances of coercion.

17    In summary, consideration of the totality of the

18  circumstances pursuant to the correct legal standard results in

19  an objectively reasonable conclusion that Petitioner's statements

20  were not involuntary or coerced.  Petitioner has not shown that

21  the state court's decision denying his petition was contrary to,

22  or an unreasonable application of, clearly established federal

23  law.  Further, Petitioner has not shown that it was based on an

24  unreasonable determination of the facts in light of the evidence

25  presented in the state court proceedings.

26    V.  Alleged Violation of Petitioner's Miranda Rights

27    Petitioner argues that the first two statements he gave at

28  the house were taken in violation of the protocol established in

45

1  *Miranda v. Arizona*, 384 U.S. 436 (1966) and thus were erroneously

2  admitted in the prosecution's case-in-chief.  Further, he argues

3  that his later statements were inadmissible because of the

4  preceding *Miranda* violations.[5]

5      In order to implement the Fifth Amendment privilege against

6  self-incrimination made binding upon the states by the Fourteenth

7  Amendment, the Supreme Court has held that statements made in the

8  course of interrogation while a person is in custody are not

9  admissible in the prosecution's case-in-chief in a criminal case

10  unless the defendant is advised that 1) he has the right to

11  remain silent, 2) anything he says can be used against him in

12  court, 3) he has a right to counsel before questioning and to

13  counsel's presence during interrogation, 4) if he is indigent,

14  counsel will be appointed for him before interrogation, and 5)

15  the government demonstrates by affirmative evidence that the

16  defendant voluntarily and intelligently waived his privilege

17  against self-incrimination and his right to counsel.  *Miranda v.*

18  *Arizona*, 384 U.S. 436, 468-75 (1966); *Harris v. New York*, 401

19  U.S. 222, 226 (1971).

20      However, the Court in *Miranda v. Arizona* expressly noted the

21  following:

22          General on-the-scene questioning as to facts
            surrounding a crime or other general questioning
23          of citizens in the fact-finding process is not
            affected by our holding. It is an act of responsible
24          citizenship for individuals to give whatever information

25

26          [5] Petitioner also contends that the admission of his extra-judicial
    statements kept him from testifying.  (FAP 41.)  However, Petitioner does not
27  inform the Court what the substance of his testimony would have been.
    Further, in any event, if Petitioner had testified, even statements taken
28  without adequate *Miranda* warnings would have been admissible to impeach
    Petitioner.  *Harris v. New York*, 401 U.S. 222, 226 (1971).

they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.

Miranda, 384 U.S. 436, 468.

It is undisputed that Petitioner was not given his Miranda warnings and did not waive his rights before he made the statements to Deputy Campbell and Detective Molsbergen at his home in the early morning following the shooting.

Even if the atmosphere of an interrogation is coercive, Miranda warnings are required to be given only when one who is interrogated is restricted to the extent that he is in custody. Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (holding that a suspect was not in custody when he voluntarily came to the police station at an officer's request, was told he was not under arrest and was falsely informed that his fingerprints had been discovered at the scene of a theft, confessed to having committed the theft after having been questioned for five minutes in an office with the door closed, and then departed after a half-hour interrogation); Orozco v. Texas, 394 U.S. 324, 325-27 (1969) (holding that a suspect was in custody where he was interrogated by four police officers who came to his boardinghouse and questioned him in his bedroom at 4:00 a.m. at a time when he was under arrest and not free to leave).

The Supreme Court has reiterated that the test for custody is "simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Oregon v. Mathiason, 429 U.S. at 495). In Beheler, the

47

defendant invited officers to his home shortly after a
companion's commission of a homicide in the defendant's presence,
made statements to police and consented to a search of his home
that resulted in authorities' finding the murder weapon, and then
voluntarily accompanied officers to the police station; he was
told he was not under arrest.  He was interviewed at the station
for thirty minutes after having been drinking and while
emotionally distraught.  He made a statement about the murder
without being given Miranda warnings.  He then returned home, and
he was arrested five days later.  After receiving Miranda
warnings, he made a second statement and said that he had given
his earlier statements voluntarily.  Because the defendant's
freedom was not restricted in any way, the Court held that he was
not in custody at his home or during the interview at the
station, and his statements were all admissible.  463 U.S. at
1123-24.  The proximity of the questioning to the crime and the
clear focus on him as a suspect did not render the interrogation
custodial.  Id.  The Court found significant the fact that the
defendant himself had invited the police to his home.  Id. at
1125.

     More recent cases direct that custody must be determined by
how a reasonable person in the suspect's situation would perceive
his circumstances.  Berkemer v. McCarty, 468 U.S. 420, 442
(1984).  In Berkemer, it was held that a suspected drunk driver
was not in custody when a police officer, who at the outset
intended to arrest him, effected a traffic stop, questioned him,
administered a field sobriety test, and elicited admissions that
he had been drinking and ingesting a drug.  There was no custody

1  because the officer had not informed the driver of his intent to
2  arrest him, and thus the officer's unexpressed intention did not
3  bear upon the issue of custody.  The Court stated, "[T]he only
4  relevant inquiry is how a reasonable man in the suspect's
5  position would have understood his situation."  Id.

6       In the instant case, this Court must thus examine all the
7  objective circumstances surrounding the interrogation and
8  determine how a reasonable person in the position of the
9  individual being questioned would gauge the breadth of his or her
10 freedom of action, Stansbury v. California, 511 U.S. 318, 322-23,
11 325 (1994), or, whether or not a reasonable person would have
12 felt he or she was at liberty to terminate the interrogation and
13 leave, Thompson v. Keohane, 516 U.S. 99, 112 (1995).

14      Here, Petitioner himself called 9-1-1 and summoned
15 authorities to his residence.  Officers were then engaged in a
16 preliminary investigation and were attempting to obtain
17 information, determine the location of the shooting, and collect
18 evidence.  The questioning of Petitioner was not accusatory or
19 prolonged.  Petitioner was allowed to remain in his own living
20 room, to rest, and even to sleep at will while the officers were
21 present.  Further, he was permitted to take medication as he
22 chose.  Although Petitioner claimed that he was required to stay
23 on the floor of his living room and was not allowed to move, the
24 state court could have considered the totality of the
25 countervailing circumstances and could have reasonably determined
26 that Petitioner was not as restricted in movement as he later
27 claimed.

28      Further, a reasonable person in Petitioner's circumstances

49

1  at his house could reasonably have believed that he was not

2  suffering constraints tantamount to a formal arrest, but rather

3  was simply restricted from roaming at large while the extent of

4  the scene was being determined and while evidence was being

5  collected.  Although Petitioner failed to supply any details as

6  to any requests to use the telephone, a reasonable person in the

7  circumstances could have understood that a temporary cessation of

8  the numerous calls Petitioner had already made to his family and

9  friends that night was not indicative of a formal arrest, but

10 rather was simply an incident of an ongoing investigation.

11 Petitioner consistently gave the appearance of someone who

12 welcomed the presence of the law enforcement officers and desired

13 to reveal to them not only his version of the events with the

14 decedent, but also other evidence that he believed would

15 establish his innocence of any crime.  Although Petitioner was

16 slightly restricted, considering all the circumstances, a

17 reasonable person would not have believed that he was under a

18 formal arrest or that he was suffering a restriction of his

19 freedom of movement tantamount to a formal arrest.

20      Because this case arises pursuant to 28 U.S.C. § 2254

21 (d)(1), this Court must determine whether a state court decision

22 that Petitioner was not in custody would be contrary to, or

23 involve an unreasonable application of, clearly established

24 federal law, or a decision based on an unreasonable determination

25 of the facts before it.

26      The present case is similar to Yarborough v. Alvarado, 541

27 U.S. 652, 663-667 (2004), where the state court had concluded

28 that an inexperienced minor's two-hour interview at a police

station, where he was brought by his legal guardians, was not
custodial even though his parents were not allowed to be present
because he was told it would be brief, was asked if he wanted
breaks, and was allowed to leave at its conclusion.  The Supreme
Court in Yarborough found that the state court adjudication was
not objectively unreasonable, emphasizing that fairminded jurists
could disagree as to how to apply the very general test of
custody, and that the subjective factors of a suspect's age and
experience were given undue weight by the lower federal court
that had found that the state court's determination was
unreasonable.  541 U.S. at 666-69.

Here, the state court's application to the pertinent
circumstances of clearly established federal law concerning
custody for Miranda purposes was not objectively unreasonable.
Fairminded jurists could disagree how to apply the very general
test of custody to the circumstances presented at Petitioner's
home.  Likewise, its determination was not based on an
unreasonable determination of the facts in light of the evidence
before it.

Petitioner argues that because Miranda warnings were
deliberately withheld at the time of his first two statements,
his later waivers of his Miranda rights were ipso facto invalid.
Petitioner relies on Missouri v. Seibert, 542 U.S. 600 (2004),[6]

_____

[6] Seibert involved the intentional withholding of Miranda advisements
during initial custodial interrogation at a police station after the defendant
had been formally arrested, followed by the giving of Miranda warnings, waiver
of Miranda rights, and subsequent statements by the person in custody.  542
U.S. 600, 604-05, 610-11.  Three justices agreed that the state of mind or
intentionality of the officers was not the appropriate focus of the analysis.
542 U.S. 617 n.6 (Justice Souter, with Justices Stevens and Ginsburg joining).
Justice Breyer required exclusion of the later, warned statements unless the
initial failure to warn during custodial interrogation was in good faith.  542

1  in which a plurality found that the giving of <u>Miranda</u> warnings

2  and obtaining a waiver of rights was ineffective to establish a

3  valid waiver where the waiver was preceded by an exhaustive

4  custodial interrogation, which was proximate in time and similar

5  in content, and was undertaken without giving <u>Miranda</u> rights.

6      Here, as the foregoing analysis reflects, Petitioner's

7  unwarned statements were made when Petitioner was not in custody.

8  The present case may thus be distinguished from <u>Seibert</u>.

9  Further, although Petitioner alleged in a conclusional fashion

10 that the officers had intentionally withheld <u>Miranda</u> warnings at

11 Petitioner's home in order to elicit incriminating statements

12 before Petitioner understood his rights, there was no evidence

13 before the state court of deliberate withholding of

14 <u>Miranda</u> warnings.  The state court could reasonably have found

15 that the reason why no warnings were given at Petitioner's house

16 was because the questioning there was not custodial.

17     In any event, <u>Seibert</u> was decided on June 28, 2004, or

18 twelve days after June 16, 2004, the date on which the California

19 Supreme Court denied Petitioner's habeas petition raising the

20 pertinent issues.[7]  Under §2254(d)(1), "clearly established

21 Federal law, as determined by the Supreme Court of the United

22 States" includes only the Supreme Court's decisions as of the

23 time of the relevant state court adjudication on the merits.

24

25 U.S. 617-18.  Justice Kennedy required exclusion of the later statements if

26 the procedure of "confession first, then warn" was deliberately employed and
   there was an absence of curative measures undertaken before the later
   statement was made.  542 U.S. 618-22.

27

28     [7] A decision of the California Supreme Court denying a petition for writ
   of habeas corpus is final immediately upon filing.  Cal. Rules of Ct., Rule
   8.532(b)(2)(C) (formerly, Rule 29.4, adopted eff. Jan. 1, 2003).

1  *Cullen v. Pinholster*, 131 S.Ct. at 1399.  Here, when the state

2  court made the pertinent decision, *Seibert* had not been decided

3  and thus was not clearly established.

4      Petitioner contends that he raised the allegedly erroneous

5  admission of his extra-judicial statements in his later (third)

6  petition to the California Supreme Court, which was filed long

7  after the date of the *Seibert* decision.

8      In *Baldwin v. Reese*, 541 U.S. 27 (2004), the Court held that

9  a state prisoner does not fairly present a claim to a state court

10 if that court must read beyond a petition or a brief (or a

11 similar document) that does not alert it to the presence of a

12 federal claim in order to find material, such as a lower court

13 opinion in the case, that does so.  The Supreme Court ruled that

14 judges reviewing a petition were not required to read lower court

15 opinions or lower court briefs in the pertinent case that were

16 not included in the petition or briefing of the petition.

17 *Baldwin v. Reese*, 541 U.S. at 32.  Likewise, in *Castillo v.*

18 *McFadden*, 399 F.3d 993 (9th Cir. 2005), the court held that to

19 present a claim fairly for the purposes of exhaustion, a

20 petitioner must have presented his federal, constitutional issue

21 before the state court within the four corners of his appellate

22 briefing.  *Id.* at 999-1000 (citing *Baldwin v. Reese*, 541 U.S.

23 27).

24     Here, review of the petition for review filed in the

25 California Supreme Court in the third round of post-judgment,

26 collateral proceedings reveals that the issue of Petitioner's

27 statements was not stated as a question presented in the

28 petition.  (LD 30, 1a-1c.)  Further, the issue was not stated in

1   argument in the petition.  The issue was only mentioned in
2   response to a query on the petition form concerning previous
3   petitions or applications.  Petitioner noted that it was an issue
4   that had been raised in a separate petition filed in a previous
5   case.  (LD 30, petition form at p. 6.)  Such a listing of the
6   legal issue raised in a previous petition does not constitute
7   fair presentation of the claim under the foregoing authorities.
8   Therefore, the Court concludes that Petitioner did not raise
9   issues concerning his statements before the California Supreme
10  Court in the third and final round of post-judgment, collateral
11  proceedings.  The Court further concludes that Seibert was thus
12  not clearly established federal law available to Petitioner on
13  June 16, 2004, when the California Supreme Court denied the
14  pertinent petition in which Petitioner had raised the issue.

15      Before Seibert, in Oregon v. Elstad, 470 U.S. 298 (1985), it
16  was held that a brief, inculpatory, and voluntary statement made
17  by a suspect at his home before Miranda warnings were given and
18  as he was being arrested did not bar admission of a later,
19  inculpatory statement made at the police station after the
20  suspect had been warned and had waived his Miranda rights.  In
21  Elstad, the Court determined that in the absence of coercion or
22  improper tactics in obtaining the initial, unwarned statement, a
23  later waiver of Miranda rights after being given Miranda warnings
24  would normally be considered voluntary and effective.  The Court
25  had expressly declined in Michigan v. Tucker, 417 U.S. 433, 450-
26  52 (1974) to remedy Miranda violations by excluding any "fruits"
27  of Miranda violations in the form of third-party statements
28  discovered as the result of a Miranda violation.  In Elstad, the

1  Court reaffirmed that after a <u>Miranda</u> violation, subsequent

2  warning of <u>Miranda</u> rights and waiver thereof by a suspect who

3  proceeded to make a statement were generally sufficient to

4  protect the goals of assuring trustworthy evidence and deterring

5  improper police conduct.  470 U.S. at 308-09.

6      Aside from the coercion and <u>Seibert</u> claims, Petitioner does

7  not allege that the <u>Miranda</u> warnings that he was given at the

8  hospital, the sheriff's station, or the walk-through were

9  otherwise defective in any substantive respect.

10     The Court therefore concludes that with respect to

11 Petitioner's subsequent waiver of his <u>Miranda</u> rights while in

12 custody, a state court decision that Petitioner's <u>Miranda</u> waiver

13 was valid did not result in a decision that was based on an

14 unreasonable determination of the facts in light of the evidence

15 presented in the state court proceeding, or that was contrary to,

16 or involved an unreasonable application of, clearly established

17 federal law as determined by the United States Supreme Court.[8]

18     VI.  <u>Ineffective Assistance of Trial Counsel</u>

19     Petitioner argues that his right to the effective assistance

20 of trial counsel under the Sixth and Fourteenth Amendments was

21 violated because trial counsel failed to 1) investigate and

22 present exculpatory evidence in the form of an opinion or report

23

24 ───────────────

   [8] Petitioner alleges in the traverse additional facts concerning the 9-1-
25 1 call, and he asserts that a preliminary hearing transcript indicated that
   Deputy Campbell was instructed to take Petitioner into his house and obtain a
26 statement, followed by Campbell's taking Petitioner into his house by the arm
   and without asking consent to enter.  (Doc. 98, 31-32.)  The Court notes that
27 it is not clear that these facts were before the California Supreme Court.  In
   any event, in light of Petitioner's having called law enforcement to his
   house, even if these facts were before the state courts, they would not have
28 changed the analysis of the voluntariness of Petitioner's statements or
   alleged violations of the <u>Miranda</u> protocol.

of criminalist Stephen O'Clair regarding the jammed cartridge case in the gun's chamber (FAP 25-27); 2) present the exculpatory evidence of criminalist Steven Dowell concerning the results of a gunshot residue test performed on the victim (FAP 28-29); 3) consult, hire, and present the evidence of an expert such as Joseph Orantes to examine and opine concerning all the "readily available" exculpatory forensic evidence (FAP 29-32); 4) object to the use of Petitioner's involuntary, unwarned statements (FAP 32); 5) investigate and call Avila to impeach the testimony of Sanchez, the jailhouse informant (FAP 32-33); and 6) request discovery regarding, and properly investigate, Sanchez (FAP 33-34).

    A.   <u>Facts as Reflected by the Evidence Introduced at Trial</u>

    The evidence admitted at trial concerning Petitioner's statements has been previously summarized in connection with the claims concerning the voluntariness of Petitioner's statements and waiver of <u>Miranda</u> rights.  As noted, Deputy Campbell testified at trial concerning his arrival at Petitioner's house, discovery of the decedent, his observations of Petitioner, the first statement given by Petitioner on November 25, 1997, and Campbell's transporting Petitioner to the sheriff's office and then to the hospital.  Detective Molsbergen testified concerning Petitioner's four additional statements made to Molsbergen at his house, at the hospital when arrested, at the sheriff's office, and at the walk-through.

    The additional trial evidence will be briefly summarized.
    A photograph or photographs of the decedent, as observed

1  upon Campbell's arrival, were admitted into evidence.  (RT 23.)

2  Campbell testified that another deputy arrived within two minutes

3  of Campbell's arrival.  (RT 29.)

4      Detective Molsbergen testified that upon arrival at

5  Petitioner's home, he saw a white female with a bleeding head

6  wound sitting on the right front seat of a Mustang and leaning to

7  the right with her head against the top of the door panel.  (RT

8  44.)  A wound to the left side of her head, just right above her

9  ear, was visible.  The handle of a black, semi-automatic handgun

10  was partially under the victim's left arm; the gun was registered

11  to Petitioner, who admitted that it was his gun.  The victim wore

12  a white or tan sweater that was hip-length or longer, and no

13  shoes, but shoes were found on the right floorboard around her

14  feet.  A set of keys to the decedent's car was looped around her

15  right thumb.  Both passenger and driver windows were down.  (RT

16  44-45, 58, 63.)  Photographs taken contemporaneously reflected

17  these observations, including the firearm at the victim's left

18  hip.  (RT 46, 58.)  A paper bag and tape were used to cover the

19  decedent's hands to facilitate recovery of evidence at an

20  autopsy.  (RT 62.)  Drips or trails of blood on the right inner

21  door panel were visible.  (Id.)  The gun was confiscated and

22  booked into evidence by Investigator Angus, who processed the

23  scene and testified that it was a nine millimeter Glock.  (RT 47,

24  72-73.)  Angus checked the gun for palm prints and fingerprints

25  and found none.  (RT 74.)  Molsbergen testified that only one gun

26  was found in Petitioner's car, and there was found no other

27  evidence to support the presence of another gun in the car.  (RT

28  101.)  Pieces of satin found in the pit by Petitioner's home were

1   almost completely burned, and Molsbergen could not determine what
2   they had been before being burned.  (RT 54-55.)

3       While Petitioner was on his way down to the valley with
4   Deputy Campbell, he directed Molsbergen and others via radio to
5   the spot where the decedent had actually been shot, where
6   Molsbergen found a green Ford Taurus registered to the decedent;
7   later he did a walk-through with Petitioner at the scene.  (RT
8   56.)  Eventually Petitioner tried to show Molsbergen where he was
9   parked when the shooting occurred, but the place he pointed out
10  was not where the decedent's vehicle was found; rather, it was
11  seventy-five to a hundred feet from where the vehicle was found
12  on the morning of the twenty-fifth.  (RT 93.)  Law enforcement
13  personnel used a metal detector in an attempt to locate bullets
14  or casings, projectile brass, or other evidence at both the site
15  of the decedent's vehicle and the location Petitioner had
16  believed the shooting occurred.  (RT 57, 94.)  Nothing was found
17  with the metal detector.  (RT 94.)  Angus's search of the car for
18  spent casings revealed none other than the one in the chamber of
19  the handgun.  (RT 94.)  Angus drew a diagram of the scene,
20  including Petitioner's home and a fire pit located about ninety-
21  five feet from the house and fifty-five feet from the driveway.
22  (RT 70-71.)  He confirmed that the decedent wore no underwear,
23  and she had a sweatshirt over her lap.  (RT 72.)

24      Molsbergen talked with Petitioner's wife, Connie, who said
25  that she had destroyed a note or notes.  (RT 83-84.)  No note was
26  ever recovered.  (RT 51.)  An attempt to subpoena Petitioner's
27  wife failed because Molsbergen was unable to locate her.  (RT
28  85.)

1    Records revealed that the decedent had a concealed weapon
2    permit for a Jennings .22 caliber automatic, which would function
3    in a similar manner as the semi-automatic that killed her because
4    if a round is fired, the slide goes back; if there is a new
5    cartridge in the magazine, it will load the cartridge into the
6    chamber.  The decedent had to take a class and a test in order to
7    obtain the permit.  (RT 97-98.)

8    Molsbergen also testified at trial that his measurements
9    reflected that the Raymond General Store was about 2.1 miles from
10   the English property where the shooting occurred; the English
11   property was 4.2 miles from Petitioner's house; the drive from
12   Connie's house in southeast Fresno to Petitioner's home took an
13   hour and fifteen to thirty minutes; and the drive from the
14   decedent's home to Petitioner's took approximately forty-three or
15   forty-five minutes.  (RT 86-87.)  Telephone records revealed that
16   two calls were made from the Raymond General Store to the
17   decedent's house: one of zero minutes in duration at 7:15 p.m.,
18   and a completed call of almost three minutes at 7:36 p.m.  (RT
19   88.)  Two calls were made from the Frontier Inn to the decedent's
20   home, the first being a coin call lasting for three minutes at
21   approximately 8:53, and the second a collect call at 8:59 p.m.
22   that lasted six minutes.  (Id.)  A forty-five second call from
23   Petitioner's house to the house of Connie, his wife, was made on
24   the twenty-fifth at seven minutes after midnight.  (RT 87-88.)  A
25   collect call lasting ten minutes was made from Connie's home to
26   Petitioner's home immediately afterwards.  (RT 89-90.)  A grid
27   search of the areas where the decedent's car was parked and where
28   Petitioner thought the shooting had occurred revealed no metal.

1  (RT 94.)

2      An identification specialist from the Madera County

3  Sheriff's Office testified that the Glock nine millimeter gun had

4  about fifteen bullets in the magazine and appeared to be full,

5  but he was not sure; it bore no fingerprints or palm prints, but

6  considering the gun's texture and surface, the lack of prints was

7  not unusual.  (RT 69, 72-75.)  When recovered, the gun had a

8  cartridge that was jammed; the slide had come back and closed

9  onto an expended shell or bullet.  The specialist explained that

10 one part of a bullet flies out the end of the gun, and the other

11 stays in the gun and is pushed to the side.  In this case, a

12 cartridge was jammed in the area where the part stayed and was

13 pushed out the side at the point of the gun's ejection port.  (RT

14 76.)  Detective Molsbergen testified that one casing remained in

15 the chamber of the handgun, and no others were found; the round

16 did not eject out of the top part of the gun as it typically did.

17 (RT 94-95.)

18     Detective Molsbergen testified that the gun was a semi-

19 automatic pistol, with cartridges maintained in a magazine that

20 feeds into the grip of the pistol.  A release on one side lets

21 the action of the slide move forward.  If there are cartridges in

22 the magazine, the action of the slide moving forward will force a

23 round into the chamber.  If pushed, a magazine release button

24 will cause the magazine to come out such that if the magazine is

25 lowered out of the locked position, then even if a cartridge is

26 in the magazine, it would not feed a cartridge in.  (RT 91.)

27 Petitioner had described to Molsbergen a process of slight

28 release of the magazine, pulling the slide back, pushing that

back in, pushing the magazine back in and pulling the trigger, which would "dry fire" the gun.  After the trigger is pulled, the gun is uncocked and would not fire again; the trigger could not be pulled back unless the slide is pulled back and released.  (RT 91-92.)  Once the slide is cocked and is engaging in the trigger, and a bullet is actually brought back up into the chamber, then after the gun is fired, each successive pull of the trigger should or would load a new cartridge behind it until the magazine is empty.  After a round is actually fired, another one is automatically chambered, assuming the magazine is in; if there is a bullet in the chamber and the slide is pulled back, it would eject the live round and automatically chamber another round if the magazine is pushed in.  It was only if a bullet was discharged from the gun that it would recoil on its own and bring another one up.  If there is a bullet in the chamber, the gun can be fired if the magazine is not in.  (RT 96, 152-53.)  If a cartridge does not fully eject, a new round cannot feed in.  (RT 100.)  There were eleven (11) bullets in the magazine of the gun, which held a maximum of eighteen (18), when the gun was booked into evidence.  (RT 100.)

Rebecca Fuller, the mother of the decedent, testified that Bonham was thirty-five when she died, was right-handed all her life, and had been separated from her husband for about three or four months.  Fuller and the decedent were very close and spoke very frequently; Bonham had been very happy, was starting back to school to study to be a nutritionist, and was trying to get a better job.  Bonham behaved normally on the day of her death; she had never talked about killing herself or ending her life.  She

1  was knowledgeable about guns and had taken a gun safety course to

2  obtain a permit.  She had her gun at home and was not carrying

3  it.  (RT 120-25, 127.)

4      Joy Bonham, the decedent's fourteen-year-old daughter,

5  testified that on November 24, 1997, she lived with her mother

6  and her three brothers.  The decedent put them to bed around 9:00

7  or 10:00 p.m., told the witness that she loved her, and behaved

8  normally; she would not have taken her own life because she had

9  much to look forward to, had just started school, and still had

10 her children to raise.  The decedent was right-handed and never

11 used her left hand alone; she had taught her daughter not to play

12 with guns. (RT 137-41.)

13     The registrar at Reedley College confirmed that the decedent

14 had been registered for the fall and the upcoming spring

15 semester.  (RT 141-45.)

16     Dowell Cash, a friend of the decedent for twenty-six years,

17 had visited the decedent two weeks before her death.  Bonham had

18 received a telephone call, had a short conversation, became

19 agitated, slammed the phone down, and an hour later walked Cash

20 to his car, where a red Mustang driven by Petitioner went by very

21 slowly.  Petitioner stared at Cash, took off very fast, drove to

22 the end of the block, turned around and returned driving fast,

23 and flipped Cash off.  (RT 173-180.)

24     Cash testified that the decedent had been a caring, loving,

25 and helpful person.  She was right-handed and had been separated

26 from her husband for about six months, had a more positive and

27 uplifted state of mind after the separation, and planned to

28 become a nurse. (RT 180-183, 187.)  She was not the type of

person to consider killing herself and had never tried to do so. She behaved responsibly around guns; she would not, and had not, put a gun to her head.  (RT 184-85.)

The decedent's friend for twelve years, Susan Patterson, testified that Bonham was not suicidal but was level-headed, caring, responsible, loving, generous, and kind.  Bonham had told Patterson about her relationship with Petitioner, and Patterson thought she was a little bit ashamed because she was married at the time.  (RT 188-94.)

Rudy Sanchez testified that he was thirty-three years old and had spent most of his life between the ages of eleven and twenty-five in jail or prison.  He first went to San Quentin when he was twenty or twenty-one, but he stayed out of prison for almost eight years after he turned twenty-five.  On direct examination, Sanchez testified that he had a felony conviction for drug sales, but on cross-examination he admitted that he had four felony convictions.  (RT 197-98, 243.)  He previously had been a confidential informant for the police in San Francisco in 1989 in order to leave the county and get out of a prison gang. (RT 245.)

Sanchez had lived in Madera since he was paroled there in 1989.  In 1997, he entered a guilty plea to a felony charge of conviction of assault with intent to commit rape and received a sentence of one year local (county) time and five years felony probation; he went to jail on it in September 1997.  He completed his sentence and got out of jail on May 15, 1998, having received the typical one-third off his sentence for good time and work time credit.  (RT 199-200.)  At the time of the trial, he was on

felony probation, and if he violated probation, he would get five years in prison.  He considered testifying against another inmate to be a death sentence; however, he was testifying in order to tell the truth.  (RT 202-03.)

Sanchez met Petitioner in jail right after Thanksgiving and began talking to him around Christmas despite having told Petitioner that he did not want to hear about his case because it was "heavy."  Petitioner would just start talking to Sanchez; Sanchez never asked him questions.  Sanchez became Petitioner's best friend in jail.  Sanchez knew nothing about Petitioner's case except what he was told by Petitioner.  Little by little, Petitioner told Sanchez that he was accused of shooting his daughter's Sunday school teacher and his wife's best friend, Cathy Bonham, with whom Petitioner often had sex when they met down the road from his house.  Bonham would not wear underwear or panties when they met.  Petitioner would laugh and smirk when he told Sanchez about their sex life, and he showed no remorse, although Sanchez once saw him crying while holding her picture from a newspaper article in his cell.  (RT 203-08, 210-11.) Petitioner told Sanchez that he and his wife had separated but that before the incident, his wife was going to come back, and Petitioner wanted his family to get back together.  (RT 209.)

Petitioner told Sanchez that he had called Bonham to meet him because her husband had found out about their relationship, and they met in the usual spot.  Petitioner told Bonham he was upset about what had happened earlier between Petitioner and Bonham's husband, so they "got into it where he was upset."  (RT 211-13.)  Petitioner told Bonham to go to her car, and she went

1  to get a gun that was in her trunk.  She came into Petitioner's
2  car on the passenger side.  (RT 213-14.)  Sanchez testified in
3  pertinent part:

4      I don't know what was going on, but they--
       that--he said that he had her grab--put the gun in
5      her hand and he had another gun in his hand
       up to her chest, put the other gun by her head--
6      her hand first, his hand on top of her hand-

7      Q  All right.

8      A  – and then pull the trigger.

9  (RT 214.)  Sanchez clarified that Petitioner said he had his hand
10 on top of her hand on a gun which was pointed at her head, and he
11 had another gun pointed at her chest; Petitioner pulled the
12 trigger.  (Id.)  Petitioner said the gun was a Glock S-15.  (RT
13 216.)

14     Petitioner told Sanchez that he did it because he was
15 worried about cops finding out what was going on, or that
16 everything was wasted or just fell apart.  (RT 214-15.)  He
17 thought the husband was going to tell Petitioner's wife, so he
18 was upset at the time.  (RT 216.)

19     Petitioner said after he shot Bonham, he sat in the car, had
20 a beer, drove around a little bit, returned to his home, burned
21 the blankets, and called his wife because he did not want Jasmine
22 to find out what happened.  (RT 216.)  He called the cops and
23 then took pills and kept drinking.  (RT 216-17.)  Petitioner said
24 he burned a blanket so no one would know they were having sex.
25 After everything that had happened that night, he drank beer and
26 took some pills but did not say he wanted to kill himself.  (RT
27 212-13.)

28     In October, about a month after being in custody for the

last time, Sanchez started reading the Bible, learned and felt a
lot, and decided to come forward with his information because he
had "like a guilty conscience"; holding inside of him and knowing
the truth was something he had to live with.  (RT 217-18.)  His
last stint in jail actually changed him a bit, and he was trying
to better himself.  (RT 218, 222.)

Sanchez wrote a letter to the prosecutor, Linda Zebari, of
the District Attorney's Office in April, a month before he was
released on May 15; he asked Zebari to come and speak with him.
(RT 220.)  He gave the letter to officers at the jail.  (RT 249-
50.)  The letter was introduced into evidence.  (Ex. 41.)
Sanchez testified that at that time, he had been sentenced, his
case had been resolved, and he had nothing pending except driving
on a suspended license, something that he had not ever talked to
Zebari about; that case was dismissed when he was sentenced on
his felony, and it was another prosecutor and not in exchange for
anything, and it was before he wrote his letter.  (RT 222-23.)
Zebari and Molsbergen came to talk to Sanchez, who told them
basically what he had testified to that day.  (RT 220-21.)

Sanchez denied having asked the D.A.'s office or law
enforcement for any favors in return, although on cross-
examination he admitted that when he spoke with Molsbergen, he
had asked that Petitioner not be arrested until after Sanchez was
released from jail because he was scared for his safety while in
custody.  (RT 221, 247-48.)

Molsbergen testified that when he and Zebari had gone to the
jail to visit with Sanchez on April 27, 1998, Sanchez did not ask
for anything in return other than that Petitioner not be arrested

1  before Sanchez's release from jail.  (RT 256.)  Molsbergen

2  thought that he first heard that Sanchez had contacted the

3  district attorney before April 22 or April 23, 1998.  (RT 256-

4  57.)

5       Deputy District Attorney Robert McGurty testified that he

6  was a Chief Deputy District Attorney who had prosecuted for

7  Madera for four and one-half years; he was assigned a felony case

8  of Rudy Sanchez, who on March 2, 1998, entered a plea to a felony

9  assault with intent to commit rape in violation of Cal. Pen. Code

10 § 220 pursuant to McGurty's offer, and received in exchange a

11 year in county jail and felony probation for five years.  Sanchez

12 was sentenced on March 23, 1998.  Although McGurty was vaguely

13 aware of the Cottrell case and its facts when he made the

14 agreement with Sanchez, he did not have any idea that Sanchez was

15 in any way involved with the Cottrell case, and it did not enter

16 into his considerations for making the offer.  (RT 257-60.)

17 McGurty also recalled that after the plea, he saw Sanchez again

18 in the Borden Court for a traffic violation and another

19 misdemeanor charge and dismissed the charges because previously

20 Sanchez had pled guilty to a felony, and it was McGurty's

21 practice to dismiss minor cases; it had nothing to do with the

22 Cottrell case.  (RT 261.)

23      Sanchez testified that he continued to see Petitioner after

24 release from custody, and Petitioner showed him where the crime

25 occurred.  (RT 225, 246.)  Sanchez wrote to Petitioner's parents,

26 Petitioner, and his daughter in the same month he wrote the

27 district attorney, saying that Petitioner was a great person.  He

28 asked Petitioner's parents for $20 for toiletries, but the

request was returned by jail personnel.  (RT 231-34, 236-37, 253-54.)  After release, Sanchez stayed at Petitioner's house and worked with him once for food.  (RT 246-47.)

Sanchez testified that Petitioner was obsessed with his guns, taught his daughter to take the S-15 apart and put it back together, and would shoot off his S-15 to let his neighbors know he was home.  He called his guns his "babies."  (RT 227-28 249-50.)

Detective Molsbergen attended the autopsy of Bonham, which was performed by Dr. Jerry Nelson, a pathologist.  (RT 92-93.)

Jerry Nelson testified he was a medical doctor and had been a pathologist for thirty-four years; he held a board certification in anatomical and clinical pathology and had performed 7,760 autopsies, of which 780 were gunshot wounds, and 226 were suicides by intentional gunshot wounds; he had testified 392 times.  (RT 154-57, 167.)  He performed an autopsy of the decedent on November 26, 1997, at 3:00 p.m.; he found an entry and exit wound of the head that was a contact wound in which the muzzle of the gun was against the skin, with no bullet present in the cranium cavity.  The cause of death was a gunshot wound to the cerebrum, with entry at the left temple and scalp one-half inch above the left ear canal, and exit at the most rear portion of the right parietal scalp two and one-half inches behind the right ear canal.  (RT 158-60.)  He had never seen a suicide by gunshot inflicted with the non-dominant hand.  (RT 161.)  The angle of the wounds found in the decedent's head was demonstrated with a witness at trial and was five to ten degrees downward and thirty degrees toward the rear; however, the position of the head

and of the arm and hand at the time of the shooting was
uncertain.  (RT 161-64, 166, 169-70.)

Dr. Nelson opined that because of the use of the left hand
he was very suspicious that the decedent's wound was not self-
inflicted and was perhaps a homicide.  (RT 164, 171.)  Accidental
shootings were more likely with a rifle or shotgun and with an
angle other than the classic example in a suicide; the angle of
decedent's wounds was not classic for suicide (wounds directed to
the rear and somewhat upward), but it was not impossible.  (RT
167-68, 171-72.)

B.  <u>Evidence before the Madera County Superior Court
on Petitioner's Motion for New Trial</u>

Petitioner was represented by David Elgin on his motion for
a new trial heard on June 18, 1999.  (RT 372, 376, 380.)

The evidence introduced at the motion for new trial was
summarized by the DCA in its decision in the consolidated appeal
and habeas proceedings, the pertinent portion of which is set
forth at length below in connection with the analysis of the
pertinent claims.

Additional evidence in the record that was not noted by the
DCA included a letter written to the trial judge by a fellow jail
inmate of Petitioner and Sanchez, Michael J. Avila, dated
February 16, 1999, in which Avila described conduct and
statements of Rudy Sanchez, whom Avila had known at the jail.
Avila wrote that while Petitioner was incarcerated, Sanchez
outwardly manifested the behavior of a Christian, but afterward
he grew angry, cursed, and neglected his studies.  Sanchez told
Avila that he was taking notes on Petitioner's case and believed

that Petitioner was an idiot for talking to him because Sanchez
had warned Petitioner it could be used by inmates for their own
benefit.  Avila stated that Sanchez told Avila that Petitioner
was his "meal ticket."

Before Petitioner's trial, Avila had given his contact
information to Petitioner for the use of Petitioner's trial
counsel, John Garvin; on January 20, 1999, during the trial,
Avila called Garvin's office and left his number and a message
with Garvin's secretary to contact him immediately as a possible
defense witness for Petitioner, but he never heard back from
anyone from Garvin's office.  Avila stated that he had a phone
record of the call placed to Garvin's office.  (CT [LD 17] 123-
24.)

Telephone records confirmed that Avila had called trial
counsel's office on the second day of the jury trial and left a
message but received no return call.  The contents of the message
were not corroborated; Garvin did not recall receiving any
messages from or concerning Avila either before or during trial.
Garvin only became aware of him after trial; therefore, he had
not contacted Avila.  (CT 160, 166, 191.)

Garvin had reviewed all discovery and the criminal history
of Sanchez; he had contacted Petitioner's family, and his
investigator interviewed Sanchez for an hour, but no written
report was made.  (CT 161.)  Garvin believed that the prosecutor
lacked evidence; the greatest obstacle was the jailhouse
informant.  (RT 403.)  When Garvin's investigator interviewed
him, he found Sanchez highly credible.  (RT 404.)

David Smothers, a criminal law practitioner for seven years

with experience in felony jury trials, had been assigned to the
Cottrell case in 1997 and early 1998.  He considered O'Clair's
opinion that an expended cartridge in the chamber was indicative
of a self-inflicted gunshot wound and Dowell's tests on gunshot
residue to be crucial, exculpatory information.  Smothers was not
allowed to present it at the preliminary hearing, but Smothers
won a 995 motion on the ground that it had been erroneous not to
permit introduction of the evidence.  (CT 164.)

> C.   Trial Counsel's Failure to Investigate and Present
>      Evidence

Petitioner argues that his trial counsel's omissions
violated his right under the Sixth and Fourteenth Amendments to
the effective assistance of counsel based on counsel's failure to
1) investigate and present exculpatory evidence of criminalist
Stephen O'Clair regarding the jammed cartridge case in the gun's
chamber (FAP 25-27); 2) present the exculpatory evidence of
criminalist Steven Dowell concerning gunshot residue (FAP 28-29);
3) consult, hire, and present the opinion of an expert such as
Joseph Orantes concerning all the "readily available" exculpatory
forensic evidence (FAP 29-32); 4) object to the use of
Petitioner's involuntary statements (FAP 32); 5) investigate and
present Avila as a witness to impeach the testimony of Sanchez,
the jailhouse informant (FAP 32-33); and 6) request discovery
regarding, and properly investigate, Sanchez (FAP 33-34).

> 1. Background concerning Subclaims 1,2,3, and 5

Petitioner raised subclaims 1, 2, 3, and 5 in his motion for
new trial and on appeal, and the appellate court affirmed the
appeal with an unpublished opinion that constituted a reasoned

1  decision on the merits.  (Doc. 3, Exs. to Pet., Vol. II, Ex. I.)

2  A petition for review was denied by the California Supreme Court

3  on January 3, 2002, without any statement of reasons or citation

4  of authority.  (Id. at Ex. II.)  Petitioner raised the same

5  subclaims in subsequent habeas corpus petitions in the Madera

6  County Superior Court (MCSC), District Court of Appeal (DCA), and

7  California Supreme Court.  (LD 8, 10, 11-13.)  Petitioner also

8  raised additional claims concerning ineffective assistance based

9  on the failure to object to Petitioner's pretrial statements and

10 to obtain extra-record evidence via discovery concerning the

11 jailhouse informant.

12      In its order denying the petition for writ of habeas corpus,

13 the MCSC cited to the earlier opinion and orders of the DCA and

14 Supreme Court; it stated that with respect to ineffective

15 assistance of trial counsel, the issue had been raised and

16 rejected on appeal and on the initial habeas petition before the

17 DCA; further, review by the California Supreme Court was denied.

18 (Doc. 3, Ex. III; doc. 59, 121-22.)  The MCSC then stated:

19          On the issue of ineffective assistance of trial counsel,
            this court finds insufficient justification for renewal
20          of that issue on habeas corpus.  *In re Harris* (1993) 5
            Cal.4th 813, 825, 829.  On the issue of ineffective
21          assistance of appellate counsel, petitioner has failed
            to show by a preponderance of the evidence facts that
22          establish a basis for relief for habeas corpus.  *In re
            Visciotti* (1996) 14 Cal.4th 325, 351.  The petition is
23          denied.

24      The succeeding petitions filed in the DCA and California

25 Supreme Court were denied without any statement of reasoning or

26 authority.  (LD 10, doc. 59, 124; LD 11-13, doc. 59, 126.)

27      The MCSC's citation to In re Harris, 5 Cal.4th 813, 825, 829

28 (1993) was an invocation of the procedural rule of California

1  jurisprudence often referred to as the "Waltreus rule," which

2  provides that an issue raised and determined on appeal cannot be

3  raised in a subsequent petition for writ of habeas corpus, and an

4  attempt to do so will be met by a summary denial of a habeas

5  petition.  Forrest v. Vasquez, 75 F.3d 562, 563 (9th Cir. 1996).

6      In Ylst v. Nunnemaker, 501 U.S. 797 (1991), the state

7  intermediate appellate court rejected on appeal a Miranda claim

8  because it was being raised for the first time on appeal, and the

9  California Supreme Court denied a petition for discretionary

10  review of the appellate court's ruling.  The Petitioner then

11  raised the claim in petitions for habeas relief filed in the

12  trial court, intermediate appellate court, and California Supreme

13  Court.  The petitions were summarily denied in the lower courts,

14  but the California Supreme Court denied the petition with a

15  citation of various authorities, including In re Waltreus, 62

16  Cal.2d 218, 225 (1965).  After filing a petition in federal court

17  and suffering a dismissal for failure to exhaust state court

18  remedies, the petitioner filed a second habeas petition raising

19  the Miranda claim in the California Supreme Court, which was

20  summarily denied.

21      The Supreme Court held that the California Supreme Court's

22  silent denial of the second habeas petition did not disturb or

23  lift the earlier decision invoking a procedural bar, and it did

24  not otherwise constitute a decision on the merits of the Miranda

25  claim.  The Court directed federal courts to determine the reason

26  for an unexplained decision by applying the following

27  presumption:

28      Where there has been one reasoned state judgment

73

> rejecting a federal claim, later unexplained orders
> upholding that judgment or rejecting the same claim
> rest upon the same ground. If an earlier opinion
> "fairly appear[s] to rest primarily upon federal law,"
> Coleman, 501 U.S., at 740, 111 S.Ct., at 2559, we will
> presume that no procedural default has been invoked by
> a subsequent unexplained order that leaves the judgment
> or its consequences in place. Similarly where, as here,
> the last reasoned opinion on the claim explicitly
> imposes a procedural default, we will presume that a
> later decision rejecting the claim did not silently
> disregard that bar and consider the merits.

Ylst, 501 U.S. 797, 803.  The Court reasoned that the appropriate

interpretation of unexplained orders is that they "say nothing,"

and thus the appropriate principle of construction is a

presumption that gives them no effect and which simply "looks

through" them to the last reasoned decision.  Id. at 804.  The

presumption may be rebutted by strong evidence.  Ylst, 501 U.S.

at 804-05.

The Court further noted that because a petitioner in

California is not required to seek state habeas relief in order

to exhaust state court remedies, the denial of a state habeas

petition on Waltreus grounds has no bearing on a petitioner's

ability to raise a claim in federal court.  Id. at 805.  Thus,

the Court characterized a Waltreus denial on state habeas as

neither a ruling on the merits nor a denial on procedural

grounds, and it instructed that federal courts "look through" a

denial based on Waltreus to previous state court decisions.

Id. at 805-06.

Therefore, where the California Supreme Court denies a

habeas petition or petition for review without citation or

comment, a district court will "look through" the unexplained

decision of that state court to the last reasoned decision of a

74

1  lower court as the relevant state-court determination.  Ylst v.

2  Nunnemaker, 501 U.S. 797, 803-04 (1991); Taylor v. Maddox, 366

3  F.3d 992, 998 n.5 (9th Cir. 2004); Shackleford v. Hubbard, 234

4  F.3d 1072, 1079 n.2 (9th Cir. 2000).  Further, where the

5  intermediate court of appeal adopted the reasoning of the trial

6  court, the federal court also discusses the trial court's

7  decision.  Taylor v. Maddox, 366 F.3d 992, 998 n.5 (9th Cir.

8  2004).

9       Here, the unexplained denials of the DCA and California

10 Supreme Court did not disturb the decision of the MCSC, which in

11 turn rested upon Waltreus.  This Court looks through the MCSC's

12 "Waltreus" decision on habeas, and through the previous,

13 unexplained decision of the California Supreme Court denying

14 review of the DCA's opinion in the consolidated appeal and first

15 state habeas proceeding.  The last reasoned decision on the

16 merits of sub-claims 1, 2, 3, and 5 concerning the ineffective

17 assistance of counsel was thus the opinion of the DCA, which

18 addressed both the appeal pending before that court and the

19 simultaneously filed habeas petition.  The DCA's opinion also

20 relied on and adopted the trial court's reasoning.

21      Accordingly, this Court will look to the opinion of the DCA

22 and the pertinent aspects of the trial court's decision.

23      With respect to the record on which the decision in this

24 Court should be based, Respondent contends that Petitioner is

25 limited to the documents presented to the trial court in

26 connection with motion for a new trial.  In the petition for writ

27 of habeas corpus filed in the DCA, Petitioner relied on the trial

28 court record with respect to the claim of ineffective assistance

of counsel; the only additional evidence presented to the DCA consisted of declarations concerning Sanchez's alleged recantation, which pertained to Petitioner's claim of newly discovered evidence, and not to Petitioner's claim concerning ineffective assistance of counsel.  (LD 14 [HC1], 3, 11-12, 15, 17-18, 21.)  The Court will thus determine Petitioner's ineffective assistance sub-claims 1, 2, 3, and 5 based on the evidence considered by the trial court and by the DCA in the appellate proceedings.

2.  The State Court Proceedings concerning Subclaims 1, 2, 3, and 5

In a habeas proceeding brought by a person in custody pursuant to a judgment of a state court, a determination of a factual issue made by a state court shall be presumed to be correct; the petitioner has the burden of producing clear and convincing evidence to rebut the presumption of correctness.  28 U.S.C. § 2254(e)(1); Sanders v. Lamarque, 357 F.3d 943, 947-48 (9th Cir. 2004).

Here, because Petitioner has not produced clear and convincing evidence to rebut the presumption of correctness, the Court will set forth the factual summary from the opinion of the California Court of Appeal, Fifth Appellate District, filed on October 22, 2001, in consolidated cases numbered F033539 and F037604:[9]

> Shortly after the verdicts, the prosecutor put on the record the opinion a Department of Justice analyst shared with her before trial that Bonham probably shot

_____

[9] See, Galvan v. Alaska Dep't. Of Corrections, 397 F.3d 1198, 1199 n.1 (9th Cir. 2005) (setting forth a factual summary from the state appellate court's decision).

herself and the possibility she and predecessor defense counsel with whom she shared that opinion might never have so informed Cottrell's trial attorney:

"'Several months ago after this case was refiled I called Stephen O'Clair, the DOJ analyst, who wrote a report regarding the shell casing found in the chamber of the gun. Mr. O'Clair wrote in his report that the casing left in the chamber of the gun was quote, "Indicative of a self-inflicted gunshot wound or someone preventing the slide from going backward when it was fired. It is also possible that the suspect was holding the pistol loosely when it was fired and the cartridge case did not eject," end quote.

"During my telephone conversation with Mr. O'Clair he told me that, quote, 'off the record, in his opinion, she, the victim, probably shot herself.' I do not know what he based his opinion on.

"At the time of this conversation the attorney of record for Mr. Cottrell was Tim Neal of John Barker's office. I called Mr. Neal and told him what Mr. O'Clair had told me. I got the impression Mr. Neal did not find the information important.

"Barker's office subsequently declared a conflict on the case and John Garvin became the attorney of record. I don't recall whether or not I ever told John Garvin [Cottrell's trial attorney] about Mr. O'Clair's statement to me. I don't know if Mr. Neal ever passed the information on to Mr. Garvin. Regardless, I'd like this information to be put on the record.'"

The trial court promptly appointed a new attorney to file a new trial motion on the ground of ineffective assistance. The trial court appointed the criminalist whom the new attorney requested, heard evidence and argument, and denied the motion.

Cottrell's motion argued that in two respects his trial attorney rendered ineffective assistance, first by failing to call three witnesses at trial -- Department of Justice senior criminalist Stephen O'Clair, Los Angeles County Coroner's Office research criminalist Steven Dowell, and former jail inmate Mike Avila -- and then by failing to secure a criminalist to help present an effective defense. The prosecution opposed the motion.

Characterizing the investigation of Cottrell's trial attorney's performance as "adequate," though not "complete," the trial court noted that his introduction of evidence of a self-inflicted wound showed he was a reasonably competent attorney acting as a diligent

1
2
3
4
5

advocate, even though he might have called more
witnesses on that issue than he did. Emphasizing his
"vigorous cross-examination throughout the trial" that
subjected the prosecution's case to "meaningful
adversarial testing" and brought to the jury's
attention the issues of the self-inflicted wound and
the reliability of the informant, the trial court found
Cottrell had a fair trial and denied the motion.

(Pet (Doc. 3) Exs. Vol. II, Ex. I, 9-10.)

6
7

    The DCA considered subclaims 1, 2, 3, and 5 and upheld the

8

trial court's findings of fact:

9
10
11
12
13
14

    The adjudication of a statutory new trial motion rests
    so completely within the trial court's discretion that
    only a showing of a manifest abuse of discretion will
    permit the appellate court to disturb the trial court's
    ruling. *(People v. Delgado* (1993) 5 Cal.4th 312, 328; §
    1181.) The standard of review of the trial court's
    ruling on a new trial motion on the *nonstatutory* ground
    of ineffective assistance is different, however. (Cf. §
    1181.) That requires a two-step process analogous to
    the trial court's ruling on a section 1538.5 motion and
    the appellate court's review of that ruling. (*People v.
    Taylor* (1984) 162 Cal.App.3d 720, 724; cf. § 1181.)

15
16
17
18
19
20

    In the first step, the trial court makes findings of
    fact as to which, on appeal, all presumptions favor the
    trial court's exercise of its discretion to judge the
    credibility of witnesses, resolve conflicts in
    testimony, weigh evidence, and draw factual inferences.
    (*People v. Taylor*, supra, 162 Cal.App.3d 720, 724.) If
    substantial evidence supports the trial court's
    findings of fact, whether express or implied, the
    appellate court will uphold those findings. (*People v.
    Leyba* (1981) 29 Cal.3d 591, 596-597.)

21
22
23
24
25
26
27

    Applying that standard of review, we find no
    justification for disturbing those findings. "The trial
    judge is the one best situated to determine the
    competency of defendant's trial counsel. Where, as
    here, defendant is represented by different counsel on
    the motion for a new trial and the issue is called to
    the trial court's attention, the trial judge's decision
    is especially entitled to great weight and we defer to
    his fact finding power." (*People v. Wallin* (1981) 124
    Cal.App.3d 479, 483; *see, e.g.*, *People v. Aubrey* (1999)
    70 Cal.App.4th 1088, 1104, disapproved on another point
    in *People v. Rubalcava* (2000) 23 Cal.4th 332, 334, fn.
    8; 5 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000)
    Criminal Trial, § 225, p. 350.)

28

(Doc. 3, Exs. Vol. II, Ex. I, p. 11.)

1     The DCA then set forth the governing legal standards

2  concerning the issues of deficient performance and prejudice:

3        In the second step, the trial court decides, on the
         basis of those findings, whether the party [claiming]
4        ineffective assistance discharged the burden of proof
         of deficient performance under an objective standard of
5        professional reasonableness test and of prejudice under
         a test of reasonable probability of a different
6        outcome. *(Strickland v. Washington* (1984) 466 U.S. 668,
         687-698; *People v. Osband* (1996) 13 Cal.4th 622, 664;
7        *People v. Taylor*, supra, 162 Cal.App.3d at p. 725.)
         Both the performance and prejudice components of that
8        inquiry are mixed questions of fact and law.
         (*Strickland v. Washington*, supra, 466 U.S. at p. 698.)
9        Insofar as an ineffective assistance claim constitutes
         a question of law instead of a question of fact, the
10       substantial evidence rule does not bind the appellate
         court, which instead has "'the ultimate
11       responsibility... to measure the facts, as found by the
         trier, against the constitutional standard....' On that
12       issue, in short, the appellate court exercises its
         independent judgment." *(People v. Leyba*, supra, 29
13       Cal.3d at p. 597; cit. omitted; fn. omitted; see *People
         v. Bess* (1984) 153 Cal.App.3d 1053.)

14
         To establish prejudice, the accused must show a
15       reasonable probability that but for the trial
         attorney's deficient representation, the outcome of the
16       proceeding would have been more favorable to the
         accused. *(Strickland v. Washington*, supra, 466 U.S. at
17       pp. 688, 693-694; *People v. Ledesma* (1987) 43 Cal.3d
         171, 215-218.) If the accused cannot establish
18       prejudice, a claim of ineffective assistance fails
         without the need for the appellate court to determine
19       whether trial counsel's performance was deficient.
         (*Strickland v. Washington*, supra, 466 U.S. at p. 697;
20       see also *In re Alvernaz* (1992) 2 Cal.4th 924, 945.)

21  (Doc. 3, Pet., Exs. Vol. II, Ex. I, 11-12.)

22     The DCA then reviewed the evidence and arguments presented

23  on the motion for new trial:

24       With regard to O'Clair, the criminalist who performed
         tests on Cottrell's Glock, the motion argued his trial
25       attorney failed to contact him even though his report
         noted: "A fired cartridge case was reportedly found in
26       the chamber of the pistol. This is indicative of a
         self-inflicted gun shot wound or someone preventing the
27       slide from going backward when it was fired. It is also
         possible that the suspect was holding the pistol
28       loosely when it was fired and the cartridge case did

not eject." His trial attorney stated in a declaration he did not contact O'Clair because he found his statements "repetitive of other evidence in the case," notably the coroner's testimony "that the shot was consistent with a self inflicted gunshot wound."

At the hearing on the motion, Cottrell's trial attorney testified he thought O'Clair would not "shed any additional light" because his testimony would "go both ways." The prosecution's opposition argued O'Clair's testimony had the potential to hurt the defense, in light of evidence of Cottrell's drinking before the shooting, since a "drunk pointing a gun at someone's head would very likely be holding the gun loosely." Not calling O'Clair, the prosecution argued, was "a valid tactical decision."

With regard to Dowell, the criminalist who performed a gunshot residue (GSR) test on Bonham, the motion argued Cottrell's trial attorney failed to contact him even though his report found gunshot residue on her hands. His report noted Bonham "may" have discharged a firearm or otherwise had her hands in an environment of gunshot residue or received those particles from an environmental source. Adverting to the instruction that if circumstantial evidence permits two reasonable interpretations the jury must adopt that which points to innocence and reject that which points to guilt, the motion argued Cottrell's trial attorney failed to utilize the synergy of O'Clair's and Dowell's testimony. (CALJIC No. 2.01.)

On the other hand, Cottrell's trial attorney stated in a declaration he researched gunshot residue, conferred with Dowell, and decided "his testimony would not be helpful." Likewise, the prosecution's opposition argued Dowell's "testimony would have been useless for either side" since anyone sitting in the front seat at the time of the shooting would acquire gunshot residue. At the hearing on the motion, Cottrell's trial attorney testified he anticipated the prosecution would not call Dowell and hoped to cast doubt on the thoroughness of the investigation by bringing before the jury the failure to perform a GSR test on his client.

With regard to Avila, another inmate who met Cottrell and Sanchez in county jail, the motion argued Sanchez told Avila "Cottrell was his meal ticket," Avila informed Cottrell's trial attorney's office he was a witness for the defense, and no one ever returned his call. Cottrell's trial attorney states in a declaration he did not contact Avila because no one told him about him until after trial. The prosecution's opposition notes Avila called his office during trial, criticizes the expectation he should return calls in the middle of

a murder trial with "no indication that the message
held any importance," and suggests analysis of the
issue not as ineffective assistance but as newly
discovered evidence. At the hearing on the motion, no
one questioned Cottrell's trial attorney about Avila.
(Footnote omitted.)

The motion refers to attached "declaration and phone
records," and the opposition refers to the declaration
attached to the motion, but the appellant's opening
brief gives no citation to the record for those
attachments. (Cf. Cal. Rules of Court, rule 15(a).) Nor
does the respondent's brief, which states "Avila's
declaration is not in the record." Our review of the
record confirms that, so we rely instead on summaries
of his declaration in the motion and in the opposition.
(See *Duarte v. Chino Community Hospital* (1999) 72
Cal.App.4th 849, 856.)

With regard to Cottrell's trial attorney's not securing
a criminalist, the motion argued expert testimony was
imperative since neither O'Clair nor Dowell could
testify the shooting of Bonham was "accidental and
self-inflicted." The motion attached the report of the
defense criminalist whom the trial court appointed and
who concluded Bonham died from an accidental
self-inflicted gunshot. Cottrell's trial attorney
stated in a declaration he relied on the pathologist's
finding "that the shot was consistent with a
self-inflicted wound" and testified at the hearing on
the motion he conferred with half a dozen or so
attorney and expert members of the criminal defense
network he had developed in his years of practice
before he chose "to go after the reasonable doubt
argument" by focusing on the prosecution's inability to
show who pulled the trigger.

(Id. 12-14.)

The DCA then set forth its conclusions:

In the exercise of our independent judgment, we find on
that record Cottrell did not discharge his burden of
proof. Even without testimony by O'Clair, Dowell, or a
defense criminalist, the evidence presented to the jury
alternative scenarios of a gunshot wound Cottrell
inflicted on Bonham and of a gunshot wound she
inflicted on herself, by accident or by suicide. His
ingestion of copious quantities of alcohol and Elavil
suggested a plausible reason why his statements to
investigators were not entirely consistent. The
pathologist, though skeptical Bonham shot herself,
was not entirely dismissive, admittedly relying on an
assumption about not shooting oneself with the
non-dominant hand. As the new trial motion acknowledged,

any testimony from O'Clair and Dowell could only be disjunctive, allowing for the same alternative scenarios as did the pathologist. Were pretrial discovery to have disclosed a defense criminalist, one could well have expected the prosecution to have countered with yet another criminalist. We perceive no intrinsic defense advantage to a "battle of the experts" over the evidence in the record.

The impact of Avila's testimony on the trial could only have been negligible. First, considering his testimony as newly discovered evidence, mere impeachment on the issue of credibility with no proof of the accused's innocence generally will not surmount the hurdle of immateriality. (*People v. Green* (1982) 130 Cal.App.3d 1, 11; *People v. Quaintance* (1978) 86 Cal.App.3d 594, 602; 6 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crim. Judgm., § 96, p. 128; see § 1181, P(8).) Second, Sanchez's testimony was of dubious credibility, as argument to the jury shows, even without Avila's testimony. Both counsel impugned Sanchez's character, Cottrell's trial attorney calling him an "opportunist" and "a user and abuser of people," the prosecutor denigrating her own witness as "odd" and "weird." Bearing out the prosecutor's prediction that the case was neither "easy" nor "normal," the jury deliberated for over four hours, listening to the readback of Sanchez's testimony, to the pathologist's testimony, and to the instruction on personal use of a firearm before reaching verdicts. In short, on none of the four grounds on which Cottrell sought a new trial does the record show deficient performance under an objective standard of professional reasonableness test or prejudice under a test of reasonable probability of a different outcome. (Strickland v. Washington, supra, 466 U.S. 668, 687-698.)

(Id. at 14-16.)

### 3.   Analysis of Sublaims 1,2,3, and 5[10]

The law governing claims concerning ineffective assistance of counsel is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).   Premo v. Moore, –U.S. –, 131 S.Ct. 733, 737-38 (2011); Canales v. Roe, 151 F.3d 1226, 1229 n.2 (9th Cir. 1998).

---

[10] To the extent that Petitioner argues that Dr. Nelson gave false or erroneous testimony concerning the angle of the head wound, the Court does not consider the matter because Petitioner did not exhaust state court remedies concerning such claim.

To demonstrate ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments, a convicted defendant must show that 1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all the circumstances of the particular case; and 2) unless prejudice is presumed, it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 687-94 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). A petitioner must identify the acts or omissions of counsel that are alleged to have been deficient. Strickland, 466 U.S. at 690. This standard is the same standard that is applied on direct appeal and in a motion for a new trial. Id. at 697-98.

In determining whether counsel's conduct was deficient, a court should consider the overall performance of counsel from the perspective of counsel at the time of the representation. Strickland, 466 U.S. at 689. There is a strong presumption that counsel's conduct was adequate and within the exercise of reasonable professional judgment and the wide range of reasonable professional assistance. Id. at 688-90. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment." Id. at 687.

In determining prejudice, a reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. Strickland, 466 U.S. at 694. In the context of a trial, the question is thus whether there is a reasonable

probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt. Id. at 695. This Court must consider the totality of the evidence before the fact finder and determine whether the substandard representation rendered the proceeding fundamentally unfair or the results thereof unreliable. Id. at 687, 696.

Where the state court has applied the correct, clearly established federal law to a claim concerning the ineffective assistance of counsel, a federal district court analyzes the claim under the "unreasonable application" clause of § 2254(d)(1), pursuant to which habeas relief is warranted where the correct law was unreasonably applied to the facts. Weighall v. Middle, 215 F.3d 1058, 1062-62 (2000) (citing Williams v. Taylor, 529 U.S. 362 (2000)).

The Supreme Court has described the high bar presented by § 2254(d)(1) for prevailing on a claim of ineffective assistance of counsel:

> "To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.' [Strickland,] 466 U.S., at 688 [104 S.Ct. 2052]. A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. Id., at 689 [104 S.Ct. 2052]. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' Id., at 687 [104 S.Ct. 2052].

> "With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' ...

> " 'Surmounting Strickland's high bar is never an easy task.' Padilla v. Kentucky, 559 U.S. ----, ---- [130 S.Ct. 1473, 1485, 176 L.Ed.2d 284] (2010). An

ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial [or in pretrial proceedings], and so the Strickland standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S., at 689-690 [104 S.Ct. 2052]. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' Id., at 689 [104 S.Ct. 2052]; see also Bell v. Cone, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. Strickland, 466 U.S., at 690, 104 S.Ct. 2052.

"Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both 'highly deferential,' id., at 689 [104 S.Ct. 2052]; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is 'doubly' so, Knowles, 556 U.S., at ----, 129 S.Ct., at 1420. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ---- [129 S.Ct., at 1420]. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."

Premo v. Moore, -U.S. -, 131 S.Ct. 733, 739-40 (2011) (quoting Harrington v. Richter, –U.S.-, 131 S.Ct. 770 (2011)).

Here, the state court applied the appropriate, clearly established federal law embodied in the Strickland case. Petitioner identified the specific omissions alleged to have been substandard.  As the foregoing, extensive summary of the

1   pertinent evidence shows, no basis in the record appears for
2   determining that the state court unreasonably determined the
3   facts in light of the evidence presented in the state
4   proceedings.

5       The state court concluded that the failure to call O'Clair
6   to opine concerning the jammed cartridge case was not outside the
7   wide range of professionally competent assistance and was not
8   prejudicial.  This determination was not contrary to, or an
9   unreasonable application of, clearly established federal law.
10  O'Clair opined not that there was one, clear explanation for the
11  jamming; rather, he offered three possible explanations:  a self-
12  inflicted wound, which was helpful to Petitioner; prevention of
13  the slide from going backward upon firing, which was consistent
14  with Petitioner's having held his hand on the gun when it was
15  fired; or a loosely held pistol, which was consistent with the
16  victim's holding the gun under duress or not having proper hold
17  of the gun due to Petitioner's also holding it, or with an
18  intoxicated person's handling of the gun.  The testifying
19  pathologist's opinion did not exclude a self-inflicted wound and
20  was based on an assumption regarding use of the non-dominant
21  hand.  The facts, which included the victim's having keys in her
22  dominant hand at the time of the shooting and being situated so
23  that her left hand was next to Petitioner, did not compel
24  acceptance of the pathologist's assumption.  Counsel's theory was
25  that the victim pulled the trigger, and his strategy was to
26  narrow the evidence and avoid confusing the jury.  Considering
27  counsel's independent research and investigation as well as the
28  theory of the case, O'Clair's opinion was reasonably determined

not to have been so exculpatory that failure to present it fell below professional norms or prejudiced the outcome of the trial.

Although Dowell's report was consistent with a self-inflicted wound, it also was consistent with the victim's hands having been in an environment of gunshot residue or receiving the residue from an external or environmental source.  A particle was found on the palm of the victim's right hand.  (CT 152.)  The evidence was thus not necessarily exculpatory, and it did not preclude or contradict possible prosecution theories that gunshot residue was a result of Petitioner's discharging the weapon.  Trial counsel reasonably believed that in light of other evidence, including Petitioner's own statements and conduct, a jury might question the reasonableness of an interpretation of the evidence that pointed to innocence.  Further, counsel desired to underscore the incomplete nature of law enforcement's investigation of the incident by showing that the GSR test had been run on the victim but not on Petitioner.  The state court's application of the law to these facts was not unreasonable.

Although Orantes opined that the victim's wound was accidental and self-inflicted, trial counsel had reasonably relied on Dr. Nelson's finding that the wound was consistent with a self-inflicted wound.  Counsel had made a reasonably informed tactical decision that because no definitive evidence of either homicide or self-infliction was present, the focus should be on reasonable doubt.  The state court reasonably relied on not only the opinion evidence, but also the demonstrative evidence regarding the unusual position and angle of the gunshot wound. The gunshot residue evidence upon which Orantes relied showed

1  gunshot residue on both of the victim's hands and thus provided a

2  basis for both sides' theories about the incident.  Further,

3  Orantes' point that the expended cartridge was retained in the

4  firing chamber because the discharge produced a contact wound

5  was questionable considering other testimony that the cartridge

6  case was jammed in the ejector port.  (CT 154, RT 76.**)**

7      The state court reasonably determined that the jury had been

8  presented with the "alternative scenarios" of accidental or

9  suicidal self-infliction on the one hand, and shooting by

10 Petitioner on the other, even without the additional evidence

11 from O'Clair, Dowell, and Orantes.  (Opinion at 15.)  Further, it

12 was reasonably concluded that the prosecution could have been

13 expected to counter any disclosed expert opinion evidence with

14 contradictory opinion evidence and thus to have mounted a "battle

15 of the experts."  (Id.)  In this regard, the state court did not

16 unreasonably apply clearly established federal law.

17      With respect to Avila, who Petitioner asserts could have

18 testified that Sanchez had characterized Petitioner as his "meal

19 ticket" and displayed self-interest, the state appellate court

20 noted in its opinion that the record did not contain Avila's

21 declaration.  (Op. at 14 n.3.)  The court instead relied on

22 summaries of the declaration contained in the motion and

23 opposition.  (Id.)  The record contains a motion to defer

24 judgment filed by Petitioner proceeding pro se on February 19,

25 1999, followed by a letter from Avila addressed to the trial

26 judge dated February 16, 1999, and received by the trial court on

27 February 22, 1999.  (CT [LD 17] 120-25.)  Although Avila stated

28 that he called trial counsel's office and left a message that he

was a possible witness for the defense, the specifics of that transaction are not set forth.  The appellate court noted that no one questioned trial counsel concerning Avila at the hearing on the motion to suppress, and counsel had declared that he was unaware of the witness until after trial and that no party had informed him of his existence.  (Op. at 13-14.)  Thus, the record was sufficiently vague to preclude a sound conclusion that counsel's failure to discover, respond to, or investigate Avila was substandard practice.

The state court concluded that even if Avila had testified, his testimony would only have constituted further impeachment of Sanchez, who already had provided testimony of "dubious credibility." (Op. at 15.)  The state court did not unreasonably apply clearly established federal law.  The record contained Petitioner's counsel's extensive cross-examination and impeachment of Sanchez, who admittedly had accepted Petitioner's hospitality, treacherously insinuated himself into the lives of Petitioner's family members, sought money from Petitioner's parents, and suffered four felony convictions before a purported religious conversion.  Sanchez's previous cooperation with law enforcement in order to escape from a gang was also before the jury.  As the appellate court noted, even the prosecutor had admitted to the jury that Sanchez's motivation was unclear and that he was odd and weird.  Although Sanchez was a key witness, given the uncertainty of what Avila's actual testimony under penalty of perjury would have been, and considering the extensive impeachment of Sanchez at trial, it was reasonable for the state court to conclude that Petitioner's counsel had not rendered

objectively substandard representation and that it had not been
shown that had Avila testified, there was a reasonable
probability that the result of the trial would have been
different.

Further, focusing on the totality of the evidence further
reflects the reasonableness of the conclusion that Petitioner had
not shown that had Avila testified, a more favorable result was
reasonably probable.  Sanchez knew many details concerning
Petitioner's conduct on the night of the shooting and his
previous relationship with the victim.  Thus, the assertion that
Petitioner had revealed further details of the shooting itself
was fully believable.  Independent evidence corroborated
Sanchez's testimony.  Avila was a recidivist whose information
was gathered while he was in custody.  There is no evidence that
Sanchez ever indicated to Avila that Sanchez's representations of
what Petitioner had told him were untrue; rather, Avila at best
provided a basis for inferring that Sanchez proceeded according
to his self-interest, a conclusion that was brought out at trial
in both the evidence and argument.  Further, Sanchez had been
sentenced already, and there was uncontradicted evidence that
there had been no agreement concerning Petitioner in connection
with Sanchez's guilty plea.

Other evidence provided an independent basis for the trier
of fact to conclude that Petitioner had inflicted the fatal
wound, including Petitioner's inconsistent statements concerning
the character of the shooting as an accidental or intentional
act, other significant inconsistencies in his stories, his
burning of evidence and delay in contacting authorities after the

shooting, and his motive to conceal his relationship with the victim.

In summary, the state court's conclusion that Petitioner had not demonstrated either substandard representation of counsel or prejudice was not an unreasonable application of clearly established federal law.  Further, the state court decision did not result in an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

> 4.  <u>Counsel's Failure to Object to</u>
>     <u>Admission of Petitioner's Statements</u>
>     <u>as Involuntary or in Violation of Miranda</u>

In the fourth sub-claim of ineffective assistance of counsel, Petitioner argues that trial counsel was ineffective for failing to object on due process grounds to admission of Petitioner's pretrial statements because they were 1) involuntary, and 2) intentionally obtained in violation of the requirements established by <u>Miranda v. Arizona</u>.

This sub-claim or set thereof was first raised during the second round of habeas proceedings in the petition filed in the MCSC. (HC2-MCSC, LD 8, 15-22.)  The MCSC noted that the ineffectiveness of trial counsel had been raised and rejected on appeal and in the habeas petition filed in the appellate court, as to which review was denied by the California Supreme Court. In denying the petition, the MCSC stated:

> On the issue of ineffective assistance of trial counsel, this court finds insufficient justification for renewal of that issue on habeas corpus.  <u>In re Harris</u> (1993) 5 Cal.4th 813, 825, 829.

The issue was not raised in Petitioner's petition to the DCA, which was summarily denied, and the Supreme Court summarily

1  denied the petition in which Petitioner raised the issue.

2       If it is presumed that the California Supreme Court's

3  summary denial incorporated the trial court's invocation of the

4  Waltreus rule, then there would be no decision on the merits to

5  review.  When it is clear that a state court has not reached the

6  merits of a petitioner's claim, or has denied the claim on

7  procedural grounds, the AEDPA's deferential standard does not

8  apply, and a federal habeas court must review the claim de novo.

9  Cone v. Bell, 556 U.S. 449, 129 S.Ct. 1769, 1784 (2009);  Nulph

10 v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

11      However, if it were concluded that the California Supreme

12 Court's summary denial was on the merits, then there would be a

13 decision on the merits to review, but no statement of reasoning.

14 Where the state court reaches a decision on the merits but

15 provides no reasoning to support its conclusion, a federal habeas

16 court independently reviews the record to determine whether

17 habeas corpus relief is available under § 2254(d).  Himes v.

18 Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

19      Here, regardless of the way the California Supreme Court's

20 decision is characterized, the foregoing analysis of Petitioner's

21 claims of due process and Miranda violations concerning

22 Petitioner's extra-judicial statements shows that the claims were

23 without merit.  Thus, efforts by counsel to exclude the

24 statements from evidence would have been futile.  Petitioner has

25 not shown that any prejudice resulted from counsel's failure to

26 object to the evidence of his statements.  Thus, Petitioner has

27 not shown that trial counsel engaged in prejudicial, substandard

28 practice by failing to raise the claims concerning Petitioner's

1  extra-judicial statements.  Cf. James v. Borg, 24 F.3d 20, 27
2  (9th Cir. 1994).

3      Petitioner's sixth and last set of sub-claims of ineffective
4  assistance of trial counsel is based on counsel's failure to
5  conduct an adequate investigation and to request discovery, which
6  allegedly resulted in counsel's failure to obtain recordings of
7  Sanchez's conversations with Petitioner after Petitioner's
8  release from jail, a crime report of Sanchez's possession of
9  cocaine in jail, and a laboratory report indicating the absence
10 of spermatozoa in the victim's vaginal swab.  These claims relate
11 to, and are in some respects dependent upon, Petitioner's claims
12 that the government's failure to disclose these materials to
13 defense counsel constituted a violation of the Due Process Clause
14 and the government's duty to disclose materials to the defense
15 pursuant to Brady v. Maryland, 373 U.S. 83, 87-88 (1963).

16     In the interest of judicial economy, the Court will defer
17 analysis of the ineffective assistance of counsel sub-claims
18 relating to the materials that are the subject of Brady claims
19 until after the Court's analysis of the pertinent Brady claims.

20     VII.  Prosecutorial Misconduct

21     Although the claim is placed within a larger argument
22 concerning cumulative error, Petitioner seeks reversal based on
23 allegations that in closing argument, the prosecutor vouched for
24 Sanchez's credibility, argued extra-record matters that were not
25 in evidence, and violated the advocate-witness rule. (FAP 46-52.)

26     A.  Exhaustion of State Court Remedies

27     Respondent argues that this claim or group of sub-claims
28 concerning prosecutorial misconduct was not presented as a

federal claim in the state courts, and thus state court remedies were not exhausted.  Respondent asserts that the entire petition should be dismissed because it contains a claim that has not been exhausted.  (Ans., doc. 75, 99:6-18.)

A petitioner who is in state custody and wishes to challenge collaterally a conviction by a petition for writ of habeas corpus must exhaust state judicial remedies.  28 U.S.C. § 2254(b)(1). The exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations.  Coleman v. Thompson, 501 U.S. 722, 731 (1991); Rose v. Lundy, 455 U.S. 509, 518 (1982); Buffalo v. Sunn, 854 F.2d 1158, 1162-63 (9th Cir. 1988).

A petitioner can satisfy the exhaustion requirement by providing the highest state court with the necessary jurisdiction a full and fair opportunity to consider each claim before presenting it to the federal court, and demonstrating that no state remedy remains available.  Picard v. Connor, 404 U.S. 270, 275-76 (1971); Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996).  A federal court will find that the highest state court was given a full and fair opportunity to hear a claim if the petitioner has presented the highest state court with the claim's factual and legal basis.  Duncan v. Henry, 513 U.S. 364, 365 (1995) (legal basis); Kenney v. Tamayo-Reyes, 504 U.S. 1, 9-10 (1992), superceded by statute as stated in Williams v. Taylor, 529 U.S. 362 (2000) (factual basis).

Additionally, the petitioner must have specifically told the state court that he was raising a federal constitutional claim.

Duncan, 513 U.S. at 365-66; Lyons v. Crawford, 232 F.3d 666, 669
(9th Cir.2000), amended, 247 F.3d 904 (9th Cir. 2001); Hiivala v.
Wood, 195 F.3d 1098, 1106 (9th Cir. 1999); Keating v. Hood, 133
F.3d 1240, 1241 (9th Cir. 1998).  In Duncan, the United States
Supreme Court reiterated the rule as follows:

> In Picard v. Connor, 404 U.S. 270, 275...(1971),
> we said that exhaustion of state remedies requires that
> petitioners "fairly presen[t]" federal claims to the
> state courts in order to give the State the
> "'opportunity to pass upon and correct' alleged
> violations of the prisoners' federal rights" (some
> internal quotation marks omitted). If state courts are
> to be given the opportunity to correct alleged violations
> of prisoners' federal rights, they must surely be
> alerted to the fact that the prisoners are asserting
> claims under the United States Constitution. If a
> habeas petitioner wishes to claim that an evidentiary
> ruling at a state court trial denied him the due
> process of law guaranteed by the Fourteenth Amendment,
> he must say so, not only in federal court, but in state
> court.

Duncan, 513 U.S. at 365-366.  The Ninth Circuit examined the rule
further in Lyons v. Crawford, 232 F.3d 666, 668-69 (9th Cir.
2000), as amended by Lyons v. Crawford, 247 F.3d 904, 904-05 (9th
Cir. 2001), stating:

> Our rule is that a state prisoner has not "fairly
> presented" (and thus exhausted) his federal claims
> in state court unless he specifically indicated to
> that court that those claims were based on federal law.
> See, Shumway v. Payne, 223 F.3d 982, 987-88 (9th Cir.
> 2000). Since the Supreme Court's decision in Duncan,
> this court has held that the petitioner must make the
> federal basis of the claim explicit either by citing
> federal law or the decisions of federal courts, even
> if the federal basis is "self-evident," Gatlin v. Madding,
> 189 F.3d 882, 889 (9th Cir. 1999) (citing Anderson v.
> Harless, 459 U.S. 4, 7... (1982), or the underlying
> claim would be decided under state law on the same
> considerations that would control resolution of the claim
> on federal grounds, see, e.g., Hiivala v. Wood, 195
> F.3d 1098, 1106-07 (9th Cir. 1999); Johnson v. Zenon,
> 88 F.3d 828, 830-31 (9th Cir. 1996); Crotts, 73 F.3d
> at 865.
> ...
> In Johnson, we explained that the petitioner must alert

95

the state court to the fact that the relevant claim is a federal one without regard to how similar the state and federal standards for reviewing the claim may be or how obvious the violation of federal law is.

Lyons v. Crawford, 232 F.3d 666, 668-69 (9th Cir. 2000), as amended by Lyons v. Crawford, 247 F.3d 904, 904-05 (9th Cir. 2001).

Citation to either a federal or state case involving the legal standard for a federal constitutional violation is sufficient to establish exhaustion. Castillo v. McFadden, 399 F.3d 993, 999 (9th Cir. 2005) (citing Lyons v. Crawford, 232 F.3d 666, 670 (2000), as modified by 247 F.3d 904 (9th Cir. 2001)).

Examination of the petition for review filed in the California Supreme Court reflects that Petitioner identified among the questions presented for review the issue of whether he was denied due process and a fair trial when the prosecutor 1) called another prosecutor to the stand to testify concerning Sanchez's credibility, 2) vouched for the credibility of the state's key witness and argued matters not within the record, and 3) used false testimony. (Doc. 30, 1b.) Petitioner cited Giglio v. United States, 405 U.S. 150, 154 (1972), concerning the failure to disclose a key prosecution witness's agreement with the prosecution and to correct false testimony on the matter as a denial of the due process clause. (Id. at 4e.) In connection with the contention concerning prosecutors acting as witnesses, Petitioner relied on federal authority, United States v. Prantil, 764 F.2d 548, 552-53 (9th Cir. 1985), concerning a defendant's constitutional right to confrontation and cross-examination guaranteed under the Sixth Amendment; likewise, in connection

with references to extra-record evidence, Petitioner relied on United States v. Edwards, 154 F.3d 915, 921 (9th Cir. 1998), concerning placing the prestige of the government behind the witness, or indicating that information not presented to the jury supports the testimony of a witness whose credibility is crucial, as likely to jeopardize the fundamental fairness of the trial. Petitioner expressly contended that the prosecutor's argument concerning Sanchez's false claims, her use of another prosecutor's testimony, and her personal vouching by testifying indirectly as to how deals were made all combined to constitute a denial of due process so serious that reversal was required even without a showing of prejudice.  (LD 30, 4i-4j.)

The Court concludes that Petitioner, acting on his own behalf, sufficiently raised the claim or claims as federal claims to exhaust his state court remedies.

### B.   Procedural Default

The claim of prosecutorial misconduct was first raised in the third round of state habeas in a petition filed in the MCSC as part of a claim concerning cumulative prejudice. (HC3-MCSC, LD 28, doc. 36, pp. 13-25.)  The MCSC denied the petition because the petition was successive, and Petitioner was presenting claims in a piecemeal fashion. (LD 28, 1-2.)  The MCSC also stated the following with respect to Petitioner's claim of cumulative prejudice:

> Since there has been no legal error and petitioner's factual allegations lack credibility his claim must be denied.

(LD 28, 3.)  The claim was raised in the habeas petition to the DCA (LD 29, 4d-4j), which denied the petition, stating that

97

1  Petitioner was filing piecemeal petitions, and citing to In re
2  Clark, 5 Cal.4th 750, 767-68 (1993) (LD 29).  The claim was
3  raised in the petition for review filed in the California Supreme
4  Court, which was summarily denied.  (LD 30, 4d-4k, & order of
5  denial.)

6      The doctrine of procedural default is a specific application
7  of the more general doctrine of independent state grounds.  It
8  provides that when a prisoner has defaulted a claim by violating
9  a state procedural rule which would constitute adequate and
10 independent grounds to bar direct review in the United States
11 Supreme Court, he or she may not raise the claim in federal
12 habeas, absent a showing of cause and prejudice or that a failure
13 to consider the claim will result in a fundamental miscarriage of
14 justice.  Coleman v. Thompson, 501 U.S. 722, 729-30 (1991);
15 Bennett v. Mueller, 322 F.3d 573, 580 (9th Cir. 2003).  This rule
16 applies regardless of whether the default occurred at trial, on
17 appeal, or on state collateral review.  Edwards v. Carpenter, 529
18 U.S. 446, 451 (2000).

19     However, a procedural default is not jurisdictional.  Trest
20 v. Cain, 522 U.S. 87, 89 (1997).  Instead, it proceeds from
21 concerns of comity and federalism because a prisoner's failure to
22 comply with a state's procedural requirement for presenting a
23 federal claim has deprived the state courts of an opportunity to
24 address the claim in the first instance.  Coleman v. Thompson,
25 501 U.S. 722, 831-32 (1991).  Therefore, a court may bypass an
26 issue of procedural bar in the interest of judicial economy, such
27 as where the issue of procedural default is complex and the claim
28 may easily be resolved against the petitioner.  Lambrix v.

1  Singletary, 520 U.S. 518, 525 (1997) (citing 28 U.S.C.

2  § 2254(b)(2), which permits a federal court to deny a habeas

3  petition on the merits notwithstanding the applicant's failure to

4  exhaust state remedies); Franklin v. Johnson, 290 F.3d 1223, 1232

5  (9th Cir. 2002) (noting the power of appellate courts to reach

6  the merits of habeas petitions if on their face and without

7  regard to any facts that could be developed in a lower court,

8  they are clearly not meritorious).

9      With respect to the claims denied as successive or

10 piecemeal, the Court exercises its discretion to consider the

11 merits of the claims in the interest of the efficient use of

12 resources.[11]

13      C.  Background

14      In his final petition filed in the California Supreme Court,

15 Petitioner alleged that the prosecutor knowingly used false

16 testimony, violated the advocate-witness rule, and vouched for

17 Sanchez. (HC3-CASC, LD 30, 4d.)  Petitioner referred to

18 Sanchez's testimony that he had never asked law enforcement or

19 the D.A. for any favors. (Id. at 4d-4h; RT 221.)  Petitioner

20 noted the testimony of Madera County Deputy District Attorney

21 Robert McGurty, who had prosecuted Sanchez on the charge of

22 felony assault with intent to rape, that Petitioner's case had

23 nothing to do with the plea in the sexual assault case. (Id. at

24 4h; RT 257-62.)  Petitioner noted Sanchez's "recantation," in

25

26      [11]  In view of the Court's determination to reach potentially
    procedurally defaulted issues in the interest of judicial economy, the Court
27  finds it unnecessary to reach Petitioner's argument that the Court should
    bypass the procedural default because Petitioner is actually innocent of the
28  homicide (FAP 54-56), or issues of cause and prejudice or fundamental
    miscarriage of justice.

1  which Sanchez allegedly stated that he lied about Petitioner's
2  confession because he was scared of other inmates' disclosing the
3  nature of his crime (sexual assault) to other inmates, and of
4  being faced with a long prison term if drug charges were filed.[12]
5  (Id.)  Petitioner argued that Sanchez's credibility was a major
6  issue, and the police knew that Sanchez's testimony that he
7  expected nothing was untrue; thus, the prosecutor deliberately
8  and knowingly used false evidence.

9     Petitioner also argued that the prosecutor's argument to the
10  jury constituted vouching, pointing to the prosecutor's argument
11  that Sanchez had no motive to lie, had nothing to gain by
12  testifying, had never asked for or been offered anything, and was
13  honest and forthright.  (Id. at 4g-4h, RT 315-16.)

14     The prosecutor's initial argument covered the physical
15  evidence, Petitioner's statements, and the testimony and
16  credibility of Sanchez.  (RT 303-24.)  She argued that
17  credibility was determined by what one sees and hears, and that
18  she believed that Rudy came off as very credible during his
19  testimony.  (RT 315.)  She argued that he had no reason to lie
20  and ample reason to avoid prison, where he could be labeled as an
21  informant or even killed; he had nothing to gain from testifying
22  in the sense that he never was offered, or got, anything, and he
23  was trying to do the right thing despite a criminal past.  (Id.)
24  She noted the evidence of multiple details concerning
25  Petitioner's life and his relationship with the victim to which
26  Sanchez testified, arguing that this evidence substantially

27

28     [12] The alleged "recantation" of Sanchez is more fully discussed in
connection with the Brady claims.

100

1   corroborated Sanchez's testimony.  (RT 316-18.)

2       Defense counsel's argument likewise covered the physical

3   evidence, Petitioner's statements, and Sanchez.  He argued that

4   Sanchez was an opportunist, drug dealer, perpetrator of assault

5   with intent to rape, and a user and abuser of Petitioner and his

6   family who was not entitled to the jury's trust.  He asserted

7   that because Sanchez was a recidivist serving a term of probation

8   for five years, Sanchez was interested in helping the prosecution

9   so that he could rely on that cooperation when he next returned

10  to the criminal justice system.  Defense counsel noted the lack

11  of corroboration for Sanchez's testimony that there were two guns

12  in the car, and the inconsistency of such a circumstance with the

13  physical evidence.  (RT 324-38.)

14      Petitioner emphasizes one portion of the prosecutor's final

15  closing argument, which occurred right after the prosecutor

16  stated that the bullet path and Sanchez were the major pieces of

17  evidence supporting a conviction:

18      Talking about Rudy Sanchez.  Mr. Garvin paints
        him as an opportunist.  What was he trying to get
19      here?  He says, "Gee, in the future he is going to
        violate his probation and then he is going to come
20      to the DA and say, 'I did this' and "I did that[.]'"
        That's not necessarily how we operate.  So we make
21      a deal with someone and we give something in
        return, defense finds out about it, it will come
22      out.  There's even a contract made up.  That's that.

23      He never asked for anything.  He never got anything.
        And I bet that he doesn't expect anything.  I don't
24      think he's going to fall by the way side next month,
        next week, next year, go back to his old ways,
25      starts selling drugs or doing whatever, I don't know.
        But you have to judge him by what he's like today or
26      yesterday when he testified.  You heard him.  You saw
        him.

27
    (LD 30, 4h, RT 342-43.)  She argued that his testimony regarding
28

101

1  two guns was a weird thing to make up, and she characterized

2  Sanchez's behavior in his friendship with Petitioner as odd.

3  (Id. at 344.)

4       D.  Analysis

5       Prosecutorial misconduct requires reversal of a conviction

6  for a new trial if it so infects the trial with unfairness as to

7  make the resulting conviction a denial of due process.  Darden v.

8  Wainwright, 477 U.S. 168, 181 (1986); Comer v. Schriro, 480 F.3d

9  960, 988 (9th Cir. 2007).  Prosecutorial misconduct deprives the

10 defendant of a fair trial as guaranteed by the Due Process Clause

11 if it prejudicially affects the substantial rights of a

12 defendant.  United States v. Yarbrough, 852 F.2d 1522, 1539 (9th

13 Cir. 1988) (citing Smith v. Phillips, 455 U.S. 209, 219 (1982)).

14      Vouching consists of placing the prestige of the government

15 behind a witness through personal assurances of the witness's

16 veracity, or suggesting that information not presented to the

17 jury supports the witness's testimony.  United States v.

18 Necoechea, 986 F.2d 1273, 1276 (9th Cir. 1993).  Vouching for the

19 credibility of a witness or expressing a personal opinion

20 concerning the accused's guilt can pose two dangers.  First, it

21 can convey the impression that evidence known by the prosecutor

22 but not presented to the jury supports the charges, and thus it

23 can jeopardize the defendant's right to be tried solely on the

24 basis of the evidence presented to the jury.  United States v.

25 Young, 470 U.S. 1, 18 (1985).  Second, the prosecutor's opinion

26 reflects the imprimatur of the government and may induce the jury

27 to trust the government's judgment rather than its own assessment

28 of the evidence.  Id. at 18-19.  Where a prosecutor engages in

102

argument that violates the ethical principle that a lawyer not
express a personal belief or opinion in the truth or falsity of
any testimony or evidence, the violation must be viewed in
context to determine whether the prosecutor's conduct affected
the fairness of the trial.  United States v. Young, 470 U.S. at
10-11.  To determine whether prejudicial error occurred, a court
must consider the probable effect of the prosecutor's argument on
the jury's ability to judge the evidence fairly.  Id. at 12.
Vouching for a witness's credibility is more likely to be
damaging where the credibility of the witness is crucial.  United
States v. Edwards, 154 F.3d 915, 921 (9th Cir. 1998).

However, prosecutors may argue reasonable inferences based
on the evidence, including that one of the two sides is lying.
United States v. Necoechea, 986 F.2d 1273, 1276.

Attorneys are generally prohibited from taking the witness
stand to testify in a case they are litigating because it raises
a risk that jurors will be unduly influenced by the prestige and
prominence of the prosecutor's office and will base their
credibility determinations on improper factors.  United States v.
Edwards, 154 F.3d 915, 921 (9th Cir. 1998).  Related concerns for
maintaining the appearance of justice and public confidence in
the administration of justice are especially significant where
the testifying attorney represents the prosecuting arm and
advocate of the government.  Id.  The rule functions to maintain
a boundary between the advocate and the witness by preventing an
attorney from appearing as both a witness and an advocate in the
same litigation.  United States v. Prantil, 764 F.2d 548, 552-53
(9th Cir. 1985).  When, in context, a prosecutor is portrayed as

1  being personally involved with an investigation or transaction
2  that is in evidence, it can be a violation of the rules against
3  vouching or advocates acting as witnesses.  See, United States v.
4  Hermanek, 289 F.3d 1076, 1089-99 (2002) (prosecutor's reference
5  to the team investigating the crime as "we" and "us" was
6  considered to be a violation).

7       In California, a claim of prosecutorial misconduct is
8  forfeited on appeal if there was no objection in the trial court
9  unless objection was impossible or futile, or a timely admonition
10 would not have cured the harm caused by the misconduct.  People
11 v. Cole, 33 Cal.4th 1158, 1201 (2004).  Failure to comply with
12 California's rule requiring a contemporaneous objection has been
13 held to result in a procedural default of a prosecutorial
14 misconduct claim.  See, Rich v. Calderon, 187 F.3d 1064, 1069-70
15 (9th Cir. 1999) (citing Coleman v. Thompson, 501 U.S. 722, 729-
16 32, 750 (1991)).  Here, there was no objection to any of the
17 alleged misconduct at the trial level.  It does not appear that
18 objection was impossible or futile.  Thus, a state court could
19 reasonably have denied the claim based on a conclusion that the
20 issue had been waived.

21      However, as previously noted, the Court will proceed to the
22 merits of the claim.  An examination of the substance of
23 Petitioner's claim results in a conclusion that the advocate-
24 witness rule was not violated by the prosecutor's calling Deputy
25 District Attorney McGurty to testify concerning the absence of an
26 agreement relating to Sanchez's sexual assault conviction, or by
27 the prosecutor's argument concerning McGurty's testimony.  There
28 is no suggestion in the record that the prosecutor in

1   Petitioner's murder case participated in Petitioner's sexual

2   assault case.  Further, the record does not support an inference

3   that McGurty participated in the investigation or prosecution of

4   Petitioner's murder case; rather, McGurty did not know that

5   Sanchez was involved in Petitioner's case when he prosecuted

6   Sanchez for sexual assault, offered to accept a plea of guilty to

7   sexual assault with intent to rape in exchange for a sentence of

8   one year in jail and felony probation for five years, and noted

9   the entry of a plea of guilty by Petitioner on March 23, 1998.

10  (RT 259-60.)  McGurty was thus a witness with personal knowledge

11  of the plea bargaining process in the prosecution of Sanchez's

12  sexual assault case, which was a separate prosecution.  The fact

13  that McGurty happened to be a prosecutor in the same office as

14  the prosecutor of Petitioner's case does not endow him with the

15  status of an advocate in Petitioner's case.  Accordingly, no

16  violation of the advocate-witness rule has been established.

17      With respect to vouching, the prosecutor did assert what she

18  thought of Sanchez's credibility.  (RT 315.)  However, that

19  remark was preceded by her statement that a persons's credibility

20  is determined by what was seen and heard, and followed

21  immediately by a review of Sanchez's testimony and motivation and

22  the pertinent corroborating evidence.  (RT 315-16.)  The

23  prosecutor also stated that she did not think that Sanchez was

24  going to go back to his old ways.  (RT 343.)  However, that

25  statement was followed directly by her admonition that the jury

26  had to judge him by what was seen and heard when he testified.

27  (RT 343.)  The comments that could be understood as personal

28  opinion were made in the context of a review of Sanchez's

testimony and the related evidence.  Although she occasionally
expressed her argument as her own thoughts, the prosecutor's
comments were not glaring statements of opinion as distinct from
comment on what she thought the reasonable inferences were to be
drawn from the evidence.

In controverting defense counsel's argument that Sanchez
wanted to curry favor with the prosecution for his eventual
advantage in connection with any future contacts he might have
with law enforcement, the prosecutor referred to how "we"
operate, how "we" make a deal with someone, and how "we" give
something in return.  This identification with the larger
prosecution team did raise a risk of improper influence upon the
jury with respect to a credibility determination.  However, that
determination concerned directly the testimony of McGurty, whom
defense counsel declined to cross-examine.  The prosecutor's
comment about how they operated thus could reasonably have been
understood as comment upon the evidence, which reflected a plea
bargain that was written up and recorded in a file, as distinct
from a vague, amorphous, unilateral expectation of leniency at
some uncertain time in the future.  The prosecutor was
underlining the fact that the evidence reflected that Sanchez
never requested or received any benefit in connection with the
murder case, including any favors in relation to the sexual
assault prosecution.  Her argument was thus based on the evidence
in the record, and it did not raise any appreciable risk that the
jury would think she was relying on unspecified, extra-record
evidence.  To the extent that she injected the stature of the
prosecutor's office into her argument, her remarks were directly

106

focused on the credibility of McGurty.  In context, it is clear
that the prosecutor was arguing that there was no component in
Sanchez's plea bargain that related to Sanchez's conduct or
testimony in Petitioner's murder prosecution, and that some vague
hope for an indefinite benefit in the future did not suffice as a
basis for significant bias or interest on the part of Sanchez in
connection with the testimony he gave in Petitioner's case.

The Court concludes that viewing the argument in the context
of the evidence admitted at trial, the prosecutor's argument was
not likely to affect the jury's ability to judge the evidence
fairly.  Petitioner has failed to show that any misconduct on the
part of the prosecutor affected the fairness of the trial.  The
Court concludes that the state court's denial of Petitioner's
claim was not contrary to, or an unreasonable application of,
clearly established federal law.  Further, it did not result in a
decision that was based on an unreasonable determination of the
facts in light of the evidence presented to the state court.

VIII.  <u>Failure to Disclose Material, Exculpatory Evidence</u>

Petitioner argues that his right to due process of law
protected by the Fifth and Fourteenth Amendments was violated by
the prosecution's failure to disclose material, exculpatory
evidence.  (FAP 34-39.)  Because the claims were raised in
different state-court proceedings, different decisions
adjudicated the various issues.  Thus, each claim will be set
forth and analyzed separately.

A.  <u>Failure to Disclose Evidence that Sanchez
    Possessed Cocaine in Jail</u>

Petitioner argues he was denied due process of law by the

1  prosecution's failure to disclose an incident report of the

2  Madera County Department of Corrections (MCDC) dated June 23,

3  1997, in which it was reported that Sanchez possessed "crack"

4  cocaine when he was searched upon his arrival at jail on June 22,

5  1997.  (FAP 34-35.)

6      Although Sanchez's alleged recantation of his trial

7  testimony was raised in Petitioner's first habeas petition heard

8  by the DCA concurrently with Petitioner's direct appeal (LD 10),

9  the Brady issue as such was first presented to the DCA in

10 Petitioner's second round of state habeas proceedings.  (LD 10,

11 ground 3.)  The petition was denied on April 3, 2003, without a

12 statement of reasoning or authority.  (Doc. 59, 124.)  The claim

13 was presented in a petition for writ of habeas corpus filed in

14 the California Supreme Court (LD 11), which also summarily denied

15 the petition (doc. 59, 126).

16     The claim based on the failure to disclose the incident

17 report was not raised in Petitioner's third round of state habeas

18 proceedings, so the California Supreme Court's summary denial is

19 the most recent decision on the claim.  Because the parties

20 advance no basis in the record to rebut the presumption that the

21 summary decision was an adjudication on the merits within the

22 meaning of § 2254(d)(1), the Court will consider the Supreme

23 Court's decision.  See, Harrington v. Richter, 131 S.Ct. at 784-

24 85.  Where a state court has not explained its reasons, the

25 petitioner's burden is met by showing there was no reasonable

26 basis for the state court to deny relief.  Id. at 784.  This

27 Court will review the state court's decision and the record and

28 will determine if the state court's decision was contrary to, or

1  an unreasonable application of, clearly established Supreme Court

2  law.  See, Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000)

3  (overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63,

4  75-76); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

5          1.  Background

6       The petition filed in the California Supreme Court included

7  as an exhibit an incident report, dated June 23, 1997, made by

8  Officer D. Bonilla of the MCDC, that reflects that Rudy Sanchez

9  admitted to the officer that on the street he had been given a

10  substance that he knew was a narcotic.  Sanchez stated that he

11  intended to dispose of it but did not have time to do so before

12  being arrested and incarcerated.  (LD 11, exs. (unpaginated).)

13  The rock measured 1/4 inch by 1/4 inch and tested positive for

14  crack cocaine.  (Id.)  The report reflects that a crime report

15  was "to be written subsequently."  (Id.)

16       The exhibits to the petition included another incident

17  report written by Officer D. Zepeda on November 11, 1997, when

18  Sanchez planned to appear in the Borden Municipal Court on the

19  sexual assault charge.  The report reflected Sanchez's reported

20  fear of gang-related violence from the boyfriend of the mother of

21  the victim of the assault with which he was charged.  (Id.)

22  Zepeda informed Correctional Officer Gonzalez of the problem, who

23  interviewed Petitioner.  Extra security was provided.  (Id.)

24       The petition considered by the California Supreme Court

25  included copies of the declarations concerning Sanchez's post-

26  trial statements which were the basis of Petitioner's

27  unsuccessful argument in the first habeas petition before the DCA

28  that Sanchez's alleged recantation was newly discovered evidence

109

1   that warranted a new trial.

2        In a declaration dated February 9, 2001, Petitioner's

3   sister, Cheri Cottrell Bodle, stated that when visiting Sanchez

4   in prison in November 2000, he orally admitted that he had lied

5   in court and that Petitioner had never admitted killing Bonham.

6   Further, he told Bodle that he had been caught using "crank"

7   while incarcerated in the jail, and in return for not being

8   charged, he was persuaded to "snitch" on Petitioner and was told

9   what to say and how to say it. (LD 11, ex. 1.)  Bodle declared

10  that Sanchez said he was instructed to stay close to Petitioner

11  and befriend him after release.  Sanchez allegedly stated that he

12  did so and later told his story to the officers investigating the

13  shooting.  Bodle declared that Sanchez said that the prosecutor

14  was unaware of Sanchez's drug problem in the jail, and Sanchez

15  did not know if any of the investigating deputies were aware.

16  Bodle declared that Sanchez wrote and signed short statements and

17  an apology freely and voluntarily, and without any coaching from

18  Bodle.  Bodle sent the papers to Mr. Blake, Petitioner's

19  appellate attorney.  (Id.)

20        The exhibits also included two short statements and an

21  apology allegedly written by Sanchez in Bodle's presence. (LD

22  11, ex. 1.)

23        One statement dated November 30, 2000, was allegedly signed

24  by Rudy Sanchez, who gave his address and prisoner number as

25  well, and was written to Mr. Smothers, Petitioner's former trial

26  attorney.  Sanchez wrote:

27          Well first of all Dale is innocent.  Everything
            that was said on my behalf, was lie's.  I realize
28          I have to do what is right. Mr. Smother take

110

Dale case.  He's innocent he never shot Kathy
[B]onham.

(Id.)

In another statement, which was undated but allegedly signed by Sanchez, the following was stated:

> I Rudy Sanchez was scare for my safety,
> because of what happen, about drugs in the
> Madera County Jail, I did what I did because,
> I was looking at a lot of time, before my
> oranginl charge, what I'm in here now for,
> I was told to work for Gonzale's, so
> nothing will happen, I'm, a gang drop out,
> and I was scared.

(Id.)

The third statement was undated and was written on a copy of a portion of the book of Psalms from the Bible.  The handwritten text stated:

> Dale I'm sorry for what I did don't give up.  Please
> forgive me. Your sister will work it out.

(Id.)  The statement was followed by the words "Bobby Fisher," an alleged reference to chess master Bobby Fischer by Sanchez, who Bodle declared had taught Petitioner to play chess.  (Id.)

The habeas petition before the California Supreme Court also included the declaration of Stevan Rosenlind, an experienced, licensed private investigator and educator who was retained by Petitioner's appellate counsel, Christopher Blake, and was present with Blake during a visit to Sanchez in prison on January 26, 2001, when Blake showed Sanchez the previously described letters believed to have been given to Bodle.  Rosenlind declared that Sanchez indicated that he had written the letters in Bodle's presence, twice saying, "When I wrote those letters...."  Sanchez read over the letter written on Bible verses and then made

1  statements to Rosenlind indicating that Sanchez was affirming and
2  acknowledging that he personally wrote the letter.  (Id.)[13]

3      The habeas petition[14] filed in the California Supreme Court
4  included summaries of the evidence presented at trial, including
5  Sanchez's testimony.  (LD 11-13.)

6      Rudy Sanchez was in the Madera County Jail from June 22
7  through 26, 1997, and it was in connection with this custody that
8  Sanchez was found to have been in possession of crack cocaine on
9  June 23, 1997.  (LD 11, p. A, 14.)  Bonham died on the night of
10 November 24, 1997.  (Id. at "Page a-1.")  Petitioner was arrested
11 at the hospital and placed into the Madera County Jail on
12 November 27, 1997.  (Id. at "Page a-3"; LD 12 at 7.)

13     Sanchez returned to jail custody on September 17, 1997, in
14 connection with a charge of assault with intent to commit rape
15 and remained there until May 15, 1998.  (LD 11, pp. A, a-6.)
16 Sanchez had been in prison at least three times, mostly for drug-
17 related offenses.  (Id. at p. a-6.)  Sanchez pleaded guilty to
18 the charge of assault with intent to commit rape pursuant to a
19 plea bargain and served only one year with four years probation.
20 (LD 11, pp. A, a-7.)  Sanchez had been a "snitch" in San
21 Francisco.  (Id. at p. a-7.)

22     The initial charge that Petitioner had murdered Bonham was
23 dismissed on April 6, 1998, after a preliminary hearing held in

24

25     [13] No declaration from Blake was included in the petition filed in the
26 California Supreme Court.

27     [14] Although Petitioner's supplements to the petition were received and
   not filed by the California Supreme Court (LD 12-14), Respondent notes the
28 supplements and does not object to consideration of them.  (Ans., doc. 75,
   55:18-19.)

February 1998 and a motion to dismiss pursuant to Cal. Pen. Code § 995 on the grounds of insufficiency of evidence and denial of a substantial right because Petitioner's counsel was not permitted to cross-examine Detective Molsbergen concerning his investigation and findings from the Department of Justice and the Los Angeles Coroner's Office that showed that all the evidence was consistent with a self-inflicted gunshot wound.  (LD 32, ex. d, mot. at 2-4, p. 2.)  Petitioner was released from custody. The main difference between the first and second prosecution was the presence of Sanchez at the second trial.  (LD 13, 8.) Charges were not re-filed until Sanchez surfaced, alleging that Petitioner had confessed.  (LD 12, 7.)

At trial, Sanchez denied having asked for or having expected any favors from anyone in a position of authority in return for being an informant.  (Id. at 8.)  The prosecutor argued that Sanchez did not have any motive to lie, was thus credible, and provided primary or major evidence, without which the trial would not have occurred.  (Id.)

Respondent asserts that when considering Petitioner's Brady claim concerning the incident report, the state court had before it the facts developed in the first habeas corpus petition filed in the DCA that was pending simultaneously with his direct appeal to that Court.  (Answer, doc. 75, 45-46, 46 n. 27.)  Respondent cites to LD 14, which is a copy of the docket in Dale L. Cottrell on Habeas Corpus, case number S115848 (HC2-CASC).  Review of the docket reveals no entry that would indicate that all the facts developed in the first habeas petition in the DCA were before the California Supreme Court; instead, it reflects that all the

documents received by the court were submitted by Petitioner, and review of those documents does not provide support for Respondent's assertion.

Further, the issues raised in Petitioner's first habeas corpus petition before the DCA that was pending contemporaneously with his appeal (HC1) did not include a claim of violation of due process due to a failure to disclose a report of possession by Sanchez of cocaine in jail; rather, the petition concerned whether Petitioner was entitled to a new trial, or a further hearing on his motion for new trial, based on previously raised claims of ineffective assistance of counsel and newly discovered evidence that suggested a recantation and cooperation by Sanchez with law enforcement.  The allegedly newly discovered evidence did not include the report that is the subject of the instant contention, although it did suggest that Sanchez had done what he did because of concerns related to drugs in jail.[15]  Therefore, it does not appear that the DCA's opinion in the consolidated appeal and habeas petition would have contained any findings of fact pertinent to the Brady issue.

2.  Legal Standards

The Due Process Clause of the Fifth and Fourteenth Amendments imposes upon the prosecution a duty to disclose evidence in its possession that is favorable to an accused if it is material either to guilt or punishment.  Brady v. Maryland, 373 U.S. 83, 87-88 (1963).  The prosecution violates its constitutional duty to disclose to the defense material

---

[15] The Court notes that in the petition pending before this Court, Petitioner has not raised any claim concerning the alleged recantation.

exculpatory evidence where, regardless of whether the defense requested the evidence, 1) the evidence was favorable to the accused because it was either exculpatory or impeaching; 2) the evidence was suppressed by the government either willfully or inadvertently; and 3) prejudice resulted from the failure to disclose. Strickler v. Greene, 527 U.S. 263, 280 (1999).

Evidence is material in this context if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Kyles v. Whitley, 514 U.S. 419, 433-34 (1995). A reasonable probability of a different result is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. United States v. Bagley, 473 U.S. 667, 678 (1985). Although each item of undisclosed evidence must be evaluated, the cumulative effect of all suppressed evidence is evaluated for purposes of materiality. Kyles, 514 U.S. at 436-37.

### 3. Analysis

The Respondent does not contend that the MCDC report was not suppressed or that the report was outside the scope of the prosecutor's duty of disclosure.[16] Thus, the Court will consider whether prejudice resulted from the prosecution's failure to

---

[16] Even though a prosecutor is actually unaware of exculpatory or impeaching evidence that is in the government's hands, the prosecutor has a duty to learn of any such evidence known to others acting on the government's behalf. This is because the prosecution is in a unique position to obtain information known to other agents of the government, and thereby to ensure the accuracy and fairness of trials by submitting all available evidence bearing on guilt or innocence to the adversary process. Carriger v. Stewart, 132 F.3d 463, 479-80 (9th Cir. 1997). It has been held that when the state chooses to use a career criminal as a witness, it is the state's obligation to turn over all pertinent information bearing on the witness's credibility, including criminal records and correctional files. Id. at 480.

disclose the report by determining whether the undisclosed report was material.

The state court was presented with a record that demonstrated that Sanchez's testimony provided the sole evidence of Petitioner's confession of guilt. Further, it showed that the prosecutor emphasized Sanchez's testimony in closing argument to the jury. The prosecutor characterized Sanchez's testimony and the evidence concerning the path of the bullet through the victim's head as the two major or primary pieces of evidence in the case, without which none of the participants in the trial would be there. The prosecutor also argued that Sanchez had no motive to lie and had never asked for or been offered anything in exchange for his testimony. The central issue in the case was whether the death was the result of suicide, accident, or the criminal act of Petitioner. Sanchez's testimony thus made conviction more likely, and it is possible that the introduction of evidence that would significantly impeach Sanchez might have changed the result.

Sanchez's possession of cocaine upon his arrest some five months before Bonham's death and over a year before Sanchez's testimony at trial could provide a basis for an inference of bias or interest. Because significant time had already elapsed between the jail possession incident and Bonham's death without referral for prosecution, and further considering that Sanchez was affirmatively prosecuted for a serious felony during the interim without any apparent consideration by the prosecutor's office, the inference of bias would not have been particularly strong. Nevertheless, a reasonable juror could have concluded

that Sanchez would have some degree of subjectively based fear of prosecution for the drug possession and thus would have a desire to please or cooperate with authorities.

However, the evidence before the state court did not establish that there was a deal or agreement with authorities that Sanchez would give particular testimony or would otherwise cooperate in Petitioner's case in order to avoid prosecution for the offense or to receive other consideration related to the drug possession.  The declaration of Bodle as to what Sanchez told her would have been hearsay if offered to prove the truth of the matter asserted, namely, that Petitioner had a deal with authorities.  See, Cal. Evid. Code § 1200.[17]  Sanchez's alleged oral statements to Bodle were not made under penalty of perjury. Further, they were vague and devoid of underlying facts: Sanchez did not identify the person or persons who allegedly had persuaded him to "snitch" on Petitioner, and he did not provide any facts concerning the circumstances concerning the making of the alleged deal.

Sanchez's written statements were likewise unsupported by a declaration or verification and were similarly vague and uncertain.  It is unclear to what Sanchez was referring when he wrote that everything that was said on his behalf was lies.  A conclusion that this was a reference to Sanchez's trial testimony is not supported by the plain meaning of the statement, which refers to things being said on Sanchez's behalf, but not to

---

[17] Cal. Evid. Code § 1200 provides that hearsay evidence, defined as evidence of a statement made other than by a witness while testifying at the hearing that is offered to prove the truth of the matter stated, is inadmissible except as otherwise provided.

1  testimony given by Sanchez himself that related to Petitioner.

2  It is unclear how Sanchez's having to do what was right related

3  to Smothers' taking Petitioner's case; Sanchez did not indicate

4  that he himself had lied on the stand or had engaged in any

5  misconduct.  His assertions of Petitioner's innocence, which

6  could not have had a basis in personal knowledge, were

7  unexplained and unsupported by any statement of fact.

8       Similarly, Sanchez's statements concerning what he did were

9  barren of any indication or description of what it was that he

10 did.  His expressed fear for his safety appears to have rested on

11 what happened about drugs in the jail and on his predicament of

12 already being a gang drop-out and "snitch," who was facing a long

13 period of incarceration on the assault with intent to rape.  He

14 omitted any details about the alleged instruction to work for

15 "Gonzale's so nothing will happen...."  Without any information

16 about the persons involved or any other circumstance except for a

17 general indication of timing, a state court could reasonably have

18 concluded that the Petitioner had not stated a prima facie case

19 that Sanchez received any promises or instructions.

20      The third statement constituted an apology for what Sanchez

21 did and a request for forgiveness.  However, the conduct that

22 precipitated the communication was not specified.  Therefore, the

23 state court could have reasonably concluded that Sanchez was

24 referring to his giving testimony against his friend after having

25 developed a friendship in order to gain information that Sanchez

26 ultimately intended to transmit to the authorities in the hope of

27 receiving some favorable treatment.  The statements lack the

28 requisite specificity to support a conclusion that Sanchez was

apologizing for having given false testimony, or that a
representation that he had falsified testimony was implied in his
statements.

Rosenlind's declaration that Sanchez confirmed having
written the statements was hearsay because it was a statement
made by one other than Rosenlind that was offered to prove the
truth of the matter asserted.

Further, Petitioner had alleged in his petition that the
prosecutor and Detective Molsbergen had denied the existence of
any deal with Sanchez.

Evidence that testimony was given by a witness with the hope
that it would result in a reduced sentence for pending criminal
charges does not constitute sufficient evidence to establish an
agreement. Williams v. Woodford, 384 F.3d 567, 598-99 (9th Cir.
2004), reh. den. in Williams v. Woodford, 396 F.3d 1059 (9th Cir.
2005). In the absence of a promise or a deal, a witness's
subjective belief that he might receive lenient treatment in
exchange for testifying does not render perjurious the witness's
testimony that he received no promises that he would benefit from
testifying. Hovey v. Ayers, 458 F.3d 892, 917 (9th Cir. 2006).

Here, the evidence before the state court showed that when
Sanchez testified at the trial over a year after he was found in
possession of cocaine in the jail, he had not been referred for
prosecution or charged criminally in connection with the
possession, but he had been charged with a quite serious,
separate offense involving a sexual assault and had received one
year in jail and five years probation. The evidence arising
after the trial did not establish that he had given false

testimony at the trial, that any favors or benefits had been
promised to Sanchez, or even that he had received any benefits in
connection with his cooperation and testimony.

The state court could have reasonably concluded that despite
his cooperation, there was no agreement with Sanchez, who had a
lengthy history of involvement in controlled substances, was
charged with a subsequent offense, and faced a lengthy probation
period that could have resulted in his return to prison for a
substantial time upon a violation of probation.  The state court
could have reasonably concluded that the evidence showed no more
than that Sanchez had a subjective belief that he might receive
lenient treatment in exchange for transmitting information
concerning, and testifying about, Petitioner's involvement in the
killing of Bonham.

The jury had before it Sanchez's history as an informant and
a person convicted of multiple, drug-related offenses, sentenced
to prison three times, and resigned to a lengthy period of
probation and the attendant possibility of a return to custody
for a substantial term upon any probation violation.  This
evidence independently and significantly impeached Sanchez's
credibility on the ground of bias.  Evidence that Sanchez had yet
another potential reason for wanting to avoid or reduce time in
custody did not provide a significantly different basis of
impeachment from that already presented to the trier of fact.
Generally, where the undisclosed evidence provides duplicate
grounds for impeachment that were actually presented to a jury,
it does not provide the defense with a new and different ground
of impeachment, and thus the evidence is not material.  Barker v.

1    Fleming, 423 F.3d 1085, 1096-97 (9th Cir. 2005) (citing Silva v.

2    Brown, 416 F.3d 980 (9th Cir. 2005)).  The state court could

3    reasonably have concluded that with respect to its impeachment

4    value, the report would not have affected the trier's

5    determination because it was essentially duplicative, and thus,

6    it was not material.

7         The major physical evidence in the case concerned the path

8    of the bullet through the victim's skull.  The probative value of

9    this evidence was not affected by the non-disclosure of the

10   report.  Although Sanchez's testimony concerning Petitioner's

11   confession gave the jury a basis for interpreting that evidence,

12   the probative value of the physical evidence was not dependent

13   upon Sanchez's testimony.  The evidence before the trier included

14   the opinion of Dr. Nelson concerning the rarity of self-inflicted

15   gunshot wounds that were caused by the non-dominant hand and

16   resulted in a path through the skull such as that found in

17   Bonham's case.

18        The state court was also presented with a summary of

19   multiple items of evidence that corroborated Sanchez's testimony

20   concerning the substance of the statements Petitioner made to

21   him.  Much of this evidence was derived from Petitioner's own

22   statements to the police, and some of it was independently

23   corroborated by physical evidence.  It is not the sort of

24   evidence that would be in the possession of the public or persons

25   who were not involved in the investigation of the offense.  The

26   evidence that corroborated Sanchez's testimony consisted of

27   details concerning Petitioner's relationship with the victim and

28   the events of the evening of Bonham's death, including

1  Petitioner's affair with Bonham, Petitioner's telephone call to

2  Bonham in which a meeting was arranged, the previous incident in

3  which Petitioner and Bonham's husband played "Russian roulette,"

4  Petitioner's having sex with Bonham at or near the location of

5  the shooting, Petitioner's shooting Bonham in the head while she

6  had her hand on the gun, and Petitioner's return to his house and

7  incineration of the bedding in order to avoid discovery of his

8  sexual relationship with the victim.

9      The evidence before the state court also included all of

10  Petitioner's statements, which presented inconsistencies

11  concerning not only the precise conduct of Petitioner and Bonham

12  in the car, but also the nature of the shooting as suicide or

13  accident.  This evidence warranted an inference of Petitioner's

14  consciousness of guilt.  Further, although a portion of

15  Petitioner's delay of several hours in calling authorities was

16  explained, some of it remained unexplained.

17      Because in this case the verdict is supported by other,

18  strong circumstantial evidence from multiple sources, this case

19  is unlike Smith v. Cain, –U.S.–, 132 S.Ct. 627, 629-31 (2012), in

20  which the sole evidence connecting the petitioner to the crimes

21  of murder during armed robbery was the testimony of a witness

22  that he had no doubt from standing face-to-face with one of the

23  gunmen that the petitioner was one of several perpetrators. The

24  Court found to be material undisclosed detective's notes, made at

25  the time of the crime and a few days after, that the witness had

26  not seen faces and could not identify any perpetrators.  In

27  Smith, the evidence was material because it directly contradicted

28  testimony that provided the sole basis for connecting the

petitioner to the crime.  Here, the undisclosed evidence is not
inconsistent with other, similar evidence of Sanchez's criminal
activity and cooperation with law enforcement.  Further, other
evidence here links the Petitioner to the crime and provides the
trier of fact a basis for drawing inferences as to Petitioner's
conduct, state of mind, and motive.  Viewing all the evidence
supports a conclusion that the report was not material.

The state court could reasonably have concluded that in view
of the nature of the information Sanchez possessed about the
pertinent events, and in light of the other, independent evidence
tending to show Petitioner's guilt of an intentional shooting,
the undisclosed report at most provided an additional basis for a
finding of bias on the part of Sanchez, and thus it did not
undermine confidence in the outcome of the trial.

Therefore, Petitioner has not shown that the state court
decision that the undisclosed evidence was not material was an
objectively unreasonable application of clearly established
federal law.

B.   The Allegedly Recorded Conversations

Petitioner alleges that the prosecution's failure to
disclose that after Sanchez was released from jail, Sanchez was
working for the prosecution and recorded unspecified
conversations with Petitioner while wearing a "wire," constituted
a failure to disclose material exculpatory evidence and violated
Petitioner's right to due process of law.  (FAP 29-30.)
Petitioner alleges that the defense could have used the
undisclosed evidence to show 1) the prosecution had the
opportunity to obtain Petitioner's confession on tape, and 2)

Petitioner did not confess to Sanchez.  Petitioner alleges that
when they were out of custody, Sanchez asked him whether he
killed Bonham and why, and Petitioner emphatically denied killing
her.  (Id. at 30.)  Petitioner also argues that if the defense
had known that Sanchez was recording conversations while working
for the government, it could have introduced the absence of any
taped admission by Petitioner to raise a reasonable doubt in the
jury's mind.  (Id.)  Finally, Petitioner contends that showing
that Sanchez asked Petitioner whether he killed Bonham would
constitute proof that Petitioner had never previously confessed
to Sanchez.  (Id.)

Petitioner first raised this issue in his third habeas round
in the petition filed in the MCSC (HC3-MCSC, LD 36), which denied
the petition on grounds of 1) failure to justify delayed and
piecemeal presentation of claims, and 2) a lack of merit (LD
28).[18]  Petitioner next raised the issue in a petition filed in
case number F051651 in the DCA (HC3-DCA, LD 29), which denied the
petition as follows:

> The "Petition For Writ Of Habeas Corpus," filed in
> this court on November 16, 2006, is denied.  Petitioner
> is filing piecemeal petitions and the issue of
> *Brady v. Marilyn* (sic) (1963) 373 U.S. 83, is without
> merit.  *(In re Clark* (1993) 5 Cal.4th 750, 767-768.)

(LD 29.)  Petitioner last raised the issue in a petition for
review filed in case number S152051 in the California Supreme
Court (HC3-CASC, LD 30), which summarily denied the petition (LD
30).

---

[18] The court concluded that because the basis for the claim was an
anonymous letter, and because the information upon which the claim depended
was unverified, not specific, and not material, it was insufficient to provide
the basis for a claim for relief.  (LD 28 , 2.)

1    Pursuant to <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801-02, it is

2  rebuttably presumed that the California Supreme Court denied the

3  petition for the same reasons as did the DCA.  No basis for

4  rebuttal of the presumption has been asserted by the parties.

5           1.   <u>Procedural Default</u>

6     Here, the Court looks through the California Supreme Court's

7  decision to the DCA's decision, which clearly and expressly

8  stated that Petitioner was filing piecemeal petitions, a

9  reference to the bar of successive petitions set forth in the

10 case and pages cited by the DCA, namely, <u>In re Clark</u>, 5 Cal.4th

11 750, 767-68 (1993).

12    Again, considering the nature of the issues raised in the

13 petition before the Court and the need for cumulative analysis,

14 the Court exercises its discretion to consider the merits of the

15 procedurally defaulted <u>Brady</u> claim.

16           2.   <u>Background</u>

17    The Court takes judicial notice of the docket of the

18 petition for review in case number S152051 (HC3-CASC), which

19 reflects that one doghouse of record was received from the DCA,

20 which presumably was the record of the third-round habeas

21 proceeding in the DCA.  Further, the California Supreme Court

22 also received from the DCA the transcripts and briefs that had

23 been filed in the consolidated direct appeal and first round of

24 habeas in DCA case number F033539.

25    In the petition for review filed in the California Supreme

26 Court, Petitioner alleged that the prosecution withheld the fact

27 that Sanchez was working for the prosecution after his release

28 from jail and was wearing a wire and recording Petitioner's

conversations with him.   Petitioner alleged that "during the time

period in which he was working for the prosecution, wearing a

wire and recording Petitioner's conversations with him," Sanchez

asked Petitioner whether he killed Bonham and why, and Petitioner

emphatically denied killing her. (Pet. rev., LD 30, 3-3a.)

       The California Supreme Court had before it the exhibits

filed in the habeas petition filed in the DCA, which included a

letter to Petitioner that Petitioner alleged he had received

around July 2005.  (HC3-DCA, LD 29, pet. at p. 6b, att. I.)   The

letter bore no visible date or signature.   It stated that

Petitioner probably did not remember the writer, who was an

aspiring writer who was monitoring Petitioner's case after having

met Petitioner briefly when Petitioner had been delivering rocks

to the neighbor of the letter writer.   The letter stated that

testing of the "substance" in Bonham was negative for sperm, and

it referred to the test report, which was enclosed.   The letter

stated the following concerning Sanchez:

> I have something else that will come as an even greater
> shock. Rudy Sanchez, the informant who testified against
> you, was wearing a wire and recording conversations
> between you and him during the period between his release
> from jail and your re-arrest. Those tapes also should
> have been turned over to your lawyer as part of discovery.
> They were withheld because, of course, they were not
> helpful to the prosecution.  I contacted the prison and
> asked whether prisoners were allowed to receive tapes in
> the mail.  They said only if the tapes came from "an
> approved vendor." (?)  I assure you however that you
> were being recorded, but just in case you have some
> doubts I will tell you how you can verify this
> information.

(Id.)   Thereafter the writer explained the procedure to follow to

request the records and any DNA records from the Department of

Justice under the California Public Records Act, noting that if

the records do not exist, "they" would tell Petitioner;
otherwise, they would inform him of a fee for the copies or tell
him that they are exempt from disclosure.  (Id.)   The letter
continued:

> Additionally, you might want to take a good look
> at the police reports your lawyer received in
> discovery.  If you do not have at least 70 pages
> you might want to include a request for the reports
> when asking for the tapes from the Sheriffs Department.

(Id.)

There are unexplained redactions of the letter, with the
second sentence, and later five lines in the penultimate
paragraph, completely blacked out.  (Id.)   There is no apparent
explanation for these obliterations.  Further, Petitioner did not
submit any declaration to explain whether or not he knew the
identity of the writer or otherwise to provide any details
concerning the circumstances relating to the receipt of the
letter.  Finally, Petitioner did not submit any declaration from
trial counsel concerning whether or not counsel had received all
of the police reports.

After allegedly discovering that the pages of the copies of
police reports he had received from his counsel were numbered
"25" through "58," Petitioner wrote the Madera County Sheriff's
Department a letter dated July 25, 2005, to request copies of the
police reports and "all records and audio recordings of Dale L.
Cottrell, and specifically all recorded conversations between
Dale L. Cottrell and Rudy Sanchez made between the dates of May
15, 1998 and August 3, 1998.  (LD 29, att. J.)   On August 3,
2005, the records supervisor of the sheriff's department wrote
Petitioner and stated that the request for reports and recordings

1  was received but that according to Cal. Govt. Code § 6254(f), the

2  records were considered investigative records and not subject to

3  public disclosure or disclosure to Petitioner.  It was suggested

4  that Petitioner contact his attorney.  (Id., att. K.)

5      At the end of September 2005, Petitioner wrote Mr. Garvin,

6  his trial counsel, and informed Garvin that DNA testing on the

7  semen found in Bonham had revealed that the semen was not

8  Petitioner's.  He further stated that he had learned that Sanchez

9  had been working for the prosecution, wearing a wire, and

10  recording his conversations with Petitioner during the time

11  between Sanchez's release from county jail and Petitioner's re-

12  arrest.  (LD 29, att. N.)  Petitioner asked Garvin whether he had

13  made a formal or informal discovery request, had relied on

14  previous counsel's informal written discovery request, or had any

15  copies of the police reports beyond the thirty-four (34) pages

16  Garvin had turned over to Petitioner's successor (appellate)

17  counsel in view of Petitioner's information and belief that there

18  were at least seventy (70) pages of reports.  (Id.)  If the

19  reports had not been turned over, Petitioner asked Garvin to

20  indicate whether the prosecutor had been asked for, or had

21  offered, an explanation fo their absence.  Petitioner requested a

22  declaration concerning the discovery request.  (Id.)

23      Within a week, Garvin responded that he no longer had any

24  documentation regarding Petitioner's case, and he did not

25  independently recall whether he filed a separate discovery

26  motion, relied on the one filed by previous counsel, or requested

27  it orally in court; he no longer recalled any specifics

28  concerning the case, but he stated he would forward the

1   correspondence to the chief defense attorney at the alternate

2   defense office, who would have the file.  (Id., att. O.)

3        The answer relied on the usual course of business in the

4   prosecutor's office concerning whether trial counsel received the

5   report of testing due to trial counsel's refusal to permit access

6   to the file without a court order.  (LD 29, att. P, 2.)  In the

7   answer the respondent denied the allegation that anyone in the

8   prosecutor's or sheriff's office had any information concerning

9   Sanchez's wearing a radio transmitter or that any law enforcement

10  agency working on the case made or received sound recordings of

11  any meeting between Sanchez and Petitioner after Petitioner's

12  release from jail.  (Id.)  It was alleged that counsel had

13  received the report on the vaginal swab of the victim.  (Id.)

14                3.  Analysis

15       It must be determined whether the state court's decision

16  that Petitioner's Brady claim was without merit was an

17  objectively unreasonable application of federal law.

18       Unless a procedural bar is apparent, an appellate court in

19  California receiving a habeas petition considers whether the

20  petition states a prima facie case for relief, i.e., whether it

21  states facts which, if true, entitle the petitioner to relief.

22  In re Clark, 5 Cal.4th 750, 769 (1993) (citing In re Lawler, 23

23  Cal.3d 190, 194 (1979)).  If no prima facie case for relief is

24  stated, or if it is determined that all claims are procedurally

25  barred, the court will summarily deny the petition.  People v.

26  Romero, 8 Cal.4th 728, 737 (1994); People v. Duvall, 9 Cal.4th

27  464, 475 (1995).

28       Here, in summarily denying the claim, the state court

1    determined that no prima facie case was stated.

2        In California, one seeking habeas relief must file a
3    verified petition that states the basis of the alleged illegality
4    concerning the Petitioner's restraint.   Cal. Pen. Code § 1474.
5    The verification requirement means that the allegations of fact
6    showing that the challenged imprisonment is illegal must be
7    verified, and the operative facts must be set forth in a form
8    such that perjury may be assigned upon the allegations if they
9    are false.   Cal. Pen. Code 1474; Ex parte Walpole, 84 Cal. 584
10   (1890).   The petition must specify the facts on which the
11   petitioner bases the claim that the restraint is unlawful.   In re
12   Lawler, 23 Cal.3d at 194.   A petition must state fully and with
13   particularity the facts on which relief is sought.   People v.
14   Duvall, 9 Cal.4th 464, 474.   Conclusional allegations made
15   without any explanation of the basis for the allegations will not
16   support the issuance of an order to show cause.   Id.   The
17   petition should include copies of reasonably available
18   documentary evidence supporting the claim, including pertinent
19   portions of trial transcripts and affidavits or declarations.
20   Id.   It is the burden of a petitioner challenging a criminal
21   conviction to prove by a preponderance of the evidence the facts
22   that establish a basis for relief.   In re Bolden, 46 Cal.4th 216,
23   224 (2009).   The placement of the burden on the petitioner
24   reflects the presumption of the regularity and finality of the
25   proceedings that resulted in a final judgment of conviction.   Id.

26       The letter Petitioner alleged he received is undated and
27   unsigned.   Petitioner does not explain the redactions.   Although
28   the letter writer refers to having met Petitioner, Petitioner

130

does not even set forth his own personal knowledge (or absence thereof) concerning the identity of the writer of the letter. The state court could reasonably have concluded that there was no sufficient basis to conclude that the letter was genuine.

The operative allegations set forth in the letter were not verified or specifically set forth.  The assertions that Sanchez was working for the prosecution, wore a "wire," and recorded conversations with Petitioner were set forth in the unverified letter; Petitioner had no personal knowledge concerning the substance of the letter, and thus any assertions of his concerning it would be hearsay.

Further, specific facts were not set forth in the petition. There was no information concerning how the recording or recordings were allegedly made or the medium on which they were recorded.  There are no specific facts from which it might be inferred that Sanchez was working for the prosecution, or that the prosecutor or any governmental agency involved in the investigation or prosecution of the case possessed any recordings or any information concerning the allegations that Sanchez was working for the prosecution.  Petitioner's verified allegations thus do not provide a reasonable factual basis for the conclusion that Sanchez recorded conversations with Petitioner while working for the prosecution, or that the prosecution suppressed such information.

The correspondence with the sheriff's department does not provide a basis for an inference that recordings or previously suppressed police reports existed or were in the hands of the law enforcement agency.  At all pertinent times, Cal. Govt. Code

1   § 6253(c) required that an agency determine and promptly give

2   notification of whether a request for records in whole or in part

3   sought copies of disclosable public records in the possession of

4   the agency.  2001 Cal. Stat., ch. 355, § 2.  However, disclosure

5   was not required "of complaints to, or investigations conducted

6   by... any state or local police agency, or... any investigatory

7   or security files complied by any other state or local police

8   agency...."  Cal. Govt. Code § 6254(f), 2005 Cal. Stat. ch 22,

9   § 71.  Likewise, with exceptions not pertinent to the present

10  controversy, disclosure was not required of any investigatory

11  files complied by any state or local agency for correctional or

12  law enforcement purposes.  Id.  Because Petitioner's request was

13  for records relating to an investigation concerning whether there

14  was a violation of law, the records were exempt from disclosure

15  pursuant to § 6254(f).  Haynie v. Superior Court, 26 Cal.4th

16  1061, 1068-72 (2001) (sheriff's reports concerning the stop of a

17  vehicle and investigation of its occupants for possession of

18  guns).

19      Further, upon receiving the request, the agency was not

20  required to provide any enumeration or description of any

21  potentially responsive records which existed and were exempt from

22  disclosure.  Id. at 1075.  Because the request sought police

23  reports, some of which had been provided and all of which were

24  exempt from disclosure, the state court could reasonably have

25  concluded that the response of the sheriff's department reflected

26  that police reports existed that were exempt, and that the

27  response was uncertain with respect to any recordings.  Because

28  some police reports had been provided to Petitioner's counsel for

1  trial, it was known and certain that some police reports existed.

2  Thus, possession of police reports by the agency would not have

3  provided a basis for an inference that undisclosed reports

4  existed.

5      Even if the substance of the factual allegations were

6  considered, the state court could reasonably have concluded that

7  the allegedly suppressed evidence was not material.  The core of

8  the testimony given by Sanchez concerning Petitioner's offense

9  related to statements Petitioner had made to Sanchez earlier

10 while both were in custody.  It was clear from the testimony of

11 Sanchez at trial that after Petitioner was released from jail,

12 Sanchez obtained corroborating information from Petitioner

13 concerning the crime that Sanchez then testified to on behalf of

14 the prosecution.  Sanchez did not deny that he was helping the

15 prosecution; rather, he only denied that he was promised anything

16 for his cooperation other than a short delay in Petitioner's

17 arrest to enable Sanchez to be out of custody before his

18 cooperation with the prosecution was revealed.  Thus, the jury

19 was already aware that Sanchez had been shown to have been

20 working during that time to obtain information that was helpful

21 to the prosecution.  That he was in some additional, vague sense

22 working for the prosecution would not have constituted a

23 significant addition to the body of evidence that would impeach

24 Sanchez.

25     Further, contrary to Petitioner's position, the fact that a

26 "wired" Sanchez would ask Petitioner if he killed Bonham and why

27 was consistent with Sanchez's obvious intention to obtain

28 information to be used in the prosecution of Petitioner; it would

1   not have constituted persuasive evidence that Petitioner had

2   never previously confessed to the crime.  A recording of

3   Petitioner's confession would have been even better evidence of

4   guilt than Sanchez's verbal description of Petitioner's earlier,

5   extra-judicial admissions.  A denial by Petitioner would have

6   been consistent with Petitioner's multiple statements to police,

7   which were presented to the trier of fact.  To the extent that a

8   denial would have been inconsistent with Petitioner's earlier

9   confession to Sanchez as testified to by Sanchez, it would have

10  been reasonable for Petitioner to have been suspicious of a query

11  made while Sanchez was out of custody and not subject to

12  immediate retribution from inmates for being an informant.  The

13  state court could reasonably have concluded that in view of the

14  other evidence before the trier, evidence of a recorded denial

15  would not have had significant probative force.

16      In combination, the report concerning Sanchez's possession

17  of drugs in the jail and the asserted evidence of recorded

18  statements are not material in light of the totality of evidence.

19  Petitioner gave numerous statements to police which, as

20  previously detailed, were inconsistent in material respects and

21  provided an ample basis for an inference of consciousness of

22  guilt and fabrication of various versions of the pertinent

23  events.  Petitioner delayed before calling authorities, and he

24  destroyed evidence.  The physical evidence, as interpreted by the

25  expert testimony at trial, was in some respects inconsistent with

26  a self-inflicted wound; however, additional impeachment of

27  Sanchez would not have affected the reliability or significance

28  of this physical evidence.  Sanchez had already been

significantly impeached with his criminal history and previous
participation as an informant, even though the evidence did not
indicate that any agreement or "deal" had been made between
authorities and Sanchez.  Numerous details concerning the offense
and the relationship between Petitioner and the victim, which
would not have been known to anyone who was not a participant in
the crime or a person investigating the crime, were known to
Sanchez and were consistent with facts either shown by
independent evidence or provided by Petitioner in his many
statements.  In light of the totality of the evidence, the
evidence in question would not have demonstrated the necessary
prejudice.

It is concluded that the state court could reasonably have
concluded that the cumulative information was not material.
Thus, Petitioner has not shown that the state court decision was
contrary to, or an unreasonable application of, clearly
established federal law.

C.  <u>Non-disclosure of the Laboratory Test Result</u>

Petitioner alleges that the prosecution failed to disclose
the results of a laboratory test taken by the Bureau of Forensic
Services of the Department of Justice, which revealed that there
were no spermatozoa on a vaginal slide taken from the victim at
the autopsy.  (FAP 37.)

Petitioner alleges that a laboratory report that was
disclosed to the defense reflected that acid phosphatase, an
enzyme found in semen, was detected on the vaginal swab.  (<u>Id.</u>)
Petitioner argues that the undisclosed report is material because
it tended to corroborate his statements to police that he did not

have sex with Bohnam that night and thus bolstered his

credibility; further, evidence that there was acid phosphatase

without semen tended to show that Bonham had engaged in sex with

her estranged husband, who Petitioner alleges had had a vasectomy

but who forced himself on Bonham on occasion and thereby caused

Bonham to be depressed.  (Id. at 37-38.)  Bonham's being

depressed would tend to support Petitioner's innocence by

supporting the defense theory that Bonham shot herself because

she was in a depressed state.  (Id.)  Petitioner points to

additional evidence of interviews of the victim's teachers, which

had been included in investigating officers' reports; one teacher

said Bonham had been depressed before she died.  (Id. at 37-39.)

Petitioner also notes that the prosecutor informed the jury that

Petitioner had told Rudy Sanchez that on the night of the

shooting, Petitioner had had sex with the victim on the blanket

that he burned.  (LD 20, RT 13.)  The prosecutor also detailed

Petitioner's initial statement to law enforcement that he had

never had sex with Bonham (RT 11), and his later statement that

although he did not have sex with Bonham on the night of the

shooting, he burned the bedding so that his previous sexual

encounters with Bonham would not be discovered by anyone,

especially Petitioner's wife, with whom he desired to reconcile

(RT 11-13).  Further, the prosecutor argued that the burning of

the bedding supported Rudy Sanchez's testimony concerning

Petitioner's having informed him that Petitioner and Bonham used

to meet and have sex on the English property.  (RT 311-12.)  The

Court notes that the trial record also contains Petitioner's

statement in which he stated that he did not know if he would

1  have sex with the victim that night.  (CST 25-27, 44-45.)

2       Petitioner first raised this issue in his third habeas

3  round in the petition filed in the MCSC (HC3-MCSC, doc. 36, p.

4  3b), which denied the petition on grounds of failure to justify

5  delayed and piecemeal presentation of claims, and a lack of merit

6  (LD 28).[19]  Petitioner next raised the issue in a petition filed

7  in case number F051651 in the DCA (HC3-DCA, LD 29), which denied

8  the petition with a citation to In re Clark, 5 Cal.4th 750, 767-

9  68 (1993) because Petitioner was filing piecemeal petitions and

10  because the Brady issue was "without merit."  (LD 29.)

11  Petitioner last raised the issue in a petition for review filed

12  in case number S152051 in the California Supreme Court (HC3-CASC,

13  LD 30), which summarily denied the petition (LD 30).

14       For the same reasons that prompted the Court to consider the

15  merits of the previous sub-claim concerning recordings, the Court

16  will exercise its discretion to further judicial economy by

17  considering on the merits this additional Brady sub-claim despite

18  evidence of a procedural default.

19       The California Supreme Court had before it the record of the

20  proceedings in the DCA, in which Petitioner detailed the contents

21  of the reports and alleged generally that the "prosecution also

22  withheld" the results of the test in which no sperm were

23

24       [19]  In the order of denial, the court stated the following:

25       Petitioner claims the prosecution failed to disclose a lab report which
     showed no spermatozoa on the victim's vaginal slide.  Petitioner did not
     back up his claim with information from his own attorney.  Even if not

26       disclosed a different result was not reasonably probable.  The report
     would not have had any effect on the credibility of his statements to

27       the public and other physical evidence showed he had sex with the victim
     shortly before she was killed.  Additional equivocal evidence that

28       he may or may not have had sex with the victim was not material.
(LD 28, 2.)

detected.  (LD 29, 3b-3c.)  Petitioner presented the state courts
with the aforementioned anonymous, undated letter, which has
previously been analyzed, and which allegedly stated the
following:

> This will probably come as a shock to you,
> or perhaps not, but testing was done on the substance
> found in Bonham.  The results were negative for sperm.
> Enclosed is a copy of the examination report from
> the Department of Justice.  Your lawyer should have
> received a copy of that report as a part of discovery.
> Apparently it was withheld because it was not helpful
> to the prosecution.

(LD 29, att. I.)  Also attached to the petition was a copy of a
physical evidence examination report dated March 31, 1998,
concerning a vaginal swab taken from the victim and submitted to
the laboratory by the sheriff's office on December 15, 1997,
which reflected no spermatozoa. (Id.)  Petitioner also included
correspondence from October 2005 in which he requested the
reports from the Department of Justice, as well as the reports,
including the earlier report of criminalist O'Clair, dated
January 14, 1998, reflecting that the vaginal swab "tested
positive for acid phosphatase, an enzyme found in semen."  (Id.,
att. M.)  After reciting the result of the test, the earlier
report stated:

> The swabs and slides from the kit will be
> further tested for semen and DNA typing will be
> done.

(Id., rep. at 1.)  It further stated that the victim's sexual
assault kit would be transferred to the DNA section for analysis.
(Id. at 1.)

The petition also contains a copy of Petitioner's
correspondence with his trial counsel, Mr. Garvin, concerning his

discovery requests and their nature as formal or informal.  On
December 17, 1997, Petitioner's former counsel, David A.
Smothers, filed a written, informal request for discovery, which
sought all laboratory and other reports concerning the testing
and examination of all physical evidence.  (Id., att. N.)
Correspondence revealed that Garvin stated that he had no
independent memory of filing a separate discovery motion; he may
have relied on Smothers' request or may have requested it orally
in court.  (Id., att. O.)  No declaration from counsel was
provided to the state courts.  Included in the record before the
DCA and California Supreme Court was Respondent's answer filed in
the MCSC, in which it was alleged that pursuant to the
prosecutor's office's general practice, the report was disclosed
to defense counsel.  (LD 28, att. P.)

     The state court could reasonably have concluded that
Petitioner had not established that his trial counsel had failed
to receive the report or that the report was not disclosed.
There is no factual basis for a conclusion that the writer of the
anonymous letter had any knowledge regarding what evidence was
disclosed to Petitioner's counsel.  In the absence of a
declaration from counsel, there was no specific factual basis for
a conclusion that the evidence was not disclosed.

     The record documented not only Petitioner's inconsistent
statements concerning whether he had engaged in sex in the past
with the victim, but also his admission that he burned his
bedding in order to conceal his having had sex with the victim.
The victim was found wearing a long sweater and no underwear in
Petitioner's car at a location where Petitioner had admitted that

139

they would meet and spend time together.  The precise evidentiary
significance of the evidence concerning the lack of spermatozoa
has not been the subject of expert testimony; it is unclear
whether the evidence would have the probative tendency that
Petitioner asserts.  However, even if it were assumed that it
could be used to support the proposition that Petitioner did not
have sex with the victim on the night of her death, its
nondisclosure would not result in the necessary prejudice to
Petitioner.  The evidence would not significantly affect
Petitioner's credibility.

Further, in view of Petitioner's inconsistent statements to
law enforcement, the evidence would not have a significant effect
on the credibility of Sanchez, who in this respect purported only
to repeat what Petitioner had told him, and who was impeached
substantially as previously discussed.

In addition, when such evidence is viewed in combination
with the other evidence that was allegedly withheld, it does not
undermine confidence in the outcome of the trial.

Accordingly, the Court concludes that Petitioner has not
shown that a state court decision that the prosecution had not
failed to disclose material evidence in violation of its duty of
disclosure under Brady v. Maryland was an unreasonable
application of clearly established federal law.

IX.  Trial Counsel's Failure to Obtain Discovery and
     Investigate Sanchez

In the sixth sub-claim of ineffective assistance of trial
counsel, Petitioner argues that trial counsel rendered
ineffective assistance by failing to obtain discovery concerning,

1  and otherwise to investigate, Sanchez.  (FAP 33-34.)

2      Petitioner alleges that his attorney failed to make a formal

3  request for discovery, which would have required the prosecution

4  to disclose the full extent of Sanchez's role as an informant as

5  well as any statements of Sanchez or Petitioner, recorded or

6  otherwise.  Petitioner alleges that his counsel relied on the

7  discovery request made by his previous counsel, which Petitioner

8  alleges would not have required any evidence concerning Sanchez

9  to be turned over because Sanchez had not been part of the first

10 prosecution.  Thus, any evidence concerning Sanchez would not

11 have materialized until after the dismissal of the first

12 prosecution.

13     Further, counsel failed to obtain Sanchez's jail records,

14 which would have shown that although he had been caught with

15 drugs in jail, he had never been charged with the crime.

16     Finally, counsel failed to obtain test results that would

17 have shown there was no sperm in the victim's vaginal swab and

18 thus would have supported Petitioner's statements to police about

19 not having had sex with the victim and the defense theory of a

20 self-inflicted wound.

21     Petitioner first raised this claim in his third habeas round

22 in the petition fled in the MCSC (HC3-MCSC, doc. 36, 3b), which

23 denied the petition on grounds of failure to justify delayed and

24 piecemeal presentation of claims, and a lack of merit (LD 28).[20]

25

26     [20] With respect to Petitioner's sub-claims concerning trial counsel's
   alleged ineffective assistance, the MCSC stated the following:

27     INADEQUACY OF COUNSEL

28     Petitioner argued that his attorney should have discovered recordings
   of Sanchez's conversations with him, however petitioner failed to show

141

1  Petitioner next raised the issue in a petition filed in case

2  number F051651 in the DCA (HC3-DCA, LD 29), which denied the

3  petition with a citation of In re Clark, 5 Cal.4th 750, 767-68

4  (1993) because Petitioner was filing piecemeal petitions and

5  because the Brady issue was without merit.  The issue was last

6  raised in the petition for review filed in case number S152051 in

7  the California Supreme Court (HC3-CASC, LD 30), which summarily

8  denied the petition (LD 30).

9       A.  Procedural Default

10      Respondent argues that this sub-claim was procedurally

11  defaulted by Petitioner, and thus this Court should not consider

12  it on the merits.  However, Respondent also argues that the DCA

13  must have denied the ineffective assistance claim on the merits

14  because the ineffective assistance claim was dependent upon the

15  related Brady claim,[21] which the DCA expressly stated was not

16

17           that a different result would have been reasonably probable even if
         the information had been discovered by his attorney.

18           Petitioner also alleged that his attorney failed to obtain
19       information that Sanchez was in possession of drugs in jail in 1997.
         This claim was raised and rejected previously. Additionally
         petitioner was aware of the information since 2001 but only
20       raised his claim now which is untimely.

21           It appeared that petitioner felt this additional information
         would be used to impeach Sanchez, however any further impeachment
22       even if allowed by the trial court, would not have affected the
         outcome of the trial.

23           Petitioner claims attorney (sic) did not obtain the lab report
         showing no sperm in the evidence obtained for (sic) the victim.
24       Petitioner did not back up his claim with any information from his
         own attorney.  Even if true, there was no showing of prejudice
25       to the petitioner given other evidence in the case.  Additionally
         this was a collated (sic) issue which would have no effect on the
26       scenario offered by the petitioner.

    (LD 28, 2-3.)
27

28           [21] In his state court petitions, Petitioner also had claimed that the
    government violated due process by failing to disclose to his counsel the
    materials which he here alleges that counsel was ineffective in  failing to

142

1 meritorious.  Respondent urges the Court to consider the
2 appellate court's decision as resting upon the same ground as the
3 MCSC's decision.

4     Pursuant to <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801-02 (1991),
5 it is rebuttably presumed that the California Supreme Court
6 denied the petition for the same reasons as did the DCA.  No
7 basis for rebuttal of the presumption has been asserted by the
8 parties.

9     If the claim was procedurally defaulted, then in the
10 interest of judicial economy, this Court exercises its discretion
11 to consider the claim on the merits because of the relative
12 complexity of the procedural default analysis that would need to
13 be undertaken, and considering the nature of the sub-claims
14 raised by Petitioner, including but not limited to the
15 independent necessity of engaging in a cumulative analysis of the
16 materiality or prejudicial effect of all evidence subject to
17 Petitioner's related <u>Brady</u> claims.

18     B.  <u>Analysis</u>

19     The state court could have reasonably determined that with
20 respect to the alleged recordings of Sanchez's out-of-custody
21 conversations with Petitioner, Petitioner had failed to show that
22 any such recordings had ever existed.  Further, the contents of
23 any such conversations were unclear.  The Court could have
24 determined that it had not been shown that the allegedly
25 undisclosed recordings were material or that a different result

26

27 discover, namely, recordings of Sanchez's conversations with Petitioner, the
report of Sanchez's possession of cocaine in jail, and a laboratory report
28 concerning the absence of sperm in the victim's vaginal swab.  These <u>Brady</u>
claims are addressed hereinbelow .

1   would have been reasonably probable if any recordings had been

2   discovered; thus, it had not been shown that any prejudice ensued

3   from any failure of counsel to request any recordings.

4       With respect to the MCDC report of Sanchez's possession of

5   drugs in jail, the state court could reasonably have decided that

6   given the other evidence in the case and the extensive

7   impeachment of Sanchez on related grounds of his substantial

8   criminal history and significant self-interest or bias, the

9   Petitioner had not shown that the evidence was material, or that

10  a different result was reasonably probable.

11      With respect to the laboratory report concerning the absence

12  of sperm in the vaginal swab, the state court could have

13  reasonably determined that in the absence of input from counsel,

14  Petitioner had failed to establish that the report had not been

15  disclosed to his trial counsel, who had received all other

16  discovery, including reports, one of which referred to the

17  victim's sexual assault kit.  (CT 161, 187-88; RT 386, 395-96.)

18  Further, the state court could reasonably have concluded that

19  even if the report had not been discovered, Petitioner had failed

20  to show that the evidence was material or that a different result

21  was reasonably probably if it had been introduced at trial.

22      In summary, Petitioner has not demonstrated that the state

23  court's rejection of Petitioner's claim of ineffective assistance

24  predicated on omissions concerning discovery of evidence

25  concerning Sanchez and the sperm test result was an unreasonable

26  application of clearly established federal law.

27      X.   Ineffective Assistance of Appellate Counsel

28      Petitioner states in the table of contents to the FAP that

appellate counsel was constitutionally ineffective for failing to raise other grounds, described as "1-D, 2-A, 3-A, and 5-C." (FAP 3:6-7.)   The Court understands this enumeration of issues, which corresponds to the designation of other claims in Petitioner's table of contents to the petition, to refer to appellate counsel's failure to raise the following sub-claims:  1) the ineffective assistance of trial counsel in failing to object to the state's use of Petitioner's allegedly involuntary and un-warned statements; 2) the government's failure to disclose that Sanchez had been caught possessing drugs in jail and a crime report had been written; 3) the state's use of Petitioner's allegedly involuntary and un-warned statements; and 4) the ineffective assistance of trial counsel, subsequent counsel, and appellate counsel in failing to raise the prosecutor's allegedly improper vouching, argument regarding matters outside the record, and violation of the advocate-witness rule.  (FAP 2-3.)

Respondent suggests or contends that this Court should decline to consider issues concerning the ineffective assistance of appellate counsel because of an absence of material within the body of the FAP concerning the issues.  Respondent further notes that the table of contents is separate from the petition and is not expressly incorporated by reference into the petition. Respondent appears to assert that because there are no verified allegations relating to the ineffective assistance of appellate counsel, the claim should not be considered.  (Ans., doc. 75, 95:6-15.)

With respect to other issues, the table of contents refers to pages of the text of the petition; however, as Respondent

1  notes, for the heading concerning ineffective assistance of

2  appellate counsel, there is no corresponding textual reference.

3  (Id.)   Review of the body of the petition reveals no portion of

4  text that corresponds solely to the contentions concerning

5  appellate counsel.   However, the claim concerning appellate

6  counsel's failure to raise trial counsel's omissions appears to

7  be wholly dependent upon the contentions concerning trial

8  counsel's allegedly ineffective assistance, which are fully set

9  forth.   Further, the petition contains affirmative arguments

10 concerning appellate counsel's failure to raise prosecutorial

11 misconduct. (FAP 52-54.)

12     Because the claim or claims concerning appellate counsel are

13 essentially derived from the other claims previously set forth,

14 the Court will consider the claims, which Respondent addressed on

15 the merits in the answer.   (Ans., doc. 75, 95-97.)

16          A.   Procedural Background

17     The first and third of Petitioner's sub-claims of

18 ineffective assistance of appellate counsel (appellate counsel's

19 failure to raise trial counsel's failure to object to

20 Petitioner's extra-judicial statements, and to raise the

21 prosecution's use of Petitioner's extra-judicial statements) were

22 first raised before the MCSC in Petitioner's second round of

23 state habeas corpus.   (HC2-MCSC, LD 8 at 3, 15-22.)   The MCSC

24 ruled that as to the issue of ineffective assistance of appellate

25 counsel, Petitioner had failed to show by a preponderance of the

26 evidence facts that established a basis for relief.   (Doc. 59.)

27     In the second-round petition filed in the DCA, which was

28 summarily denied, Petitioner raised appellate counsel's failure

to object to the use of Petitioner's extra-judicial statements and to raise trial counsel's failure to object to the statements, as well as appellate counsel's failure to raise the government's failure to disclose that Sanchez had been found in possession of cocaine in jail and a crime report had been written. (HC2-DCA, LD 10, 3-4D, 15-31.)  In the second-round petition for writ of habeas corpus filed in the California Supreme Court, which was likewise summarily denied, Petitioner raised appellate counsel's omissions with respect to raising the inadmissibility of Petitioner's extra-judicial statements, trial counsel's failure to object to the admission of the statements, and the government's failure to disclose Sanchez's cocaine possession in jail and the related crime report. (LD 11, 3-4D, 13-22.)

Petitioner's sub-claim concerning appellate counsel's failure to raise the conduct of the prosecutor in argument (vouching, argument on extra-record matters, and violation of the advocate-witness rule) was first raised in the third round of state habeas in a petition filed in the MCSC (HC3-MCSC, LD 28, doc. 36, 16-24.)  The issue was raised as part of a claim concerning cumulative prejudice. (Id. at 13-25.)  The MCSC denied the petition because the petition was successive, and Petitioner was presenting claims in a piecemeal fashion. (LD 28, 1-2.)  The MCSC also stated the following with respect to Petitioner's claim of cumulative prejudice:

> Since there has been no legal error and petitioner's factual allegations lack credibility his claim must be denied.

(LD 28, 3.)  The claim concerning appellate counsel's failure to raise the issue of prosecutorial vouching and associated argument

1 was raised in the habeas petition to the DCA (LD 29, 4f-4k),

2 which denied the petition, stating that Petitioner was filing

3 piecemeal petitions, and citing to In re Clark, 5 Cal.4th 750,

4 767-68 (1993) (LD 29).  The claim was raised in the petition for

5 review filed in the California Supreme Court, which was summarily

6 denied.  (LD 30, 4d-4k, & order of denial.)

7     With respect to the claims denied as successive or

8 piecemeal, the Court will consider the merits of the claims in

9 the interest of the efficient use of resources.

10     B.   Claims concerning Petitioner's Extra-Judicial
          Statements

11

12     Insofar as Petitioner argues that appellate counsel was

13 ineffective for failing to argue on appeal that Petitioner's

14 extra-judicial statements were inadmissible as involuntary or in

15 violation of the Miranda protocol, the state court could

16 reasonably have determined that appellate counsel made a

17 reasonable decision not to raise the issues on appeal because the

18 claim would have been barred by trial counsel's failure to object

19 to the evidence.  At all times pertinent to this action, Cal.

20 Evid. Code § 353 has provided in pertinent part:

21         A verdict or finding shall not be set aside, nor
          shall the judgment or decision based thereon be
22         reversed, by reason of the erroneous admission
          of evidence unless:
23         (a) There appears of record an objection to or a
          motion to exclude or to strike the evidence that was
24         timely made and so stated as to make clear the
          specific ground of the objection or motion....

25 (1965 Cal.Stats., ch. 299, § 2.)  Because it would have been

26 futile to raise the issue on appeal without an objection having

27 been lodged at the trial level, appellate counsel's failure to

28 raise the issue would not have resulted in any prejudice to

148

1  Petitioner, and it would not have constituted ineffective

2  assistance of counsel.  Cf., James v. Borg, 24 F.3d 20, 27 (9th

3  Cir. 1994).

4      However, review of the claim on the merits requires

5  acknowledgment of California law to the effect that a reviewing

6  court in California will reverse a conviction on direct appeal

7  only if the record on appeal affirmatively discloses that counsel

8  had no rational tactical purpose for his act or omission.  People

9  v. Vines, 51 Cal.4th 830, 871-72 (2011).  Where counsel's trial

10 tactics or strategic reasons for challenged decisions do not

11 appear on the record, an appellate court will not find

12 ineffective assistance of counsel on appeal unless there could be

13 no conceivable reason for counsel's acts or omissions.  People v.

14 Weaver, 26 Cal.4th 876, 925-26 (2001).

15     In this case, the appellate record did not affirmatively

16 disclose the absence of any rational tactical purpose on the part

17 of trial counsel.  Petitioner's statements constituted the only

18 evidence of Petitioner's point of view of the pertinent events

19 surrounding Bonham's death.  The state court could reasonably

20 have concluded that trial counsel might have had a tactical

21 reason for not objecting to the admission of Petitioner's extra-

22 judicial statements.  Thus, the contention would not have been

23 successful on appeal, and the failure to raise the issue would

24 not have constituted ineffective assistance.

25     In addition, in proceeding with the appeal, appellate

26 counsel was limited to the record on appeal.  People v. Chi Ko

27 Wong, 18 Cal.3d 698, 711 (1976).  As the foregoing analysis of

28 the record concerning Petitioner's statements shows, the

appellate record, which did not contain any of Petitioner's hospital records, does not present a basis for a finding that Petitioner's statements were involuntary or were obtained in violation of <u>Miranda</u>.  Accordingly, counsel's failure to raise the issue could not have constituted ineffective assistance of counsel.

Further, the analysis of the involuntariness and <u>Miranda</u> claims set forth hereinabove shows that even as augmented with the additional evidence set forth by Petitioner in the collateral proceedings, the record did not support a finding that Petitioner's extra-judicial statements were involuntary or obtained in violation of <u>Miranda</u>.  Accordingly, trial counsel's failure to object to the introduction of the statements did not prejudice Petitioner, and it did not constitute ineffective assistance of counsel.  Likewise, appellate counsel's failure to raise trial counsel's omission could not have constituted ineffective assistance of appellate counsel.

In summary, Petitioner has not shown that appellate's counsel's failure to raise either the prosecution's use of Petitioner's extra-judicial statements or trial counsel's failure to object to such use constituted ineffective assistance of counsel.  Petitioner has not shown that a state court decision resulted in an unreasonable application of clearly established federal law.

            C. <u>Claim Based on the Failure to Raise the</u>
               <u>Non-Disclosure of Sanchez's Possession of Cocaine</u>
               <u>in Jail and of the Related Crime Report</u>

Insofar as Petitioner alleges that appellate counsel was ineffective in omitting to raise the prosecution's failure to

disclose the MCDC's report of Sanchez's possession of cocaine in custody, there is no showing that the report was part of the appellate record, which in turn limited the issues that appellate counsel could raise.  Petitioner asserted in his petition for review filed in the California Supreme Court that the drug incident in jail was unknown to Petitioner, his lawyer, his investigator, or his sister until Respondent submitted a copy of the report with his response to the petition filed in the DCA. (LD 4c, n.2.)  There is thus no basis for a conclusion that appellate counsel could have raised the contention in connection with the appeal.

With respect to raising the issue in the DCA habeas proceeding that was consolidated with the appeal, there is no showing that appellate counsel had any information concerning whether or not trial counsel had made a discovery request or had otherwise been responsible for any omissions that would have formed the basis of such a claim.  Further, the analysis concerning the lack of materiality of the report for Brady purposes applies equally here.  Petitioner has not shown that any prejudice resulted from failure to raise this issue.

Therefore, it is concluded that with respect to this claim, Petitioner has not shown an unreasonable application of clearly established federal law.

D.   The Claim Based on Failure to Raise an Issue
     concerning Prosecutorial Misconduct or Vouching

Petitioner's sub-claim concerning appellate counsel's failure to raise the conduct of the prosecutor in argument (alleged vouching, argument on extra-record matters, and

violation of the advocate-witness rule), which was raised in
connection with an argument of cumulative prejudice, was denied
by the MCSC as successive and piecemeal; further, the Court
rejected the claim of cumulative prejudice because there had been
no legal error, and Petitioner's factual allegations lacked
credibility.  (HC3-MCSC, LD 28, doc. 36, pp. 15-25; LD 28, 1-3.)

     The sub-claim concerning appellate counsel's failure to
raise the issue of prosecutorial vouching and associated
misconduct in argument was further raised in the habeas petition
filed in the DCA (LD 29, 4f-4k), which denied the petition,
stating that Petitioner was filing piecemeal petitions, and
citing to In re Clark, 5 Cal.4th 750, 767-68 (1993) (LD 29).  The
claim was raised in the petition for review filed in the
California Supreme Court, which was summarily denied.  (LD 30,
4d-4k, & ord. of denial.))

     The decision of the DCA was a reasoned decision denying the
petition based on piecemeal presentation of claims.  The later
denial by the California Supreme Court of the claim was summary
in form.  As a later, unexplained order rejecting the same claim,
the decision is presumed to have rested on the same ground of
procedural default.  Ylst v. Nunnemaker, 501 U.S. 797, 801-02
(1991).  However, in order to conserve judicial resources, this
Court exercises its discretion to bypass the procedural default
and to consider the claim on the merits.

     As the analysis of the prosecutorial misconduct claim set
forth hereinabove reflects, Petitioner did not show that he was
deprived of a fair trial by any prosecutorial misconduct.
Further, appellate counsel could not have raised the issue due to

1  trial counsel's failure to raise the issue.  Petitioner has not

2  shown that counsel's failure to raise the issue resulted in any

3  prejudice to Petitioner, or that had the issue been raised, it

4  was reasonably probable that the result of the proceeding would

5  have been different. Petitioner has not shown that there was an

6  unreasonable application of clearly established federal law.

7        XI.   Cumulative Error or Prejudice

8        Petitioner argues that he was denied due process of law

9  considering Sanchez's recantation and the cumulative effect of

10  several asserted errors, including 1) the prosecution's failure

11  to disclose a) Sanchez's drug possession in custody, the related

12  MCDC report, and audio recordings of wire-tapped conversations

13  between Petitioner and Sanchez, and b) the laboratory report

14  concerning the victim's vaginal swab; 2) the prosecution's use of

15  Petitioner's extra-judicial statements; 3) prosecutorial

16  misconduct in argument; and 4) defense counsel's failure to a)

17  investigate and present additional forensic and expert evidence

18  and evidence of Sanchez's drug possession, b) raise prosecutorial

19  misconduct, and c) object to the admissibility of Petitioner's

20  extra-judicial statements.  (FAP 43-54.)

21        In this circuit, it has been recognized that the Supreme

22  Court has clearly established that the combined effect of

23  multiple trial court errors violates due process where it renders

24  the resulting criminal trial fundamentally unfair, even though no

25  single error rises to the level of a constitutional violation or

26  would independently warrant reversal.  Parle v. Runnels, 505 F.3d

27  922, 927 (9th Cir. 2007) (citing Chambers v. Mississippi, 410

28  U.S. 284, 298, 302-03 (1973)).  Traditional principles of due

153

process provide that cumulative errors warrant habeas relief only

where the errors have so infected the trial with unfairness that

the resulting conviction denies due process, such as where the

combined effect of the errors had a substantial and injurious

effect or influence on the jury's verdict, id. (citing Donnelly

v. DeChristoforo, 416 U.S. 637, 643 (1974) and Brecht v.

Abrahamson, 507 U.S. 619, 637 (1993)), and where the combined

effect of individually harmless errors renders a criminal defense

far less persuasive than it might otherwise have been, id.

(citing Chambers, 410 U.S. at 294, 302-03).

In evaluating a due process challenge based on the

cumulative effect of multiple trial errors, a reviewing court

must determine the relative harm caused by the errors.  If the

evidence of guilt is otherwise overwhelming, the errors are

considered "harmless," and the conviction will generally be

affirmed.  Parle v. Runnels, 505 F.3d at 927-28.  The overall

strength of the prosecution's case must be considered because

where the government's case on a critical element is weak, or

where the verdict or conclusion is only weakly supported by the

record, it is more likely that trial errors will be prejudicial

to the defendant.  Id. at 928.

The foregoing analysis demonstrates that no single claim of

Petitioner has rendered the defense far less persuasive than

otherwise would have been the case or resulted in  a substantial

and injurious effect or influence on the jury's verdict.

However, the cumulative effect of the claims will nevertheless be

addressed.

Counsel's omissions with respect to presentation of

1   additional forensic evidence available at the time of trial,

2   which could have pointed to either guilt or innocence, did not

3   have a substantial and injurious effect on the verdict in view of

4   the uncertainty surrounding the character of the fatal wound as

5   the product of accident, suicide, or the criminal agency of

6   Petitioner.  For essentially the same reason, presentation of

7   additional expert opinion concerning the nature of the fatal

8   injury would not significantly have changed the posture or weight

9   of the evidence because of the likelihood that the prosecution

10  would obtain its own expert or experts, and a "battle of experts"

11  would have ensued.

12      Disclosure of the MCDC report on Petitioner's drug

13  possession in the jail would have provided an additional basis

14  for arguing the bias or self-interest of Sanchez, but in light of

15  the significant impeachment at trial of Sanchez on the related

16  grounds of his status as a career criminal with prior experience

17  as an informant and a keen desire to avoid custody, knowledge of

18  an additional basis for generalized bias would not have rendered

19  a different result at trial reasonably probable.  Material that

20  otherwise might have indicated that Sanchez had backed away from

21  his trial testimony to some extent was unsworn, vague, and

22  uncertain; it was not sufficient to undermine confidence in the

23  outcome of the trial.  The report concerning the victim's vaginal

24  swab did not necessarily indicate that the victim did not have

25  sex on the night of her death, and in any event, it related only

26  to a collateral aspect of impeachment of Petitioner, whose

27  credibility regarding his history of sexual relations with the

28  victim was already seriously compromised based on his own

1  inconsistent statements as well as his admission that he

2  destroyed evidence in order to conceal his intimacy with the

3  victim.  Petitioner failed to provide any details concerning the

4  source of the letter allegedly sent to him concerning Sanchez's

5  wearing a wire and the prosecution's withholding of evidence; the

6  letter lacked any foundation and was not established as

7  authentic.  The record does not support the assertion that the

8  prosecution withheld, or defense counsel failed to receive,

9  police reports or reports on forensic evidence, or that Sanchez

10  had worn a wire at the behest of the prosecution and had recorded

11  Petitioner's statements after their release from jail.

12      The state courts reasonably determined that Petitioner's

13  extra-judicial statements were not involuntary or obtained in

14  violation of <u>Miranda v. Arizona</u>; further, the record does not

15  foreclose the possibility that Petitioner's counsel had a

16  tactical reason for failing to object to Petitioner's statements

17  based on a desire to present to the jury a scenario involving a

18  self-inflicted wound.  Although Petitioner's statements present a

19  basis for an inference of consciousness of guilt, Petitioner's

20  delay in contacting authorities and other conduct on the night of

21  Bonham's death, including taking an overdose of medication,

22  independently warranted a strong inference of consciousness of

23  guilt.

24      Although the credibility of Sanchez was an important issue

25  in the case, the prosecutor's expression in argument of a

26  positive view of Sanchez's credibility took place in the context

27  of the prosecutor's evaluation of the evidence; it could

28  reasonably have been understood as relating to the evidence,

156

which foreclosed any pre-trial agreement between the prosecution and Sanchez for Sanchez's testimony or for other cooperation in the prosecution of Petitioner.  Although the prosecutor briefly identified herself with the plea bargaining process by use of the personal pronoun "we," independent evidence in the record supported a conclusion that plea agreements were recorded in writing in the pertinent case file, as distinct from existing in some inchoate or less concrete form, and that there had been no agreement with Sanchez.  The prosecutor's comments in argument did not raise any significant risk that the jurors would inappropriately defer to the prosecutor's opinion of Petitioner's credibility or would understand that some undisclosed, extra-record evidence warranted an inference of bias on the part of the Sanchez.  Further, in this instance, the prosecutor's argument did not undermine the defense, which had argued that Sanchez, who was on probation for five years, was "holding an ace," in that if and when Sanchez ever returned to the courthouse, he would tell his defense attorney that he had helped the prosecution in a murder case and should get something for it.  (RT 334.)   The Court emphasizes that the standard of review of claims concerning prosecutorial misconduct in proceedings pursuant to § 2254 is the narrow standard of due process, and not the broad exercise of supervisory power; even improper argument does not, per se, violate a defendant's constitutional rights.  Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (citing Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996)).  Here, even when viewed cumulatively, the prosecutor's statements did not render the proceedings unfair.

Further, although Sanchez's credibility was an important issue, the substance of Sanchez's testimony concerning what Petitioner told him was corroborated by substantial, independent evidence that was not a matter of public knowledge, including the fact that Bonham's husband had learned of her affair with Petitioner and was upset, the occurrence of a prior incident between Petitioner and Bonham's husband, Petitioner's separation from his wife and desire to reconcile with her, Petitioner's desire to conceal his affair from his wife, Bonham's having been shot with Petitioner's gun, Bonham's and Petitioner's having had sex on previous occasions, Bonham's wearing no underwear when she met Petitioner, and the fact that Petitioner had burned evidence to hide his relationship with Bonham.  Although Sanchez himself was a recidivist with a motive to better his situation with law enforcement, his testimony was consistent with the other evidence in the case, including physical evidence that reflected that Bonham was shot in the left side of her head, despite her being right-handed, with the angle of the bullet's path being unusual for a suicide.

Accordingly, it is concluded that Petitioner has not shown that cumulative error rendered the defense far less persuasive than it might otherwise have been, infected the trial with unfairness, or had a substantial and injurious effect or influence on the jury's verdict.  Petitioner has not shown any unreasonable application of clearly established federal law.

XII.   <u>Statutory Right to the Appointment of Counsel</u>

Petitioner argues that the MCSC denied his right under Cal. Pen. Code § 1405 and state court decisions for the appointment of

1  counsel in his state court habeas proceedings in connection with

2  an application for DNA testing of the victim's vaginal swab.

3  (FAP 57-58.)

4      In the traverse, Petitioner also argues that counsel should

5  have been appointed pursuant to Habeas Rule 6(a), which requires

6  a judge to appoint counsel if necessary for effective discovery

7  upon the Court's authorization of discovery with respect to

8  petitioners who qualify to have counsel appointed under 18 U.S.C.

9  § 3006A.[22]

10     Federal habeas relief is available to state prisoners only

11 to correct violations of the United States Constitution, federal

12 laws, or treaties of the United States.  28 U.S.C. § 2254(a).

13 Federal habeas relief is not available to retry a state issue

14 that does not rise to the level of a federal constitutional

15 violation.  Wilson v. Corcoran, 562 U.S. — , 131 S.Ct. 13, 16

16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Alleged

17 errors in the application of state law are not cognizable in

18 federal habeas corpus.  Souch v. Schaivo, 289 F.3d 616, 623 (9th

19 Cir. 2002).  Thus, it is established that federal habeas relief

20

21 ─────────────

22     [22] There currently exists no absolute right to appointment of
   counsel in habeas proceedings.  See e.g., Anderson v. Heinze, 258

23 F.2d 479, 481 (9th Cir.), cert. denied, 358 U.S. 889 (1958);
   Mitchell v. Wyrick, 727 F.2d 773 (8th Cir.), cert. denied, 469
   U.S. 823 (1984).

24     A Magistrate Judge may appoint counsel at any stage of a
   habeas corpus proceeding if the interests of justice require it.

25 18 U.S.C. § 3006A; Rule 8(c) of the Rules Governing Section 2254
   Cases.  A district court evaluates the likelihood of a

26 petitioner's success on the merits and the ability of a
   petitioner to articulate his claims pro se in light of the

27 complexity of the of the legal issues involved.  Weygandt v.
   Look, 718 F.2d 952, 954 (9th Cir. 1983).

28

is not available to redress procedural errors in the state collateral review process. Ortiz v. Stewart, 149 F.3d 923, 939 (9th Cir. 1998) (claim concerning the alleged bias of a judge in a second post-conviction proceeding for relief); Carriger v. Stewart, 95 F.3d 755, 763 (9th Cir. 1996), vacated on other grounds, Carriger v. Stewart, 132 F.3d 463 (1997) (Brady claim in post-conviction proceedings); Franzen v. Brinkman, 877 F.2d 26, 26 (9th Cir. 1989) (claim that a state court's delay in deciding a petition for post-conviction relief violated due process rights).

Accordingly, because Petitioner's state law claim concerning the denial of his request for appointment of counsel during the state collateral review process does not warrant relief in a proceeding pursuant to § 2254, the claim will be dismissed.

Petitioner's claim that the MCSC should have appointed counsel for Petitioner based on 18 U.S.C. § 3006A was first articulated in his traverse. (Doc. 98, 39-40.) It is improper to raise substantively new issues or claims in a traverse, and a court may decline to consider such matters; in order to raise new issues, a petitioner must obtain leave to file an amended petition or additional statement of grounds. Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994).

Here, the Court declines to consider Petitioner's claim insofar as it is based on federal statute. The Court further notes that there is no federal right to appointed counsel in state proceedings for discretionary collateral relief. Pennsylvania v. Finley, 481 U.S. 551, 555-57 (1987).

In summary, Petitioner's state law claim concerning the

160

1  appointment of counsel will be dismissed.

2      XIII.  <u>Insufficiency of the Evidence</u>

3          A.  <u>Exhaustion of State Court Remedies</u>

4      Citing <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), Petitioner

5  argues in the conclusion of his petition that his right to due

6  process of law was violated because the evidence was insufficient

7  to support his conviction of second degree murder.  (FAP 73.)

8      In the answer, Respondent contends that Petitioner failed to

9  exhaust his state court remedies as to this claim.  In the

10 traverse, Petitioner relies on 1) excerpts from the trial court

11 record which reflect trial counsel's motion pursuant to Cal. Pen.

12 Code § 1118.1 and the prosecutor's request that manslaughter

13 instructions be given; 2) a portion of the answer filed in the

14 first round of state habeas proceedings in the DCA (HC1-DCA) in

15 which the prosecution noted that the first information had been

16 set aside on grounds other than the insufficiency of the

17 evidence; and 3) Petitioner's citation of <u>Jackson v. Virginia</u>,

18 443 U.S. 307, 319 (1979) in a supplement to his habeas petition

19 filed in the California Supreme Court in the second round of

20 habeas proceedings (HC2-CASC, doc. 13).  (Trav., doc. 98, 40-41.)

21 In his supplement to the habeas petition filed in the

22 California Supreme Court, Petitioner incorporated the facts

23 previously set forth in his petition, which included a summary of

24 the evidence admitted at trial.  (LD 13, 40; LD 11, 3, a-1, 5-

25 11.)  Petitioner incorporated the additional grounds stated in

26 the petition and argued that the errors resulted in a

27 fundamentally unfair trial such that no reasonable judge or jury

28 would have convicted Petitioner of second degree murder.  (LD 13,

40.)  Petitioner also pointed to the objective test announced in
Jackson v. Virginia and stated that it allowed courts to vacate
verdicts "which no rational person, fully cognizant of the trial
record, and sufficiently brilliant to grasp the logical import of
its every nuance, 'could' have entered."  Id.  Petitioner further
cited to Schlup v. Delo, 513 U.S. 298, 330 (1995), in which the
Court distinguished an inquiry concerning actual innocence from
the Jackson standard and the nature of the test or inquiry for
sufficiency of the evidence.  (Id.)  Petitioner appended to the
citation a note to the effect that the Jackson standard focuses
on the objective power of the trier of fact to reach its
conclusion.

Fairly read, Petitioner's habeas petition and proposed
supplement to the petition (LD 13) set forth the factual and
legal basis of the claim and cite to federal authority in a
manner that makes it clear that Petitioner was raising a federal
claim regarding the insufficiency of the evidence in the trial
record to support a conviction of second degree murder.
Consistent with the Court's previous decision on the motion to
dismiss concerning exhaustion by a supplement or proposed
supplement (doc. 22, 5-7), the Court will consider the matter in
the proposed supplement as having been presented to the highest
state court, and the Court concludes that Petitioner exhausted
his state court remedies concerning the issue of the sufficiency
of the evidence to support Petitioner's conviction.

The California Supreme Court denied the petition without a
statement of reasoning or authority.  (LD 11.)  Nothing appears
to warrant departure from the presumption that the summary denial

1  of the petition was an adjudication on the merits pursuant to 28

2  U.S.C. § 2254(d), and thus, in order to prevail on this issue,

3  Petitioner must show that there was no reasonable basis for the

4  state court to deny relief.  <u>Harrington v. Richter</u>, 131 S.Ct. at

5  784-85.

6        B.  <u>Legal Standards</u>

7      To determine whether a conviction violates the

8  constitutional guarantees of due process of law because of

9  insufficient evidence, a federal court ruling on a petition for

10  writ of habeas corpus must determine whether any rational trier

11  of fact could have found the essential elements of the crime

12  beyond a reasonable doubt.  <u>Jackson v. Virginia</u>, 443 U.S. 307,

13  319, 20-21 (1979); <u>Windham v. Merkle</u>, 163 F.3d 1092, 1101 (9th

14  Cir. 1998); <u>Jones v. Wood</u>, 114 F.3d 1002, 1008 (9th Cir. 1997);

15  <u>Payne v. Borg</u>, 982 F.2d 335, 338 (9th Cir. 1993) (en banc).

16      All evidence must be considered in the light that is the

17  most favorable to the prosecution.  <u>Jackson</u>, 443 U.S. at 319;

18  <u>Jones</u>, 114 F.3d at 1008. It must be recognized that it is the

19  trier of fact's responsibility to resolve conflicting testimony,

20  weigh evidence, and draw reasonable inferences from the facts;

21  thus, it must be assumed that the trier resolved all conflicts in

22  a manner that supports the verdict.  <u>Jackson v. Virginia</u>, 443

23  U.S. at 319; <u>Jones</u>, 114 F.3d at 1008.  The relevant inquiry is

24  not whether the evidence excludes every hypothesis except guilt,

25  but rather whether the jury could reasonably arrive at its

26  verdict.  <u>United States v. Mares</u>, 940 F.2d 455, 458 (9th Cir.

27  1991).  Circumstantial evidence and the inferences reasonably

28  drawn therefrom can be sufficient to prove any fact and to

1  sustain a conviction, although mere suspicion or speculation does
2  not rise to the level of sufficient evidence. United States v.
3  Lennick, 18 F.3d 814, 820 (9th Cir. 1994); United States v.
4  Stauffer, 922 F.2d 508, 514 (9th Cir. 1990); see, Jones v. Wood,
5  207 F.3d 557, 563 (9th Cir. 2000). The court must base its
6  determination of the sufficiency of the evidence from a review of
7  the record. Jackson at 324.

8  The Jackson standard must be applied with reference to the
9  substantive elements of the criminal offense as defined by state
10  law. Jackson, 443 U.S. at 324 n.16; Windham, 163 F.3d at 1101.
11  Further, under the AEDPA, federal courts must apply the standards
12  of Jackson with an additional layer of deference. Juan H. v.
13  Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).

14  In California, second degree murder is the unlawful killing
15  of a human being with malice aforethought but without the
16  additional elements, such as use of specified means or proof of
17  additional mental states such as willfulness, premeditation, and
18  deliberation, that would support a conviction for first degree
19  murder. Cal. Pen. Code §§ 187(a), 189; People v. Knoller, 41
20  Cal.4th 139, 151 (2007). Malice may be either express, where
21  there is manifested a deliberate intention to take away the life
22  of a fellow creature, or implied, where there is an absence of
23  considerable provocation, or when the circumstances attending the
24  killing show an abandoned and malignant heart. Cal. Pen. Code
25  § 188. The test for implied malice was recently reaffirmed and
26  restated as follows:

27  Malice is implied when the killing is proximately
   caused by "'an act, the natural consequences of which
28  are dangerous to life, which act was deliberately

1   performed by a person who knows that his conduct
2   endangers the life of another and who acts with
    conscious disregard for life.'" (*People v. Phillips,*
3   *supra,* at p. 587, 51 Cal.Rptr. 225, 414 P.2d 353.)
    In short, implied malice requires a defendant's
4   awareness of engaging in conduct that endangers
    the life of another--no more, and no less.

5   <u>People v. Knoller</u>, 41 Cal.4th at 143.

6       Further, the defendant must have actually and proximately

7   caused the death by engaging in an act or omission that set in

8   motion a chain of events that produced as a direct, natural and

9   probable consequence of the act or omission the death of the

10  decedent, and without which the death would not have occurred.

11  <u>People v. Cervantes</u>, 26 Cal.4th 860, 866 (2001).  Where the death

12  results directly from the act of a defendant, the defendant may

13  be criminally responsible even though there is another

14  contributing cause.  <u>Id.</u> at 866-67.

15                        C.  <u>Analysis</u>

16      The evidence admitted at trial has been previously

17  summarized in detail.  The victim, who had been involved with

18  Petitioner in an affair which he perceived to be jeopardizing his

19  marriage and causing him severe emotional stress, died in

20  Petitioner's car and in Petitioner's presence as a result of a

21  gunshot wound that was inflicted by Petitioner's gun at close

22  range.  The evidence concerning the victim's sophistication with

23  firearms and her upbeat state of mind, as well as the physical

24  evidence and related expert opinion evidence, warranted an

25  inference that the fatal wound was not self-inflicted.  This

26  evidence, considered along with Petitioner's conduct after the

27  shooting, including the inconsistent statements concerning the

28  details and nature of the shooting, the extended delay in calling

1  authorities, and the admitted destruction of evidence, warranted

2  an inference of consciousness of guilt.  A rational trier of fact

3  could have found that Petitioner had fired the weapon and thereby

4  caused the victim's death.  Where a defendant intentionally fires

5  a gun at a victim at close range, California courts have found

6  sufficient evidence of implied malice because such an act is

7  dangerous to human life and presents a high probability of death.

8  See, People v. Woods, 226 Cal.App.3d 1037, 1048 (1991).

9  Consideration of Sanchez's testimony further warranted an

10 inference that Petitioner intentionally killed the victim.

11     The Court concludes that a rational trier of fact could have

12 concluded from the evidence presented at Petitioner's trial that

13 Petitioner committed second degree murder as defined by

14 California law.

15     Accordingly, Petitioner has not shown that the decision of

16 the state court denying Petitioner's petition for writ of habeas

17 corpus on the ground of insufficiency of the evidence resulted in

18 an unreasonable application of clearly established precedent from

19 the United States Supreme Court.

20        XIV.  Petitioner's Request for an Evidentiary Hearing

21            A.  Legal Standards

22     Petitioner requests an evidentiary hearing.  (FAP 12.)

23     The decision to grant an evidentiary hearing is generally a

24 matter left to the sound discretion of the district courts.  28

25 U.S.C. § 2254; Habeas Rule 8(a); Schriro v. Landrigan, 550 U.S.

26 465, 473 (2007).  To obtain an evidentiary hearing in federal

27 court under the AEDPA, a petitioner must allege a colorable claim

28 by alleging disputed facts which, if proved, would entitle him to

1  relief.  Schriro v. Landrigan, 550 U.S. at 474.

2      The determination of entitlement to relief is in turn

3  limited by 28 U.S.C. § 2254(d)(1), which requires that for one to

4  obtain relief with respect to a claim adjudicated on the merits

5  in state court, the adjudication must result in a decision that

6  was either contrary to, or an unreasonable application of,

7  clearly established federal law.  Schriro v. Landrigan, 550 U.S.

8  at 474.  Further, in analyzing a claim pursuant to § 2254(d)(1),

9  a federal court is limited to the record that was before the

10  state court that adjudicated the claim on the merits.  Cullen v.

11  Pinholster, 131 S.Ct. at 1398.  Thus, in undertaking the analysis

12  pursuant to § 2254(d)(1) in this order, the Court has considered

13  only the evidence in the state court record.

14      It follows from the limitations imposed by the governing

15  statute that when a state court record precludes habeas relief

16  under the limitations set forth in § 2254(d), a district court is

17  not required to hold an evidentiary hearing.  Cullen v.

18  Pinholster, 131 S.Ct. at 1399 (citing Schriro v. Landrigan, 550

19  U.S. 465, 474 (2007)).  An evidentiary hearing may be granted

20  with respect to a claim adjudicated on the merits in state court

21  where the petitioner satisfies § 2254(d)(1), or where §

22  2254(d)(1) does not apply, such as where the claim was not

23  adjudicated on the merits in state court.  Cullen v. Pinholster,

24  131 S.Ct. at 1398, 1400-01.

25      An evidentiary hearing is not required where the state court

26  record resolves the issues, refutes the application's factual

27  allegations, or otherwise precludes habeas relief.  Schriro v.

28  Landrigan, 550 U.S. at 474.  No evidentiary hearing is required

1  for claims based on conclusory allegations.  <u>Campbell v. Wood</u>, 18

2  F.3d 662, 679 (9th Cir. 1994).  Likewise, an evidentiary hearing

3  is not required if the claim presents a purely legal question,

4  there are no disputed facts, or the state court has reliably

5  found the relevant facts.  <u>Beardslee v. Woodford</u>, 358 F.3d 560,

6  585-86 (9th Cir. 2004); <u>Hendricks v. Vasquez</u>, 974 F.2d 1099, 1103

7  (9th Cir. 1992).

8       Evidentiary hearings have been authorized where the

9  petitioner satisfied § 2254(d)(2) by showing that the state

10 court's decision was an unreasonable determination of the facts

11 in light of the evidence presented to the state court.  <u>Earp v.</u>

12 <u>Ornoski</u>, 431 F.3d 1158, 1166-67 (9th Cir. 2005).  Pursuant to

13 factors set forth in <u>Townsend v. Sain</u>, 372 U.S. 293, 313 (1963),

14 a petitioner is entitled to an evidentiary hearing if the

15 petitioner can show that 1) the merits of the factual dispute

16 were not resolved in the state hearing; 2) the state factual

17 determination is not fairly supported by the record as a whole;

18 3) the fact-finding procedure employed by the state was not

19 adequate to afford a full and fair hearing; 4) there is a

20 substantial allegation of newly discovered evidence; 5) the

21 material facts were not adequately developed at the state court

22 hearing, or 6) for any reason it appears that the state trier of

23 fact did not afford the habeas applicant a full and fair hearing.

24 <u>Earp v. Ornoski</u>, 431 F.3d at 1166-67.

25       B.  <u>Analysis</u>

26       The foregoing analysis of Petitioner's claims that were

27 adjudicated on the merits in state court proceedings was based on

28 the state court record and demonstrates that habeas corpus relief

1   is foreclosed pursuant to § 2254(d)(1).  Petitioner has not shown

2   that with respect to the claims that were adjudicated on the

3   merits in state court proceedings, an adjudication resulted in a

4   decision that was either contrary to, or involved an unreasonable

5   application of, clearly established federal law as determined by

6   the Supreme Court.  Further, Petitioner has not demonstrated that

7   any adjudication resulted in a decision that was based on an

8   unreasonable determination of the facts in light of the evidence

9   presented in the sate court proceedings.  When a state court

10  record precludes habeas relief under the limitations set forth in

11  § 2254(d), a district court is not required to hold an

12  evidentiary hearing.  Cullen v. Pinholster, 131 S.Ct. at 1399

13  (citing Schriro v. Landrigan, 550 U.S. 465, 474 (2007)).  Thus,

14  as to these claims, Petitioner's request for an evidentiary

15  hearing will be denied.

16       Some of Petitioner's claims were determined by state courts

17  to have been procedurally defaulted; further, as to some of these

18  claims, the state courts also appeared to have considered the

19  merits of the claims.  For the purpose of analyzing Petitioner's

20  request for an evidentiary hearing, it will be assumed that the

21  claims that were found to have been subject to a procedural

22  default in state courts were not adjudicated on the merits and

23  that § 2254(d)(1) does not apply to such claims in the present

24  context of this Court's review.

25       With respect to Petitioner's claim concerning prosecutorial

26  misconduct, the claim concerns the prosecutor's conduct at trial

27  during argument to the jury.  Thus, by its nature, the claim is

28  limited to the state court record, and there are no disputed

1  facts.  Further, as the foregoing analysis of the claim shows,

2  denial of the claim would not have been based on an unreasonable

3  determination of the facts in light of the evidence in the state

4  court record.  Thus, Petitioner has not shown entitlement to an

5  evidentiary hearing with respect to this claim.

6      Likewise, the ineffective assistance of counsel claims based

7  on failure to raise these arguments would not warrant an

8  evidentiary hearing.  See, Beardslee v. Woodford, 358 F.3d 560,

9  585-86 (9th Cir. 2004) (holding it was not an abuse of discretion

10 to deny an evidentiary hearing concerning a claim of ineffective

11 assistance of counsel by failing to object to alleged

12 prosecutorial misconduct that was fully evident in the trial

13 record).

14     With respect to Petitioner's claim of a due process

15 violation based on the prosecution's failure to disclose that

16 Sanchez was working for the prosecution and recording

17 Petitioner's conversations after his release, Petitioner did not

18 submit sufficient specific facts that, if proved, would entitle

19 him to relief.  Petitioner submitted unsworn material, including

20 an unauthenticated letter from an anonymous source, which

21 contained conclusional statements in place of factual

22 allegations.  Further, Petitioner has not shown that pursuant to

23 § 2254(d)(2), the state court decision resulted in an

24 unreasonable determination of the facts in light of the evidence

25 presented in the state court proceeding.  Petitioner's request

26 for an evidentiary hearing as to this claim will be denied.

27     As to Petitioner's Brady claim concerning the alleged non-

28 disclosure of the test result concerning acid phosphatase in the

1  vaginal swab, even if it were assumed that the report was not

2  disclosed to defense counsel, the report was nevertheless not

3  material.  It has not been shown that had the report been

4  disclosed, it was reasonably probable that the result of the

5  proceeding would have been different.  The non-disclosure would

6  not have undermined confidence in the outcome of the trial

7  proceedings.  Thus, Petitioner did not allege any disputed facts

8  which, if proved, would have entitled him to relief.

9  Accordingly, the request for an evidentiary hearing concerning

10 this claim will be denied.

11     Petitioner's claim or claims concerning trial counsel's

12 failure to investigate Sanchez and discover his possession of

13 drugs in jail and the related report likewise does not warrant an

14 evidentiary hearing.  Petitioner did not show that but for

15 counsel's errors, it was reasonably probable that the result of

16 the proceeding would have been different.  Thus, the facts

17 alleged by Petitioner would not have entitled him to relief.

18     In summary, Petitioner's request for an evidentiary hearing

19 will be denied.

20     XV.   <u>Request for DNA Testing</u>

21     Petitioner requests that DNA testing be done on the victim's

22 vaginal swab to determine whose bodily fluids were present.

23 (Trav., 18-19 n.2.)  Petitioner speculates that the prosecution

24 failed to perform such a test because it was known that the

25 victim had engaged in sexual relations with her estranged husband

26 on the day of her death.  Petitioner contends that the testing

27 will show that Bonham was suicidal and killed herself, and thus,

28 it will establish his innocence.

1  Petitioner's request is new matter appearing for the first
2  time in the traverse.  Petitioner did not exhaust a claim
3  concerning DNA testing in the state courts.  Further, in light of
4  the limitations of § 2254(d)(1), Petitioner has not established
5  that this Court would have the authority to consider such new
6  evidence in relation to any of the claims that are presently
7  before the Court in the FAP.

8  Accordingly, Petitioner's request for DNA testing will be
9  denied.

10  XVI.  <u>Certificate of Appealability</u>

11  Unless a circuit justice or judge issues a certificate of
12  appealability, an appeal may not be taken to the Court of Appeals
13  from the final order in a habeas proceeding in which the
14  detention complained of arises out of process issued by a state
15  court.  28 U.S.C. § 2253(c)(1)(A); <u>Miller-El v. Cockrell</u>, 537
16  U.S. 322, 336 (2003).  A certificate of appealability may issue
17  only if the applicant makes a substantial showing of the denial
18  of a constitutional right.  § 2253(c)(2).  Under this standard, a
19  petitioner must show that reasonable jurists could debate whether
20  the petition should have been resolved in a different manner or
21  that the issues presented were adequate to deserve encouragement
22  to proceed further.  <u>Miller-El v. Cockrell</u>, 537 U.S. at 336
23  (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)).  A
24  certificate should issue if the Petitioner shows that jurists of
25  reason would find it debatable whether the petition states a
26  valid claim of the denial of a constitutional right or that
27  jurists of reason would find it debatable whether the district
28  court was correct in any procedural ruling.  <u>Slack v. McDaniel</u>,

172

1  529 U.S. 473, 483-84 (2000).

2     In determining this issue, a court conducts an overview of
3  the claims in the habeas petition, generally assesses their
4  merits, and determines whether the resolution was debatable among
5  jurists of reason or wrong.  Id.  It is necessary for an
6  applicant to show more than an absence of frivolity or the
7  existence of mere good faith; however, it is not necessary for an
8  applicant to show that the appeal will succeed.  Miller-El v.
9  Cockrell, 537 U.S. at 338.

10     A district court must issue or deny a certificate of
11  appealability when it enters a final order adverse to the
12  applicant.  Rule 11(a) of the Rules Governing Section 2254 Cases.

13     Here, it does not appear that reasonable jurists could
14  debate whether the petition should have been resolved in a
15  different manner.  Petitioner has not made a substantial showing
16  of the denial of a constitutional right.

17     Accordingly, the Court will decline to issue a certificate
18  of appealability.

19     XVII.  Disposition

20     In summary, Petitioner has not shown that he is entitled to
21  habeas corpus relief pursuant to 28 U.S.C. § 2254.  The first
22  amended petition for writ of habeas corpus will be denied.

23     Accordingly, it is ORDERED that:

24     1)  Pursuant to Fed. R. Civ. P. 25(d), Acting Warden P. D.
25  Brazelton is SUBSTITUTED as Respondent; and

26     2)  Petitioner's state law claim concerning the appointment
27  of counsel is DISMISSED because it is not cognizable in a
28  proceeding pursuant to § 2254; and

1    3)   Petitioner's request for an evidentiary hearing is

2  DENIED; and

3    4)   Petitioner's request for DNA testing is DENIED; and

4    5)   The first amended petition for writ of habeas corpus is

5  DENIED; and

6    6)   The Clerk is DIRECTED to enter judgment for Respondent;

7  and  7)   The Court DECLINES to issue a certificate of

8  appealability.

9

10  IT IS SO ORDERED.

11  **Dated:    July 25, 2012**                      **/s/ Sandra M. Snyder**
                                         UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28